1 | ROBBINS GELLER RUDMAN
& DOWD LLP
2 | DAVID C. WALTON (167268)
BRIAN E. COCHRAN (286202)
3 | 655 West Broadway, Suite 1900
San Diego, CA  92101-8498
4 | Telephone:  619/231-1058
619/231-7423 (fax)
5 | davew@rgrdlaw.com
bcochran@rgrdlaw.com
6 | – and –
SAMUEL H. RUDMAN
7 | 58 South Service Road, Suite 200
Melville, NY  11747
8 | Telephone:  631/367-7100
631/367-1173 (fax)
9 | srudman@rgrdlaw.com

10 | Attorneys for Plaintiff

11 | [Additional counsel appear on signature page.]

12 | UNITED STATES DISTRICT COURT

13 | SOUTHERN DISTRICT OF CALIFORNIA

14 | CHARTER TOWNSHIP OF CLINTON )  Case No.  **'16 CV 0685 BTM BGS**
POLICE AND FIRE RETIREMENT )
15 | SYSTEM, Individually and on Behalf of )
All Others Similarly Situated, )  CLASS ACTION
16 | )
Plaintiff, )  COMPLAINT FOR VIOLATION OF
17 | )  THE FEDERAL SECURITIES LAWS
vs. )
18 | )
LPL FINANCIAL HOLDINGS INC., )
19 | MARK S. CASADY and MATTHEW J. )
AUDETTE, )
20 | )
Defendants. )  DEMAND FOR JURY TRIAL
21 | _____ )

Plaintiff Charter Township of Clinton Police and Fire Retirement System, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by LPL Financial Holdings Inc. ("LPL" or the "Company"), as well as media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of LPL common stock between December 8, 2015 and February 11, 2016, inclusive (the "Class Period"), against LPL and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Defendant LPL is an independent broker-dealer, a custodian for registered investment advisors ("RIAs") and an independent consultant to retirement plans.  The Company provides a platform of brokerage and investment advisory services to independent financial advisors enabling them to provide their retail investors with financial and investment advice.  The Company generates revenues primarily from fees and commissions on clients' brokerage and advisory assets.

3.      Prior to 2010, LPL was majority owned by TPG Capital ("TPG") and Hellman & Friedman LLC ("Hellman & Friedman"), two private equity firms.  In November 2010, these private equity firms took LPL public in an initial public offering ("IPO") in which 15.7 million LPL shares were sold to the public at $30 per share.

4.      After the IPO, TPG retained a substantial ownership stake in the Company and influence over its affairs.  For example, two TPG partners, Richard Boyce and Richard Schifter, served as directors of the Company.  LPL has also identified TPG as a "related party" in SEC filings and stated that it has continued to enter into various related-party transactions with TPG and certain of TPG's portfolio companies since the IPO.  As of December 31, 2014, TPG owned approximately 13% of the outstanding shares of LPL common stock.  LPL's annual report on Form 10-K for fiscal 2014 stated that as a result of this ownership interest, ***TPG "will continue to be able to influence our decisions***, regardless of whether or not other stockholders believe that the transaction is in their own best interests."

5.      Following the IPO, the Company became the subject of several regulatory and governmental investigations into allegedly fraudulent, deceptive and/or legally deficient business practices at LPL and among its network of financial advisors.  For example:

- In February 2013 it was announced that LPL had settled allegations by Massachusetts securities regulators that it had failed to adequately supervise its brokers who sold investments in non-traded real estate investment trusts ("REITs") for $2.5 million.

- In May 2015 the Financial Industry Regulatory Authority ("FINRA") announced that it had sanctioned LPL $11.7 million for "[w]idespread [s]upervisory [f]ailures [r]elated to [c]omplex [p]roduct [s]ales, [t]rade [s]urveillance and [t]rade [c]onfirmations [d]elivery."

- In September 2015 it was announced that LPL had agreed to pay $1.8 million to settle charges by the Massachusetts Attorney General that it had improperly sold and marketed risky exchange-traded funds ("ETFs") to retail investors.

- Also in September 2015, it was announced that LPL had agreed to remediate investor losses and pay $1.425 million in civil penalties to regulators in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands for its alleged failure to implement an adequate supervisory system regarding its sale of non-traded REITs and its failure to enforce its written procedures regarding the sale of non-traded REITs.

6.      On October 29, 2015, LPL announced its third quarter fiscal 2015 financial results.  LPL reported adjusted earnings per share ("EPS") for the quarter of $0.55 per share, above consensus analyst estimates, and stated that it expected to

move on from its regulatory problems with "meaningfully lower" regulatory-related charges going forward.  It also announced that it would be implementing a new "capital management plan to create greater shareholder value."  Key to this plan was a $500 million share repurchase program authorized by LPL's board of directors (the "Board").  The Company stated that in order to pay for this share repurchase it planned to significantly increase its leverage from a target ratio in the range of two to three times net debt-to-earnings before interest, taxes, depreciation and amortization ("EBITDA") to a target ratio of four times net debt-to-EBITDA.  On a conference call to discuss the quarterly results, defendant Mark S. Casady ("Casady"), LPL's Chief Executive Officer ("CEO") and Chairman of the Board, stated that the share buyback was a "***bargain***," as he believed LPL shares were trading "***at a significant discount to what we believe is their intrinsic value***."  Defendant Matthew J. Audette ("Audette"), LPL's Chief Financial Officer ("CFO"), meanwhile stated that increasing the Company's leverage to a four times net debt-to-EBITDA ratio is "***what makes the most sense today***," and that LPL would only exceed the four times net debt-to-EBITDA ratio if there were "***very good returns to justify doing so***."

7.     Also on October 29, 2015, national credit rating agency Moody's Investors Service, Inc. ("Moody's") downgraded LPL's corporate credit rating to Ba3 from Ba2 as a result of the Company's announced share repurchase plan and expected leverage increases.

8.     On November 24, 2015, LPL issued a press release announcing that it had entered into $700 million of new term loans due November 20, 2022 and had extended $631 million of existing term loans to March 29, 2021 in order to pay for a $250 million accelerated share repurchase plan.  As a result of the debt transaction, the Company stated its net target leverage had increased to a 3.7 times net debt-to-EBITDA ratio, and that it would breach its credit covenants if its leverage exceeded a five times net debt-to-EBITDA ratio.  In connection with the transaction, the Company incurred $21 million of debt issuance costs and its total weighted average

1  interest rate for debt outstanding increased from 3.1% to 3.9%.  The Company also
2  announced that it had entered into an agreement with Goldman, Sachs & Co.
3  ("Goldman") whereby it would pay Goldman $250 million to carry out the accelerated
4  share repurchase on LPL's behalf.  The press release stated that LPL estimated the
5  accelerated share repurchase "*will take several months to complete*."

6      9.      Analysts widely panned the debt transaction as unfavorably increasing
7  LPL's cost of debt.  For example, following the announcement a UBS analyst lowered
8  LPL's stock price target based on what were viewed as "[u]nattractive [d]ebt [t]erms."
9  Another analyst at Susquehanna Financial Group put things more bluntly, writing the
10 "*Transaction Does Not Make Economic Sense*."

11     10.     On December 2, 2015, LPL announced that it would be presenting at a
12 financial services conference sponsored by Goldman on December 8, 2015.  Around
13 this time, TPG approached Goldman about cashing out a significant portion of its LPL
14 stock as part of the accelerated share repurchase program.

15     11.     At the December 8, 2015 conference and in the related slide presentation,
16 defendants Casady and Audette made false and misleading statements regarding
17 LPL's business, prospects and financial results.  Specifically, defendants provided a
18 near-end-of-quarter financial update for LPL stating, among other false and
19 misleading statements, that:

20         (a)     LPL had an "*earnings stream that is quite steady*," and the
21 Company had been "*executing it all well*" over "the last two months," when in fact
22 quarterly adjusted earnings and net income would be down 46% and 45% year over
23 year, respectively;

24         (b)     LPL was in the midst of a "*recovery*" and had experienced a "*nice
25 rebound*" in client assets since the end of the third quarter,  specifically highlighting
26 $483 billion in client assets at the end of October 2015, when in fact client assets had
27 deteriorated and would actually decline by billions of dollars by quarter end;

28

(c)     gross profits would likely decline **only *"slightly on a sequential basis*,"** when in fact LPL would experience its worst sequential gross profit decline in four years;

(d)     commission revenues were "slow" but would be "***more of the same that we saw in the third quarter***," when in fact alternative investment revenues (including investment categories in which LPL had paid substantial regulatory fines, settlements and penalties) would drop a staggering 75% year-over-year;

(e)     the Company was "***still on track***" to meet its general and administrative ("G&A") expenses for the year, but would in fact have higher non-G&A expenses, including $8 million in regulatory-related charges and $22.5 million in depreciation and amortization costs (a 37% sequential increase); and

(f)     the recently announced share repurchase plan was the "***best use***" of the Company's capital because of the then-current "price" of LPL's common stock, when in fact defendants knew that LPL's stock price was artificially inflated and if the truth had been disclosed LPL would have suffered a negative share price decline, and thus its proposed share repurchase was a wasteful and inefficient use of Company capital that also increased the risk that LPL would violate the leverage covenants in its credit agreements.

12.     As a result of defendants' false statements, LPL common stock traded at artificially inflated prices during the Class Period, with its shares reaching a high of $45.06 per share on December 8, 2015, the day of the conference.

13.     On December 10, 2015, LPL issued a press release announcing the early completion of its accelerated share repurchase program, stating that TPG had "approached Goldman about selling a block of shares, providing the opportunity to settle the [accelerated share repurchase program] more quickly." TPG sold 4.3 million shares of LPL common stock at $43.27 per share to Goldman to be delivered to the Company through the accelerated share repurchase program. As a result, TPG generated approximately ***$187 million*** in insider sales proceeds. The release stated

that TPG had approached Goldman as it was "buying the Company's shares" for the accelerated share repurchase program, a process which began prior to defendants' December 8, 2015 conference.

14.     On February 11, 2016, LPL issued a press release announcing its fourth quarter and full year 2015 financial results.  The Company reported results that fell well below analyst's estimates.  For example, LPL stated that it had generated only $0.37 per share in adjusted EPS, well below consensus analyst estimates of $0.51 per share.  The Company also stated that client assets at quarter end totaled only $476 billion, $7 billion below the amount of client assets touted at the December 8, 2015 conference.  The Company also revealed disappointing revenues, primarily as a result of dramatically lower commission revenues and revenues from alternative investments, as well as higher-than-expected expenses for the quarter.

15.     As a result of this news, the price of LPL common stock dropped $8.76 per share to close at $16.50 per share on February 12, 2016, a one-day decline of nearly 35% on unusually high trading volume of over 11.4 million shares.  Analysts described the results as "[u]gly" and noted a "lack of confidence in management," with some expressing concern over the Company's substantially increased leverage and ability to remain under its maximum leverage ratio as required by its revised credit agreements.

16.     Notably, if TPG had sold the same 4.3 million shares of LPL stock to the Company at the February 12, 2016 closing price, its sale proceeds would have been diminished by approximately ***$115 million***.  By the same token, if LPL had waited to purchase shares from TPG until after announcing its fourth quarter results, it could have purchased the same number of shares from TPG for $115 million less.  Thus, its purchase from TPG of LPL shares at $43.27 per share was a wasteful and inefficient use of Company capital.  The following chart illustrates defendants' fraudulent scheme to allow TPG to cash out at artificially inflated price before LPL's true business, prospects and financial results were revealed:





17.    As a result of defendants' false statements, LPL common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's common stock was hammered by massive sales, sending the price of the Company's stock down 63% from its Class Period high and causing economic harm and damages to class members.  TPG, meanwhile, avoided tens of millions of dollars in investment losses and pocketed $187 million in insider sales proceeds.

## JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

20.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  LPL also maintains primary offices in this District and has publicly stated that defendant Audette will be based out of this District.

21.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

**PARTIES**

22.     Plaintiff Charter Township of Clinton Police and Fire Retirement System acquired LPL common stock as set forth in the attached certification and has been damaged thereby.

23.     Defendant LPL is an independent broker-dealer, a custodian for RIAs and an independent consultant to retirement plans.  The Company maintains offices at 4707 Executive Drive, San Diego, California 92121.

24.     Defendant Casady is, and at all relevant times was, the Company's Chairman of the Board and CEO.

25.     Defendant Audette is, and at all relevant times was, the Company's CFO.

26.     The defendants referenced above in ¶¶24-25 are referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements which caused the price of LPL common stock to be artificially inflated during the Class Period.

27.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LPL's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  They also participated in conference calls with securities analysts and investors in which they made materially misleading statements and omissions and held themselves out to be knowledgeable on the topics which they discussed.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS

28.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about LPL.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of LPL common stock was a success, as it: (i) deceived the investing public regarding LPL's prospects and business; (ii) artificially inflated the price of LPL common stock; and (iii) caused plaintiff and other members of the Class (as defined below) to purchase LPL common stock at inflated prices.

## BACKGROUND

29.     LPL, together with its subsidiaries, provides an integrated platform of brokerage and investment advisory services to independent financial advisors and financial advisors at financial institutions in the United States.  Its brokerage offerings include variable and fixed annuities, mutual funds, equities, retirement and 529 education savings plans, fixed income products, insurance and alternative investments. LPL's insurance offerings comprise personalized advance case design, point-of-sale service, and product support for a range of life, disability, and long-term care products. The Company also offers fee-based advisory platforms and support, which

provide access to no-load/load-waived mutual funds, ETFs, stocks, bonds, conservative option strategies, unit investment trusts, institutional money managers, and no-load multi-manager variable annuities. In addition, it offers cash sweep programs and retirement solution, a fee-based service that allows qualified advisors to provide consultation and advice. Further, it provides other services comprising tools and services enabling advisors to maintain and grow their practices and custodial services to trusts for estates and families. The Company offers its services to approximately 14,000 independent financial advisors, including financial advisors at approximately 700 financial institutions.

30.     The majority of LPL's revenue streams fall into two categories: commission revenues and advisory revenues. For fiscal 2014, commission revenues and advisory revenues generated 48% and 31%, respectively, of LPL's total net revenues. Commission revenues derive from upfront advisor fees and commissions for investment products and, for certain products, a trailing commission. Advisory revenues derive from fee-based advisory platforms and the provision of ongoing investment advisory services. For fiscal 2014, 68% of LPL's revenue was recurring in nature, providing the Company substantial visibility into its future revenue streams. In addition, for transaction-based commissions, the Company generates revenues "at the point of sale," providing the Company with further visibility into its commission-based revenues at a given point in time. LPL also has significant visibility into its depreciation and amortization expenses. These expenses are computed by taking the book values of long-lived assets, such as internally developed software, leasehold improvements, computers and software, and furniture and equipment (recorded at historical cost and reduced by accumulated depreciation and amortization), and then dividing those assets on a straight-line basis over the estimated useful lives of the assets – all things readily determined and anticipated and under the control of management.

31.    Prior to 2010, LPL was majority owned by TPG and Hellman & Friedman, two private equity firms that owned a combined 72% stake in the Company.  In November 2010, these private equity firms took LPL public in an IPO in which 15.7 million LPL shares were sold to the public at $30 per share.

32.    Even after the IPO, TPG retained a substantial ownership stake in the Company and influence over its affairs.  For example, two TPG partners, Richard Boyce and Richard Schifter, served as directors of the Company.  While Boyce and Schifter retired from their positions with TPG in 2013, they remained on the Board throughout the relevant time frame and kept in close contact with TPG.  LPL has also identified TPG as a "related party" in SEC filings, and stated that it has continued to enter into various related-party transactions with TPG and certain of TPG's portfolio companies since the IPO.  As of December 31, 2014, TPG owned approximately 13% of the outstanding shares of LPL common stock.  LPL's annual report on Form 10-K for fiscal 2014 stated that as a result of this ownership interest, ***TPG "will continue to be able to influence our decisions***, regardless of whether or not other stockholders believe that the transaction is in their own best interests."

33.    Following the IPO, LPL became the subject of several regulatory and governmental investigations into allegedly fraudulent, deceptive and/or legally deficient business practices at the Company and among its network of financial advisors.  For example:

- In February 2013 it was announced LPL had settled allegations by Massachusetts securities regulators that it had failed to adequately supervise its brokers who sold investments in non-traded REITs for $2.5 million.

- In May 2015 FINRA announced that it had sanctioned LPL $11.7 million for "[w]idespread [s]upervisory [f]ailures [r]elated to [c]omplex [p]roduct [s]ales, [t]rade [s]urveillance and [t]rade [c]onfirmations [d]elivery."

- In September 2015 it was announced that LPL had agreed to pay $1.8 million to settle charges by the Massachusetts Attorney General that it had improperly sold and marketed risky ETFs to retail investors.

- • Also in September 2015, it was announced that LPL had agreed to remediate investor losses and pay $1.425 million in civil penalties to regulators in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands for its alleged failure to implement an adequate supervisory system regarding its sale of non-traded REITs and its failure to enforce its written procedures regarding the sale of non-traded REITs.

34. On October 29, 2015, LPL financial announced its third quarter fiscal 2015 financial results. LPL reported adjusted EPS for the quarter of $0.55 per share, above consensus analyst estimates, and stated that it expected to move on from its regulatory problems with "meaningfully lower" regulatory-related charges going forward. It also announced that it would be implementing a new "capital management plan to create greater shareholder value." Key to this plan was a $500 million share repurchase program authorized by the Board. The Company stated that in order to pay for this share repurchase it planned to significantly increase its target leverage ratio from a range of two to three times net debt-to-EBITDA to a ratio of four times net debt-to-EBITDA. On a conference call to discuss the quarterly results, defendant Casady stated that the share buyback was a "**bargain**," as he believed LPL shares were trading "**at a significant discount to what we believe is their intrinsic value**." Defendant Audette meanwhile stated that increasing the Company's leverage to a four times net debt-to-EBITDA ratio is "**what makes the most sense today**," and that LPL would only go above the four times debt-to-EBITDA ratio if there were "**very good returns to justify doing so**."

35. Also on October 29, 2015, national credit rating agency Moody's downgraded LPL's corporate credit rating to Ba3 from Ba2 as a result of "increased credit risk" following the Company's announced share repurchase plan and expected leverage increases.

36. On November 24, 2015, LPL issued a press release announcing that it had entered into $700 million of new term loans due November 20, 2022 and had extended $631 million of existing term loans to March 29, 2021 in order to pay for a $250 million accelerated share repurchase plan. As a result of the debt transaction, the

Company stated its net target leverage had increased to a 3.7 times net debt-to-EBITDA ratio, and that it would breach its revised credit covenants if its leverage exceeded a five times net debt-to-EBITDA ratio. In connection with the transaction, the Company incurred $21 million of debt issuance costs and its total weighted average interest rate for debt outstanding increased from 3.1% to 3.9%. The Company also announced that it had entered into an agreement with Goldman whereby it would pay Goldman $250 million to carry out the accelerated share repurchase on LPL's behalf. The press release stated that LPL estimated the accelerated share repurchase "*will take several months to complete*."

37. Analysts widely panned the debt transaction as unfavorably increasing LPL's cost of debt. For example, following the announcement a UBS analyst lowered LPL's stock price target based on what were viewed as "[u]nattractive [d]ebt [t]erms." Another analyst at Susquehanna Financial Group put things more bluntly, writing the "*Transaction Does Not Make Economic Sense*."

38. On December 2, 2015, LPL announced that it would be presenting at a financial services conference sponsored by Goldman on December 8, 2015. This was around the same time TPG approached Goldman to discuss cashing out a significant portion of its LPL stock through the accelerated share repurchase program.

**FALSE AND MISLEADING STATEMENTS**
**ISSUED DURING THE CLASS PERIOD**

39. At the December 8, 2015 conference and in the related slide presentation, defendants Casady and Audette made false and misleading statements regarding LPL's business, prospects and financial results. For example, in response to an analyst question about how LPL would "turn the page" on its recent regulatory problems, defendant Casady stated that "execut[ing]" the share repurchase would be "key."

40. The analyst also asked defendant Audette what he had seen in his short time with the Company, having only joined as CFO in September 2015. Audette

responded by again highlighting the share repurchase capital plan, claiming that it was "in the best interest of shareholders," and stating that he had witnessed a Company that was a "lot more powerful and compelling than I thought from the outside," with "an earnings stream that is quite steady and produces cash flow over time," and that LPL had been "executing it all well" since he had come on board:

> But, now, being here, a little bit over two months, spending a lot of time with the team just getting up to speed on what our offering is, and starting to think through our key customer and client; the advisor running a small advisory shop in their hometown area and thinking through we've got the ability to have them offer brokerage services through us, to offer advisory services, whether I'm a small firm that wants [to] utilize our compliance work and regulatory work on the corporate side, or if I'm a bigger player and I want to utilize the overall hybrid platform and have both brokerage and independent advisory. ***Being here for these two months and spending a lot of time, I wouldn't say it was a surprise because it was expected, but I think it's a lot more powerful and compelling than I thought from the outside***.

> Third, and what Mark kind of hinted to on the capital plan side, being at a place where there's a lot less approvals necessary to go ***execute on a capital plan in the best interest of shareholders***. So, the way we speak about it, a capital-lite ***model, an earnings stream that is quite steady and produces cash flow over time***. Hopefully, the last two months have shown that that opportunity absolutely was there. ***We're executing it all well***.

41. Defendant Audette continued by giving a mid-quarter update that concealed the amount and extent of LPL's gross profit, earnings and revenue declines and non-G&A expense growth, claiming LPL was in the midst of a "recovery" with client assets experiencing a "nice rebound" since the end of the third quarter:

> I would say, very broadly, we say ***more of the same that we saw in the third quarter***. Just the very top bullet point, we did see market levels and asset levels recover nicely. Those of you that I'm sure follow closely, September 30th or Q3 quarter end, markets went down a fair bit on that day. ***So, we're up at the end of October to $483 billion versus $462 billion at the end of the quarter. So, nice rebound there***.

> Second thing is in that first bullet, net new advisory assets continue to flow in well. And we are averaging about $1.5 billion a month. And you see that we had that in October. Now, at the same time,

on that second bullet, I think the key thing here, and *I would underscore the word slightly*, is that Q4 gross profit is likely to decline slightly for a few reasons, including the one that I just mentioned, is that first sub-bullet; that advisory fees are really grounded in the prior quarter's balances, meaning right on September 30th. *So the recovery we see*, there will be a little bit of a lag of that showing up in gross profit going forward.

In the second bullet, sales commissions continue to be slow. *They were slow last quarter. They continue to be slow from what we've seen so far this quarter*. So, I think those are probably the key drivers on the gross profit side.

Final bullet here, advisor headcount growth consistent with what we saw in the third quarter. The numbers are relatively small with high-quality, higher asset level advisors coming in being offset by the lower asset size or the lower-quality items, advisors.

Turning to page 21, I would say, broadly, this page *with respect to expenses and the capital plan, is largely just reiterating that what we said on the earnings call is we are still on track to do and that's still our guidance*. And just quickly, to highlight probably the most notable ones in the first two sub bullet points in the top half of the page on expenses; that our 2015 core G&A guidance is 7.5% to 8.5% and, in dollars, roughly $700 million, that $697 million to $703 million. *We're still on track*.

And then, specifically for next year, 2016, core G&A in that $715 million to $730 million range, which is that 2% to 4% growth. So that largely – not largely – that remains on track. So, no news here. *Just reiterating that what we said on the call is still the case*.

42.     Defendant Casady then responded to an analyst's question about what he was seeing in terms of advisor growth, stating that he "like[d] th[e] trend," as he was seeing more productive advisors join the Company's network while less productive advisors were leaving:

How we know that's true is that we have 97% retention revenue. So, with the folks who are leaving, it's clear that they're small producers. *And we see good advisory asset growth overall*. And we know that the market data that tells us about movement of advisors puts us right at the top of the league tables as it relates to advisors joining LPL. So, fundamentally, *this year is sort of like any other in terms of the gross amount and what's different is that we do have the smaller producers leaving*.

Classes that are coming in are bigger, on average, in terms of production than those who are with us already. So, *we like that trend, as well*. And we're staying right around that $0.25 to the dollar, on average, cost of acquisition transition assistance, which is very good vis a vis the market. We do see a strong pipeline. So, we do think that the numbers will pick up in terms of the gross – again, it would be larger.

- 15 -

Not so sure about the small producers continuing to move out. ***But we do see the pipeline building in strength over time. So, I'd call this a pretty typical year or average year for us***.

43.     Defendant Audette later stressed that he and the Company were focused on providing investors with "transparency of [LPL's] results" and "[j]ust grounding it all."

44.     Later during the conference, defendant Casady was asked about the Company's recently announced share repurchase program and he reaffirmed that the share repurchase would be the "best use" of Company capital because of LPL's then-current share price:

> ***So, it's just price***.  At the end of the day, we can buy our own stock at 8- to 9-times EBITDA.  And what seems to be available to us in the M&A market appears to be more like 10-, 12-, 14-times EBITDA.  And, quite simply, ***I think it's a question of allocation of capital, the best use***.  And so, it's no more complex than that.

45.     The statements referenced above in ¶¶39-44 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

(a)     that LPL's earnings and revenue were not "steady," but were substantially declining, as LPL's fourth quarter adjusted earnings, EPS and net income would be down double digits year over year;

(b)     that LPL's client assets were not "rebound[ing]" nicely and in the midst of a "recovery," but were actually deteriorating and would decline by billions of dollars from the October figure provided at the conference through the end of the fourth quarter;

(c)     that LPL's gross profits would not decline "slightly on a sequential basis," but significantly, and LPL would in fact experience its worst sequential gross profit decline in four years;

(d)     that commission revenues would not be "more of the same that [LPL] saw in the third quarter," but down sequentially from the end of the third

1    quarter, and in fact, LPL was suffering a staggering loss of revenue from alternative

2    investments, including from investment categories in which LPL had paid substantial

3    regulatory fines, settlements and penalties;

4            (e)     that the Company was expecting a substantial increase in non-

5    G&A expenses, including $8 million in regulatory-related charges and a 37%

6    sequential increase in depreciation and amortization costs; and

7            (f)     that the announced share repurchase plan was not the "best use" of

8    the Company's capital because of the then-current "price" of LPL's common stock,

9    but rather a wasteful and inefficient use of Company capital in light of the inflated

10   price of LPL shares, which also increased the risk that LPL would violate the leverage

11   covenants in its credit agreements.

12       46.     As a result of defendants' false statements, LPL common stock traded at

13   artificially inflated prices during the Class Period, with its shares reaching a high of

14   $45.06 per share on December 8, 2015, the day of the conference.

15       47.     On December 10, 2015, LPL issued a press release announcing the early

16   completion of its accelerated share repurchase program, stating that TPG had

17   "approached Goldman about selling a block of shares, providing the opportunity to

18   settle the [accelerated share repurchase program] more quickly." TPG sold 4.3

19   million shares of LPL common stock at $43.27 per share to Goldman to be delivered

20   to the Company through the accelerated share repurchase program. As a result, TPG

21   generated approximately ***$187 million*** in insider sales proceeds. The release stated

22   that TPG had approached Goldman as it was "buying the Company's shares" for the

23   accelerated share repurchase program, a process which began prior to the December 8,

24   2015 conference.

25       48.     On February 11, 2016, LPL issued a press release announcing its fourth

26   quarter and full year 2015 financial results. The Company reported results that fell

27   well below analyst's estimates. For example, LPL stated that it had generated only

28   $0.37 per share in adjusted EPS, 27% below consensus analyst estimates of $0.51 per

share.  The Company also stated that gross profit had declined more than 5% since the end of the third quarter, the largest sequential decline in four years.  The Company also revealed that client assets at quarter end totaled only $476 billion, $7 billion below the amount of client assets at the end of October that defendants had touted at the December 8, 2015 conference.  In addition, LPL revealed disappointing revenues, including a 4% sequential decline in quarterly commission revenues and a staggering 75% decline in alternative investments year over year.  Further, LPL disclosed that depreciation and amortization expenses had increased 37% sequentially and that it had recorded an $8 million regulatory charge during the quarter.

49.    As a result of this news, the price of LPL common stock dropped $8.76 per share to close at $16.50 per share on February 12, 2016, a one-day decline of 35% on unusually high trading volume of over 11.4 million shares.  Analysts described the results as "[u]gly" and noted a "lack of confidence in management," with some expressing concern over the Company's substantially increased leverage and ability to remain under its maximum leverage ratio as required by its credit agreements.

50.    Notably, if TPG had sold the same 4.3 million shares of LPL stock to the Company at the February 12, 2016 closing price, its sale proceeds would have been diminished by approximately ***$115 million***.  By the same token, if LPL had waited to purchase shares from TPG until after announcing its fourth quarter results, it could have purchased the same number of shares from TPG for $115 million less.  Thus, its purchase from TPG of LPL shares at $43.27 per share was a wasteful and inefficient use of Company capital.

51.    As a result of defendants' false statements, LPL common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's common stock was hammered by massive sales, sending the price of the Company's stock down 63% from its Class Period high and causing economic harm and damages to Class members.  TPG,

meanwhile, avoided tens of millions of dollars in investment losses and pocketed $187 million in insider sales proceeds.

## LOSS CAUSATION/ECONOMIC LOSS

52.     During the Class Period, as detailed herein, defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of LPL common stock and operated as a fraud or deceit on Class Period purchasers of LPL common stock.   Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of LPL common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of LPL common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

53.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased LPL common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

54.     At all relevant times, the market for LPL common stock was efficient for the following reasons, among others:

(a)     LPL stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, LPL filed periodic public reports with the SEC; and

(c)     LPL regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

55.     Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by defendants, and thus did not fall within any "Safe Harbor."

56.     LPL did not issue verbal "Safe Harbor" warnings to accompany its oral FLS issued during the Class Period and, in any event, any warnings were ineffective to shield those statements from liability.

57.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of LPL who knew that the FLS was false.  Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

**CLASS ACTION ALLEGATIONS**

58.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased LPL common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  LPL stock is actively traded on the NASDAQ and there are nearly 89 million shares of LPL common stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LPL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; and (iv) whether defendants' statements and/or omissions artificially inflated the price of LPL common stock and the extent and appropriate measure of damages.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

64.     Plaintiff incorporates all allegations in ¶¶1-63 above by reference.

65.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LPL common stock during the Class Period.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LPL common stock.

Plaintiff and the Class would not have purchased LPL common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

68.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of LPL common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

69.     Plaintiff incorporates all allegations in ¶¶1-68 above by reference.

70.     The Individual Defendants acted as controlling persons of LPL within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of LPL common stock, the Individual Defendants had the power and authority to cause LPL to engage in the wrongful conduct complained of herein.  LPL controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

**JURY DEMAND**

2
      Plaintiff demands a trial by jury.

3
DATED:  March 22, 2016

    ROBBINS GELLER RUDMAN
      & DOWD LLP

4
    DAVID C. WALTON
    BRIAN E. COCHRAN

5

6

        *s/David C. Walton*

7
      DAVID C. WALTON

8
    655 West Broadway, Suite 1900
    San Diego, CA  92101-8498

9
    Telephone:  619/231-1058
    619/231-7423 (fax)

10
    ROBBINS GELLER RUDMAN
      & DOWD LLP

11
    SAMUEL H. RUDMAN

12
    58 South Service Road, Suite 200
    Melville, NY  11747

13
    Telephone:  631/367-7100
    631/367-1173 (fax)

14
    VANOVERBEKE MICHAUD &
      TIMMONY, P.C.

15
    MICHAEL J. VANOVERBEKE

16
    79 Alfred Street
    Detroit, MI  48201

17
    Telephone:  313/578-1200
    313/578-1201 (fax)

18
    Attorneys for Plaintiff

19
I:\Admin\CptDraft\Securities\Cpt LPL Financial.docx

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

<em>See</em> attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Charter Township of Clinton Police and Fire Ret. Sys. v. Volkswagen AG, et al.*, No. 2:15-cv-13999 (E.D. Mich.).

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21 day of MARCH , 2016.

> CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM
>
> By: _____
>
> Its: CHAIRMAN P+F PENSION BOARD

LPL

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/19/2016 | 2,600 | $34.26 |
| 02/02/2016 | 1,400 | $28.07 |