1 | ROBBINS GELLER RUDMAN
   & DOWD LLP
2 | JONAH H. GOLDSTEIN (193777)
   SUSAN G. TAYLOR (190753)
3 | BRIAN E. COCHRAN (286202)
   655 West Broadway, Suite 1900
4 | San Diego, CA  92101-8498
   Telephone:  619/231-1058
5 | 619/231-7423 (fax)
   jonahg@rgrdlaw.com
6 | susant@rgrdlaw.com

7 | Lead Counsel for Lead Plaintiff

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | CHARTER TOWNSHIP OF CLINTON ) | Case No. 3:16-cv-00685-BTM-BGS
    POLICE AND FIRE RETIREMENT )
11 | SYSTEM, Individually and on Behalf of ) | CLASS ACTION
    All Others Similarly Situated, )
12 | ) | CONSOLIDATED COMPLAINT FOR
                     Plaintiff, ) | VIOLATION OF THE FEDERAL
13 | ) | SECURITIES LAWS
        vs. )
14 | )
    LPL FINANCIAL HOLDINGS INC., et )
15 | al., )
    )
16 |                     Defendants. ) | DEMAND FOR JURY TRIAL
    )

17
18
19
20
21
22
23
24
25
26
27
28

Lead Plaintiff, Soft Drink and Brewery Workers Union Local 812 Retirement Fund ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by LPL Financial Holdings Inc. ("LPL" or the "Company"), as well as media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of LPL common stock between December 8, 2015 and February 11, 2016, inclusive (the "Class Period"), against LPL, Chief Executive Officer ("CEO") and Chairman Mark S. Casady and Chief Financial Officer ("CFO") Matthew J. Audette (collectively "LPL," the "Company" or the "Defendants") for violations of the Securities Exchange Act of 1934 ("1934 Act").  Defendant LPL is an independent broker-dealer, a custodian for registered investment advisors ("RIAs") and an independent consultant to retirement plans. The Company provides a platform of brokerage and investment advisory services to independent financial advisors enabling them to provide their retail investors with financial and investment advice.  It generates revenues primarily from fees and commissions on clients' brokerage and advisory assets.

2. LPL was founded in 1989 and in 2005 sold a majority stake to two private equity firms, TPG Capital ("TPG") and Hellman & Friedman LLC ("Hellman & Friedman"), in a deal valued at approximately $2.5 billion.  After it took private control, TPG elevated Defendant Casady to his current position as CEO and Chairman.  From 2006-2009, as CEO and Chairman, Casady oversaw TPG's multi-hundred million dollar investment in LPL, was subject to TPG's oversight and had

1  regular communications with TPG personnel.  During this time, Casady made over

2  $10 million while under TPG's control and influence.

3      3.    In November 2010, TPG and Hellman & Friedman took LPL public for

4  approximately $470 million (the "IPO").  Casady personally made $58 million in the

5  IPO.  Following the offering, TPG continued to own over 30% of LPL's common

6  stock and, after Hellman & Friedman exited LPL stock in 2013, TPG became LPL's

7  largest shareholder and maintained control and substantial influence over LPL's

8  affairs.  TPG appointed two directors to LPL's Board, Richard Schifter and Richard

9  Boyce.  TPG partner Schifter became LPL's "Lead Director" and also served on

10  LPL's Governance and Nominating Committee – a role that ensured TPG access to

11  LPL governance information, influence in the selection of Board of Director

12  candidates, and evaluation of the Board.  TPG partner Boyce also served on LPL's

13  Compensation Committee, which determined all aspects of Defendants Casady and

14  Audette's compensation, including salary, bonus, incentives, deferred compensation,

15  benefits, and severance.

16      4.    As stated in LPL's public filings, TPG retained "significant influence

17  over corporate transactions," the ability "to strongly influence or effectively control

18  LPL's decisions" and "will continue to be able to influence [LPL's] decisions

19  regardless of whether or not the stockholders believe that the transaction is in their

20  own best interests."

21      5.    In exercising such influence and control over LPL, TPG in its

22  shareholder agreement with LPL also explicitly  received "the right to obtain *any*

23  reports, documents, information or other materials . . . which a member of the LPL

24  Board has received or has the right to receive."[1]  TPG also had the right to receive

25  additional information regarding LPL's business directly from the Company's

26  executive officers.  Effectively, this meant that by virtue of the fact that TPG partners

27  

28  

---

[1]   Here, as elsewhere, emphasis has been added.

Boyce and Schifter served on LPL's Board of Directors, TPG as an entity had the right *at any time* to access inside financial information regarding LPL's financial results and prospects not available to other investors.  This special access allowed TPG to have real-time visibility into LPL's financial performance and have inside information upon which it could determine whether to trade or hold its LPL shares. TPG maintained its ability to control and influence LPL's decisions and its information rights during the 2015-16 time period relevant to this action.

6.     When LPL went public in 2010, TPG also ensured that Casady remained as LPL's CEO and Chairman, providing him with an employment agreement that lasted until February 2014, in which LPL was required to take steps to ensure Casady was elected to the board and remained its chairman.  The agreement also provided a generous severance provision that would require LPL to provide Casady with nearly $90 million in severance and stock options if he was terminated without cause.  TPG ensured that LPL rewarded Defendant Casady handsomely, and Casady in turn was beholden to TPG for his corporate position, prestige and wealth.  Between 2010 and 2015, Defendant Casady received stock proceeds and compensation valued at over $119 million as LPL's Chairman and CEO – positions he owed to TPG's oversight, influence and control over the Company:

|  | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | Totals |
|---|---|---|---|---|---|---|---|
| Insider Sales Proceeds | $ 0 | $ 0 | $ 0 | $23,452,413 | $ 600,000 | $64,467,480 | $ 88,519,893 |
| Salary | 900,000 | 885,479 | 800,000 | 800,000 | 800,000 | 800,000 | 4,985,479 |
| Option Awards | 3,519,400 | 3,079,998 | 2,799,991 | 2,800,000 | - | 2,677,905 | 14,877,294 |
| Non-Equity Incentive Comp. | 1,237,500 | 1,485,000 | 2,500,000 | 1,000,000 | 2,091,625 | 2,225,000 | 10,539,125 |
| Other Comp. | 52,475 | 71,440 | 48,842 | 57,553 | 47,673 | 39,820 | 317,803 |
|  | $ 5,709,375 | $ 5,521,917 | $ 6,148,833 | $28,109,966 | $ 3,539,298 | $70,210,205 | $119,239,594 |

7.     Following the IPO, LPL became the subject of several regulatory and governmental investigations regarding the Company's fraudulent, deceptive and/or legally deficient business practices.  In February 2013, LPL paid $2.5 million to settle

allegations by Massachusetts securities regulators that it had failed to adequately supervise its brokers who sold investments in non-traded real estate investment trusts ("REITs"). In May 2015, the Financial Industry Regulatory Authority ("FINRA"), the self-regulatory organization that regulates and oversees brokerage firms, sanctioned LPL $11.7 million for "widespread supervisory failures" related to complex product sales, trade surveillance and trade confirmations delivery. In September 2015, LPL agreed to pay $1.8 million to settle charges by the Massachusetts Attorney General that it had improperly sold and marketed risky exchange-traded funds to retail investors. LPL simultaneously agreed to pay $1.4 million in civil penalties to regulators in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands to settle charges that it failed to implement an adequate supervisory system regarding its sale of non-traded REITs and to enforce its own written procedures regarding the sale of non-traded REITs.

8. Soon before the start of the Class Period, in early October 2015, as LPL faced nagging regulatory problems, Casady's future as Chairman and CEO was "attracting a lot of conjecture" in the investing community, and it was publicly reported that Casady's "glory days were before [LPL] went public during their growth phase." Casady's continued employment depended on the approval of LPL's Board of Directors, which included now TPG Senior Adviser Schifter and now former TPG Partner Boyce.

9. Shortly after the settlement of these significant regulatory enforcement actions, and LPL's payment of over $15 million in fines, on October 29, 2015, LPL publicly assured its investors that it expected to move past its regulatory problems with "meaningfully lower" charges in the future, and that it would "maximize shareholder returns" by buying back $500 million worth of its own shares. Defendant Casady told investors that the share buyback was a "bargain," because LPL shares were trading "at a significant discount to what we believe is their intrinsic value." Defendants later stressed that the message sent to the market was that the buyback was

the "key" as to how LPL would "turn the page" on its recent regulatory problems and propel its stock upward. That same day the market analysts from Wells Fargo covering LPL stressed that, "the buyback program clearly signals management's confidence in the outlook."

10. As intended, LPL's announcement that it would buy back half a billion dollars' worth of its own shares signaled the Company's confidence in its ability to fund the buyback by delivering solid financial results and increased its earnings per share ("EPS"), propelling LPL's stock price over 10% in the days following the Company's announcement.

11. On November 24, 2015, LPL announced that it had entered into an agreement with Goldman Sachs & Co. ("Goldman") whereby the bank would carry out $250 million of the $500 million share repurchase on an accelerated schedule. LPL stressed that the accelerated share repurchase plan was not anticipated to occur immediately, but instead "***will take several months to complete***."

12. However, behind the scenes by at least the beginning of December 2015, with less than a month left in 4Q15, LPL's internal financial results showed that the Company was in the midst of a disastrous fourth quarter. The reforms the Company had implemented as a result of recent regulatory fines and penalties and a revamped Department of Labor ("DOL") fiduciary rule had caused a sharp downturn in some of the Company's most profitable financial products, including its alternative investment products which would end up down nearly ***75%*** year-over-year during the quarter. LPL's net new advisory assets, brokerage and advisory assets and gross profits were also in the midst of a substantial decline from expectations. LPL was near quarter-end with only three weeks left, and the financial metrics utilized by the Company to measure these areas of performance provided the Company visibility into the significant decline in its fourth quarter performance – a fact later acknowledged by Casady in February 2016 when he admitted that at the time of the buyback "***certainly we had insight into the quarter . . . and knew we would have challenges***."

13.     As of early December 2015, when LPL was suffering a disastrous fourth quarter: (i) TPG maintained an explicit right at any time to access LPL's financial information, and "significant influence" and ability to effectively control LPL's financial decisions; (ii) the LPL Board of Directors (on which former TPG partners Schifter and Boyce were directors) met 10 times in 2015, and thus would have likely met in close proximity to early December 2015 and discussed LPL's financial performance; (iii) TPG had utilized its prior influence in elevating Casady to Chairman and CEO; and (iv) Casady's future, which only one month prior was publicly reported to be uncertain and "attracting a lot of conjecture," depended on the continued approval of LPL's Board, of which Schifter and Boyce were members.

14.     TPG knew that if the market learned that LPL's fourth quarter results fell far short of Wall Street expectations, it would cause a significant decline in LPL's stock price from the historically high levels it was trading at in early December.  This would result in massive losses to the value of TPG's portfolio of LPL stock, unless TPG was able to unload its LPL stock before this negative financial information became public.  Thus, in late November/early December, and sometime prior to December 8, 2015, TPG approached Goldman – who was executing the buyback for LPL – to cash out more than 4 million shares from TPG's ownership of LPL through the accelerated share repurchase program while the stock was still trading at historically high levels.

15.     Prior to this sale being publicly disclosed, on December 8, 2015, LPL provided investors a near-end-of-fourth quarter financial update.  LPL falsely assured investors that the Company was performing as expected, including that LPL had an "earnings stream that is quite steady," and that the Company had been "executing it all well" over "the last two months" – all while omitting the fact that LPL was suffering a weak fourth quarter with severely disappointing financial results.  LPL's false and misleading message was material because LPL's earnings stream and financial prospects would need to be steady and would need to produce the necessary cash flow

in the future to allow LPL to successfully execute its repurchase plan, pay down its debt and avoid any potential breach of its debt covenants. The Company's December 8, 2015 statements followed less than six weeks after LPL had, on October 29, 2015, assured the public that substantially increasing the Company's debt ratio to complete the $500 million repurchase "makes the most sense today," and expressed management's confidence in LPL's financial outlook for the fourth quarter of 2015.

16.     Such statements were still alive in the market, and LPL's December 8, 2015 statements reassured investors that: (i) nothing had materially changed since the share buyback was announced on October 29, 2015; and (ii) that LPL's earnings stream was more than sufficient to go forward with a repurchase plan that made economic sense and would drive shareholder value. LPL knew that if it disclosed the truth regarding LPL's financial results, LPL's stock price would decline significantly and cause TPG (who served as Casady's benefactor and overseer) to lose out on over a hundred million dollars in insider trading proceeds. TPG's "significant influence over corporate transactions," ability to effectively control LPL's decisions, regardless of whether it is in the best interest of LPL's shareholders, and TPG's information rights to LPL's real-time financial results ensured that LPL did not disclose to other investors LPL's disappointing 4Q 2015 performance. On December 8, 2015, LPL's stock closed at $45.06 per share, near its highest levels in two years.

17.     Only two days later, on December 10, 2015, and contrary to LPL's statement only two weeks earlier that the share repurchase program "***will take several months to complete***," the Company announced that it had completed the ***entire*** $250 million accelerated share repurchase program in only a matter of days, allowing TPG to cash out 4.3 million shares of its LPL common stock at $43.27 per share. More than three quarters of LPL's $250 million buyback spending went to TPG, who at the time of the sale maintained the right to control and influence LPL's financial decisions and had direct access to undisclosed financial information indicating that LPL was suffering a disastrous fourth quarter. The transaction allowed TPG to dispose of

approximately one-third of its stake in LPL at historically high levels, generating approximately $187 million in insider sales proceeds.  Only on February 11, 2016, was it finally revealed that TPG had cashed in by selling millions of LPL shares at historically high share prices, while the Company was in the midst of a terrible fourth quarter that had not yet been disclosed to the public.

18.   On February 11, 2016, LPL announced its fourth quarter and full year 2015 financial results that revealed the false and misleading nature of Defendants' December 8, 2015 statements.  LPL disclosed that gross profits had fallen 35% in the quarter and 5% for the year and that it had generated only $0.37 per share in adjusted EPS, 27% below consensus analyst estimates of $0.51 per share.  The Company further revealed that reported net new advisory asserts for the fourth quarter were only $3.1 billion, $1.4 billion less than Defendants had misled investors to believe on December 8, 2015.  The Company also disclosed that the negative performance in LPL's advisory and brokerage assets resulted in reported earnings being worse than expected – in contrast to their December 8, 2015 statements that advisory and brokerage assets had recovered and would trend upwards.  Finally, LPL disclosed that in 4Q15, LPL's gross profit declined 5.1% from $339.8 million in 3Q15 to $322.4 million in 4Q15, the Company's worst sequential gross profit decline in four years, primarily as a result of falling commission revenues, in contrast to their December 8, 2015 statements that gross profits would decline only "slightly."

19.   As a result of this news, on February 12, 2016 the price of LPL common stock dropped $8.76, nearly 35% in one day, on record volume, to close at $16.50 per share.  Had LPL not bowed to TPG's influence and control, and purchased TPG's shares in the buyback only after disclosing its fourth quarter results, TPG's insider trading proceeds would have been diminished by approximately $115 million.  Correspondingly, LPL would have been able to purchase the same number of LPL shares back from TPG for $115 million less.

20.     Financial market analysts described LPL's results as "ugly" and "very weak" and recognized the financial impact of this previously concealed information. William Blair analysts highlighted that: (i) "[g]ross profit of $322 million was $12 million below our estimate ($0.07 EPS impact) due to a combination of items but particularly lower alternative investment revenues"; (ii) "[n]et new advisory assets totaled $3.1 billion in the quarter and $16.7 billion for the year"; and (iii) "[a]lternative investment commissions (largely non-traded REITs) were down 38% sequentially and likely will continue to decline."  Wells Fargo analysts stressed that "all in all it was a very challenging quarter with revenue down over 7% year-after-year including commissions that were down 12% year-after-year."  Credit Suisse analysts emphasized that the "well below expectations" earnings miss was driven by "weaker gross profits . . . characterized by a pull-back in brokerage sales, [and] weak advisor growth trends."  UBS analysts noted that "[u]nderlying growth metrics were unimpressive" because among other things, "net new asset growth slowed."

21.     JP Morgan analysts also noted "a lack of confidence in management" and that "management looks bad here."  Morever, during the February 11, 2016 LPL investor call, the Well Fargo analyst expressed overt cynicism that LPL did not previously know of the disappointing financial results, and noted the suspicious timing in which LPL bought back its shares from TPG:

> The follow-up I had really had to do with the buyback, and I know you guys tend to have a pretty good line of sight in your business.  And so I would imagine when you guys had some idea that the fourth quarter was going to be pretty challenging.  So not sure why then you buy so much stock ahead of that print as opposed to waiting until after the fact and then you have all kinds of dry powder.

22.     In response, Casady admitted LPL had "insight into the quarter . . . and knew we would have challenges," but blamed the Company's poor results and deteriorating performance completely on an unforeseen market downturn.  Casady went so far as to cavalierly state that the scrutiny which he was facing from the market

for his purported unforeseen surprise regarding LPL's weak fourth quarter was as severe as the damage inflicted by the Spanish Inquisition:

> Well, I think the surprise is the market downturn. No one predicted the Spanish Inquisition. So, as you look at it, you have the six weeks of relentless market drop including today, and that is the issue. So I think as you look at it, what we saw was an opportunity to get the first wave of buyback done at pace, and we have always been an aggressive buyer of our shares. So this is no different in terms of our behavior, and *certainly we had insight into the quarter. And you knew we would have challenges*, but didn't feel we would be that far off from the rest of the market, and I think the rest of the market's reporting shows that we're not that far off. And so on a relative basis, we will have said that the price is going to be somewhere around a number not too different than we used, and therefore, it makes sense to do it sooner rather than later in terms of reducing share count. It was no more complex than that.

23. But, contrary to Casady's excuse, analysts from JMP Securities and Wells Fargo noted respectively that the fourth quarter results were due not solely to a volatile market but were also the result of "company-specific headwinds," and "other [LPL specific] issues affecting results including a low level of net recruiting and ongoing declines in alternative investment sales."

24. Moreover, Casady's excuse that it was somehow only a "surprise" market downturn that caused LPL's disastrous fourth quarter is belied by the fact that LPL's results and stock price decline were each drastically worse than the Company's market and industry peers.

25. The six publicly traded companies LPL listed in its February 25, 2016 10-K filing as its peers and that provided quarterly reports beat Wall Street analyst earnings expectations by 5.5% on average for the fourth quarter of 2015. But, LPL missed *by over 27%* in comparison:



**Earnings Surprise – Peer Group**

**Difference between analyst projected and actual earnings per share**
Q4 2015

Sources: LPLA February 25, 2016 10-K filing; Bloomberg.

26.     Likewise, analyzing the stock price decline using the earning release date of ±1 trading day, LPL's peers on average suffered a 3.7% stock price decline following the release of their fourth quarter 2015 results.  But LPL stock price declined by nearly *22%* – almost seven times as much as its peers:



27.     The fallacy of Casady's excuse that LPL's disastrous fourth quarter 2015 results were due only to a "surprise" market downturn is further shown by the fact that LPL's earnings performance and corresponding stock price decline was substantially worse than the 16 comparable companies in the New York Stock Exchange ARCA securities broker dealer index.  These companies on average for the fourth quarter 2015 beat Wall Street analysts' earnings expectations by 3.8%, but LPL missed by over ***27.3%*** in comparison.

28.     Likewise, analyzing the earning release date of ±1 trading day, these 16 comparable companies on average suffered a -.5% stock price decline following the release of fourth quarter 2015 results.  But LPL stock price dropped by ***21.9%*** – over twenty times as much:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    29.    LPL's drastically worse fourth quarter performance and stock price

16 decline in comparison to its market and industry peers, as demonstrated in ¶¶23-28

17 above, shows that it was hardly a purported unforeseen general market downturn that

18 caused LPL's weak fourth quarter results.  That Casady could offer only a widespread

19 unsupported excuse for LPL's fourth quarter results further demonstrates LPL's

20 complicity in deceiving investors.

21    30.    The following chronology illustrates Defendants' fraud:

22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16  31.   As a result of Defendants' false statements, LPL common stock traded at

17 artificially inflated prices during the Class Period.  However, as the truth was revealed

18 into the market, the Company's common stock fell almost 63% from its Class Period

19 high, as the artificial inflation was removed from the stock.  As a result of their

20 transactions in artificially inflated LPL common stock during the Class Period,

21 Plaintiff and other class members suffered significant damages.  By contrast, TPG

22 generated $187 million in proceeds by selling its LPL stock back to the Company at

23 peak prices.  If TPG had sold after LPL's disastrous fourth quarter results and

24 diminished prospects were disclosed to the market, it would have generated $115

25 million less in insider trading proceeds.

26
27
28

**JURISDICTION AND VENUE**

32.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

33.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

34.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  LPL also maintains primary offices and an operational center in this District.  Defendant Audette maintains a residence in this District and is based out of this District, and Defendant Casady has maintained a residence in this District for several years.

35.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

**PARTIES**

36.    Lead Plaintiff Soft Drink and Brewery Workers Union Local 812 Retirement Fund purchased LPL common stock at artificially inflated prices during the Class Period and has been damaged as a result of Defendants' alleged misconduct, as detailed in the Certification previously filed, (Dkt. No. 10-3) and incorporated herein.

37.    Defendant LPL is an independent broker-dealer, a custodian for RIAs and an independent consultant to retirement plans.  The Company maintains primary offices at 4707 Executive Drive, San Diego, California 92121.

38.    Defendant Casady is the Company's Chairman of the Board and CEO, positions he has held since December 2005 and March 2006, respectively.

39.    Defendant Audette is the Company's CFO, a position he has held since September 2015.

40.    The Defendants referenced above in ¶¶38-39 referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements which caused the price of LPL common stock to be artificially inflated during the Class Period.

41.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LPL's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They made or were provided with the public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  They also participated in conference calls with securities analysts and investors in which they made materially misleading statements and omissions and held themselves out to be knowledgeable on the topics which they discussed.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

**DEFENDANTS' FRAUD**

42.    Defendants are liable for: (i) making materially false public statements; or (ii) failing to disclose adverse material facts known to them which rendered their public statements about LPL false and misleading.  Defendants' fraud: (i) deceived the investing public regarding LPL's financial results, prospects and business; (ii) artificially inflated the price of LPL common stock; and (iii) caused Plaintiff and other members of the Class (as defined below) to purchase LPL common stock at artificially

1  inflated prices, and suffer damages when the previously non-disclosed truth was

2  finally revealed.

3  <center>**BACKGROUND**</center>

4      43.    LPL, together with its subsidiaries, provides an integrated platform of

5  brokerage and investment advisory services to independent financial advisors and

6  financial advisors at financial institutions in the United States. Its brokerage offerings

7  include variable and fixed annuities, mutual funds, equities, retirement and 529

8  education savings plans, fixed income products, insurance and alternative investments.

9  LPL's insurance offerings comprise personalized advance case design, point-of-sale

10  service, and product support for a range of life, disability, and long-term care

11  products. The Company also offers fee-based advisory platforms and support, which

12  provide access to no-load/load-waived mutual funds, ETFs, stocks, bonds,

13  conservative option strategies, unit investment trusts, institutional money managers,

14  and no-load multi-manager variable annuities. In addition, LPL offers cash sweep

15  programs and retirement solutions, a fee-based service that allows qualified advisors

16  to provide consultation and advice. Further, LPL provides other services comprising

17  tools and services enabling advisors to maintain and grow their practices and custodial

18  services to trusts for estates and families. The Company offers its services to

19  approximately 14,000 independent financial advisors, including financial advisors at

20  approximately 700 financial institutions.

21      44.    The majority of LPL's revenue streams fall into two categories:

22  commission revenues and advisory revenues. For fiscal 2015, commission revenues

23  and advisory revenues generated 46% and 32%, respectively, of LPL's total net

24  revenues. Commission revenues derive from upfront advisor fees and commissions

25  for investment products and, for certain products, a trailing commission. Advisory

26  revenues derive from fee-based advisory platforms and the provision of ongoing

27  investment advisory services. For fiscal 2015, 72% of LPL's revenue was recurring in

28  nature, providing the Company substantial visibility into its future revenue streams.

1   In addition, for transaction-based commissions, the Company generates revenues "at
2   the point of sale," providing the Company with further visibility into its commission-
3   based revenues at a given point in time.

4          45.    LPL also has significant visibility into its expenses.  For example,
5   depreciation and amortization expenses are computed by taking the book values of
6   long-lived assets, such as internally developed software, leasehold improvements,
7   computers and software, and furniture and equipment (recorded at historical cost and
8   reduced by accumulated depreciation and amortization), and then dividing those assets
9   on a straight-line basis over the estimated useful lives of the assets – all things readily
10  determined and anticipated and under the control of management.

11         46.    Prior to 2010, LPL was majority owned by TPG and Hellman &
12  Friedman, two private equity firms that owned a combined 72% stake in the
13  Company.  In November 2010, these private equity firms took LPL public in an IPO
14  in which 15.7 million LPL shares were sold to the public at $30 per share.

15         47.    Even after the IPO, TPG retained a substantial ownership stake in the
16  Company and influence over its affairs.  Two TPG partners, Boyce and Schifter,
17  served as directors of LPL.  TPG partner Schifter became LPL's "Lead Director" in
18  2013 to 2014 and also served on the LPL Board of Governance and Nominating
19  Committee – a role that ensured TPG access to LPL governance information,
20  influence in the selection of Board of Director candidates, and evaluation of the
21  Board.  TPG partner Boyce also served on LPL's Compensation Committee, which
22  determined all aspects of Defendants Casady and Audette's compensation, including
23  salary, bonus, incentives, deferred compensation, benefits, and severance.

24         48.    As stated in LPL's public filings, TPG retained "significant influence
25  over corporate transactions" and the ability "to strongly influence or effectively
26  control LPL's decisions" and "will continue to be able to influence [LPL's] decisions
27  regardless of whether or not the stockholders believe that the transaction is in their
28  own best interests."

49.   In exercising such influence and control over LPL, TPG in its shareholder agreement with LPL also explicitly received "the right to obtain any reports, documents, information or other materials . . . which a member of the LPL Board has received or has the right to receive."  TPG also had the right to receive additional information regarding LPL's business directly from the Company's executive officers.  Effectively, this meant that by virtue of the fact that TPG partners Boyce and Schifter served on LPL's Board of Directors and TPG's other rights to inside information, TPG as an entity had the right *at any time* to access inside financial information regarding LPL's financial results and prospects not available to other investors.  This special access allowed TPG to always have real-time visibility into LPL's financial performance and to have inside information on which to either trade or hold its LPL shares.  TPG maintained its ability to control and influence LPL's decisions and its rights to inside information during the 2015-16 time period relevant to this action.

50.   LPL has also identified TPG as a "related party" in SEC filings, and stated that it has continued to enter into various related-party transactions with TPG and certain of TPG's portfolio companies since the IPO.  As of December 31, 2014, TPG owned approximately 13% of the outstanding shares of LPL common stock.

51.   Following the IPO, LPL became the subject of several regulatory and governmental investigations into allegedly fraudulent, deceptive and/or legally deficient business practices at the Company and among its network of financial advisors:

- In February 2013 it was announced LPL had settled allegations by Massachusetts securities regulators that it had failed to adequately supervise its brokers who sold investments in non-traded REITs for $2.5 million.

- In May 2015 FINRA announced that it had sanctioned LPL $11.7 million for "[w]idespread [s]upervisory [f]ailures [r]elated to [c]omplex [p]roduct [s]ales, [t]rade [s]urveillance and [t]rade [c]onfirmations [d]elivery."

- In September 2015 it was announced that LPL had agreed to pay $1.8 million to settle charges by the Massachusetts Attorney General that it had improperly sold and marketed risky ETFs to retail investors.

- Also in September 2015, it was announced that LPL had agreed to remediate investor losses and pay $1.425 million in civil penalties to regulators in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands for its alleged failure to implement an adequate supervisory system regarding its sale of non-traded REITs and its failure to enforce its written procedures regarding the sale of non-traded REITs.

52.    On October 29, 2015, LPL financial announced its third quarter fiscal 2015 financial results.  LPL reported adjusted EPS for the quarter of $0.55 per share, above consensus analyst estimates, and stated that it expected to move on from its regulatory problems with "meaningfully lower" regulatory-related charges going forward.  It also announced that it would be implementing a new "capital management plan to create greater shareholder value."  Key to this plan was a $500 million share repurchase program authorized by the Board.  The Company stated that in order to pay for this share repurchase it planned to significantly increase its target leverage ratio from a range of two to three times net debt-to-earnings before interest, taxes, depreciation and amortization ("EBITDA") to a ratio of four times net debt-to-EBITDA.  On a conference call to discuss the quarterly results, Defendant Casady stated that the share buyback was a "bargain," as he believed LPL shares were trading "at a significant discount to what we believe is their intrinsic value."  Defendant Audette meanwhile stated that increasing the Company's leverage to a four times net debt-to-EBITDA ratio is "what makes the most sense today," and that LPL would only go above the four times debt-to-EBITDA ratio if there were "very good returns to justify doing so."

53.    As intended, LPL's announcement that it would buy back up to $500 million of its own shares signaled the Company's confidence in its ability to deliver expected financial results, increased its EPS and immediately propelled its stock price over 10% in the days following the Company's announcement.  As summarized by

1   Wells Fargo's market analyst, "[W]e believe the buyback program clearly signals
2   management's confidence in the outlook."

3       54.     On November 24, 2015, LPL issued a press release announcing that it
4   had entered into a credit agreement for $700 million of new term loans due November
5   20, 2022 and had extended $631 million of existing term loans to March 29, 2021 in
6   order to fund the share repurchase plan.  As a result of the debt transaction, the
7   Company stated its net target leverage had increased to a 3.7 times net debt-to-
8   EBITDA ratio, and that it would breach its revised credit covenants if its leverage
9   exceeded a five times net debt-to-EBITDA ratio.  In connection with the transaction,
10  the Company incurred $21 million of debt issuance costs and its total weighted
11  average interest rate for debt outstanding increased from 3.1% to 3.9%.  The Company
12  also announced that it had entered into an agreement with Goldman whereby it would
13  pay Goldman $250 million to carry out an accelerated share repurchase on LPL's
14  behalf.  The press release stated that LPL estimated the accelerated share repurchase
15  "*will take several months to complete*."

16      55.     On December 2, 2015, LPL announced that it would be presenting at a
17  financial services conference sponsored by Goldman on December 8, 2015.  On or
18  about December 4, 2015, LPL insiders were preparing the presentation for the
19  Goldman investor conference, consulting the Company's most recent financial
20  records.  This was around the same time TPG approached Goldman to discuss cashing
21  out a significant portion of its LPL stock through the accelerated share repurchase
22  program.

**FALSE AND MISLEADING STATEMENTS**
**ISSUED DURING THE CLASS PERIOD**

25      56.     At the December 8, 2015 conference and in the related slide presentation,
26  Defendants made false and misleading statements regarding LPL's business, prospects
27  and financial results.  These false and misleading statements reassured the market that
28  the financing of LPL's share repurchase plan was viable, sensible and could be

1  achieved so long as LPL's future earnings and cash flows could service the debt that

2  would fund the repurchase.  For example, in response to an analyst question about

3  how LPL would "turn the page" on its recent regulatory problems, Defendant Casady

4  stated that "execut[ing]" the share repurchase would be "key" to driving top line

5  growth.

6      57.   At the December 8, 2015 conference, in discussing the Company's 2016

7  outlook, Defendant and CFO Audette highlighted the share repurchase capital plan,

8  claiming that it was "in the best interest of shareholders," and reassured investors that

9  (having just left the CFO position of E*Trade, an LPL peer company) Audette had

10 witnessed a Company that was a "lot more powerful and compelling than I thought

11 from the outside," with "an earnings stream that is quite steady and produces cash

12 flow over time," and that LPL had been "executing it all well" since he had come on

13 board in late September 2015:

> Being here for these two months [October and November 2015] and spending a lot of time, I wouldn't say it was a surprise because it was expected, but *I think it's a lot more powerful and compelling than I thought from the outside*.
>
> Third, and what Mark kind of hinted to on the capital plan side, being at a place where there's a lot less approvals necessary to go *execute on a capital plan in the best interest of shareholders*. So, the way we speak about it, a capital-lite model, *an earnings stream that is quite steady and produces cash flow over time*. Hopefully, the last two months have shown that that opportunity absolutely was there. *We're executing it all well*.
>
> \*   \*   \*
>
> … *with respect to expenses and the capital plan, is largely just reiterating that what we said on the earnings call is we are still on track to do and that's still our guidance*. And just quickly, to highlight probably the most notable ones in the first two sub bullet points in the top half of the page on expenses; that our 2015 core G&A guidance is 7.5% to 8.5% and, in dollars, roughly $700 million, that $697 million to $703 million. *We're still on track*.
>
> And then, specifically for next year, 2016, core G&A in that $715 million to $730 million range, which is that 2% to 4% growth. So that largely – not largely – that remains on track. So, no news here. *Just reiterating that what we said on the call is still the case*.

58.     The above statements were material to LPL investors because they conveyed the message that LPL's earnings stream and financial prospects were steady and would produce the necessary cash flow in the future to allow LPL to successfully execute its repurchase plan, pay down its debt and avoid any potential breach of its debt covenants.  These statements also reaffirmed LPL's statements on October 29, 2015, that substantially increasing the Company's debt ratio to complete the $500 million repurchase "makes the most sense today," and reassured investors that: (i) nothing had changed; and (ii) that LPL's earning stream was more than sufficient to go forward with a repurchase plan that made economic sense and would drive shareholder value.

59.     The statements referenced above in ¶¶56-58 were materially false and misleading when made because they failed to disclose the following facts:

(a)     By at least the beginning of December 2015, LPL's internal financial results showed that the Company was in the midst of a disastrous fourth quarter.  The reforms the Company had implemented as a result of recent regulatory fines and penalties and a revamped DOL fiduciary rule had caused a sharp downturn in some of the Company's most profitable financial products, including its alternative investment products which would end up down nearly 75% year-over-year during the quarter.  LPL's net new advisory assets, brokerage and advisory assets and gross profits were also in the midst of a substantial decline from market expectations.  LPL was already near quarter-end with only three weeks left to close of 4Q15, and the financial metrics utilized by the Company to measure these areas of poor performance were clearly visible – a fact later acknowledged by Casady in February 2016 when he admitted that "certainly we had insight into the quarter . . . and knew we would have challenges."

(b)     The purchase was not in the best interests of LPL's shareholders because Defendants did not expect future earnings to support the debt needed to fund a buyback up to $500 million.  Instead, LPL bowed to TPG's influence and control

and purchased TPG's holdings in LPL at inflated prices. Had LPL disclosed its true financial condition and prospects, the stock price would have been significantly less and the repurchase, would have been less costly for LPL. Indeed, when LPL's true financial condition was revealed, the stock dropped 35% to $16.50 per share in a single trading day, representing a potential $115 million cost savings for the share repurchase.

(c)    LPL's purchase of TPG's holdings in LPL at inflated prices increased the risk that LPL would violate the leverage covenants in its credit agreements.

(d)    Defendant Audette had recently joined the Company in late September 2015, after about four years as CFO of E*Trade Financial (an LPL peer company). Defendant Audette was therefore uniquely qualified and credible in making the misleading statement that LPL was even "more powerful and compelling" on the inside than was visible to investors "from outside," which gave the false and misleading impression that Defendants, if anything, were being conservative in their representations to the market when in reality they were materially overstating the strength of LPL's business, prospects and financial results.

**DEFENDANTS' STATEMENTS REGARDING LPL'S NET NEW ADVISORY ASSETS WERE FALSE AND MISLEADING WHEN MADE**

60.    LPL's "net new advisory assets" are a primary driver of future advisory fee revenue. Associated advisory revenues are a component of LPL revenue that is growing in importance to LPL as its revenue mix changes and the percentage of commissions' revenues (relative to total revenues) declines. As explained by LPL in its 2014 Form 10-K, "[N]et new advisory assets are a primary driver of future advisory fee revenue and have resulted from the continued shift by our existing advisors from brokerage towards more advisory business." The Company has also highlighted net new advisory assets as a key business metric in every 10-K and 10-Q from 4Q14 through 4Q15 in the Company's MD&A under a subsection entitled "How

1    We Evaluate Our Business."[2]  Numerous analysts also highlighted net new advisory

2    assets as an important financial metric demonstrating that LPL's performance and

3    revenues relating to net new advisory assets are material to LPL's investors.

4          61.     During Defendants' December 8, 2015 investor presentation, Defendants

5    made false and misleading statements regarding LPL's continued earnings growth in

6    the context of discussing net new advisory assets.  Specifically, Defendant Audette

7    gave the false and misleading impression that LPL's net new advisory assets was at

8    pace to achieve $4.5 billion in net new advisory assets in 4Q15 by stating:

9          [N]et new advisory assets continue to flow in well.  And we are
           averaging about $1.5 billion a month.  And you see that we had that in

10         October [2015]. . . .  [W]e are averaging about $1.5 billion [per month].

11          62.     Defendants' statements were made to investors when referencing a power

12    point slide titled, "LPL Q4 2015 Mid-Quarter Operational Update" and conveyed to

13    the market up-to-date reporting that: (i) because net new advisory assets "continue to

14    flow in well," results for November 2015 were on pace with the "averag[e] [of] $1.5

15    billion" per month (same as October 2015 results of approximately $1.5 billion per

16    month) and (ii) with only the three weeks of December 2015 left to complete the

17    fourth quarter, the Company had no reason to believe that net new advisory assets for

18    December 2015 would deviate from the stated $1.5 billion per month average.  Thus,

19    investors were left with the firm impression that for the first two months of 4Q15,

20    LPL had already earned approximately $3 billion in net new advisory assets and

21    because "net new advisory assets continue to flow in well," LPL was on pace to

22    garner an additional $1.5 billion for December, equaling a total of $4.5 billion for the

23    fourth quarter of 2015.

24

25    ———————————
     [2]  LPL's SEC filings explain, "[a]dvisory and brokerage assets are comprised of

26    assets that are custodied, networked, and non-networked, and reflect market
     movement in addition to new assets, inclusive of new business development and net of

27    attrition.  Insured cash account and money market account balances are also included
     in advisory and brokerage assets."  Net new advisory assets consist "of funds from

28    new accounts and additional funds deposited into existing advisory accounts that are
     custodied in our fee-based advisory platforms."

63.     On February 11, 2016, LPL announced that for the three months ended 4Q15 it had generated only $3.1 billion in net new advisory assets.  Thus, Defendants' December 8, 2015 statements that "net new advisory assets continue to flow in well," and that "we are averaging about $1.5 billion [per month]" were false and misleading when made, and could only be true if LPL suffered a completely unforeseen outflow of net new advisory assets for the rest of December 2015 resulting in negative assets – a highly improbable conclusion given that LPL, by its own words, net new advisory assets averaged as of December 8, 2015 approximately $1.5 billion per month and, by its own words, would have already amounted to approximately $3 billion in net new advisory assets for the first two months of the fourth quarter (October and November 2015).

64.     Moreover, LPL's 3Q15 filing showed that, as of September 30, 2015, net new advisory assets were $13.7 billion for the first nine months of 2015.  LPL told investors on December 8, 2015 that it earned an additional $1.5 billion in October 2015 and conveyed the message that, as assets "continued to flow in well" in November and early December, the remaining three weeks left in the quarter would be no different.  Given the consistent inflow of over $1.5 billion per month throughout almost the entirety of 2015, it is simply implausible to believe that LPL, without any prior knowledge, would go from predicting approximately $1.5 billion per month in 4Q15 to completely negative in net new assets for the final three weeks left in December to complete 4Q15.

65.     Had net new advisory assets been $4.5 billion for 4Q15, that would have represented expected growth, up from $4.2 billion the quarter before.  Consequently, investors were stunned to learn on February 11, 2016 that by the close of 4Q15 on December 31, 2015, net new advisory assets had in fact plunged 26% sequentially from $4.2 billion in 3Q15 to $3.1 billion in 4Q15 and 23% year-over-year from $4.0 billion in 4Q14 to $3.1 billion in 4Q15.  As noted by UBS financial analysts, "[u]nderlying growth metrics were unimpressive" because, among other things, "net

1   new asset growth slowed." William Blair additionally highlighted that "[n]et new

2   advisory assets totaled $3.1 billion in the quarter and $16.7 billion for the year"

3   recognizing the impact of this previously concealed information.

4        66.    Additionally, the plunge in net new advisory assets in 4Q15 concealed by

5   Defendants on December 8, 2015 substantially raised the risk that future net new

6   advisory levels would trend below expectations as well. In fact, the drop in net new

7   advisory assets that began before the December 8, 2015 conference call with investors

8   continued into 1Q16. In 1Q16, LPL's net new advisory assets would total only $2.0

9   billion (an average of $0.67 billion per month), plunging 35% sequentially from $3.1

10   billion in 4Q15 and nearly 62% year-over-year from $5.2 billion in 1Q15. Defendants

11   not only failed to warn investors that net new advisory assets had already fallen

12   substantially below an average of $1.5 billion per month at the time of their December

13   8, 2015 conference call, but also failed to warn investors that the significantly adverse

14   trend that existed as of December 8, 2015 could be expected to continue into 2016.

15   **DEFENDANTS' STATEMENTS REGARDING THE LEVEL OF LPL'S
   BROKERAGE AND ADVISORY ASSETS WERE FALSE AND
16   MISLEADING WHEN MADE**

17        67.    LPL's "Brokerage and Advisory Assets" under management ("AUM")

18   financial metric was also material to investors because AUM is an important indicator

19   of performance and financial health and growth, and represented a source of revenue

20   for the Company. During the December 8, 2015 Conference, the Company stressed

21   the "growth of assets and gross profits as more representative of its business growth

22   than revenue growth," and Defendant Audette specifically stated in February 2016

23   that "assets, both brokerage and advisory, are the key driver of our gross profit." For

24   example, advisory and brokerage assets drove approximately 79% of LPL's total net

25   revenue and gross profit for the nine months ended September 30, 2015.

26        68.    In LPL's Investor Presentation on December 8, 2015, the Company

27   stated that "LPL's steady asset growth has driven topline performance." The

28   Company provided bar charts showing that brokerage and advisory assets combined

1   and the Company's gross profit have each been growing at an "8% CAGR
2   [compounded annual growth rate]" from 2010 through 3Q15.

3      69.   Defendant Audette also told investors that although the "markets went
4   down a fair bit," he "did see market levels and asset levels recover nicely."  Audette
5   added, "we're up at the end of October [2015] to $483 billion [AUM] versus $462
6   billion at the end of the [third] quarter [of 2015] so nice rebound there."  Similarly,
7   Defendant Casady stated that the Company had "***good advisory asset growth overall***"
8   and that "fundamentally, this year [FY 2015] is like any other in terms of the gross
9   amount [of advisors] and what's different is that we do have the smaller producers
10  leaving."

11     70.   Since 2013, LPL had consistently disclosed to investors that asset growth
12  had a 60% correlation to performance of the S&P 500 Index.  LPL's statements above
13  concerning the "rebound" and recovery of "market levels and asset levels" were false
14  and misleading when made because LPL's management failed to disclose that by the
15  December 8, 2015 presentation, LPL's AUM were performing substantially below
16  expectations relative to market levels (*i.e.*, the S&P 500 Index).  For example, while
17  the S&P Index rose 8.3% in October 31, 2015, LPL's AUM actually rose only 4.6%
18  from $461.8 billion to $483 billion, a 55% correlation to the S&P 500 Index, even
19  though the Company contemporaneously claimed that "net new advisory assets
20  continue to flow in well."

21     71.   In November and December AUM performed even worse against the
22  S&P 500 Index.  While the S&P 500 Index rose 6.5% in 4Q15, LPL's advisory and
23  brokerage assets rose only 3%, a weak 46% correlation with the S&P 500 Index in
24  4Q15.  LPL's omission regarding the declining growth rate of AUM through
25  December 8, 2015 was particularly misleading in light of the Company's statement
26  that "brokerage and advisory assets [AUM] rebounded with equity markets," and,
27  further, that "LPL views growth of assets and gross profits as more representative of
28  its business growth than revenue growth."  Telling of the divergence from historical

1  performance, LPL ceased disclosing after 3Q15 the previously claimed 60%

2  correlation between AUM performance and S&P 500 Index performance.

3  72. Given the changing mix of revenue components (brokerage vs. advisory),

4  and the Company's increasing need to show demonstratively ***growing*** advisory assets

5  and related revenues to counterbalance declining brokerage revenues, investors were

6  surprised to learn during 4Q15 that the level of AUM had fallen substantially short of

7  expectations, with exceptionally slow growth relative to the S&P 500 Index.

8  Financial analysts were disappointed with LPL's $475.6 billion reported AUM as of

9  4Q15 and UBS and S&P Capital IQ specifically cited this key business metric as a

10  reason for the substantial drop in LPL's stock price following the Company's

11  announcement of 4Q15 results: (i) "[C]lient assets missed expectations"; and (ii) "We

12  cut our 12-month target [stock] price [for LPL common stock] by $30 to $21 [per

13  share], [or] 11.1X our '16 [2016] EPS estimate of $1.89 [per share], cut from $2.71

14  [per share], a discount to its two-year average P/E [price earnings multiple] of 17X . . .

15  ***due to lower AUM [assets under management, or advisory and brokerage***

16  ***assets],which [the] company expects will pressure gross profits in '16***." Similarly,

17  Credit Suisse emphasized that the "well below expectations" earnings miss was driven

18  by "weaker gross profits . . . characterized by a pull-back in brokerages sales, [and]

19  weak advisor growth trends."

20  **DEFENDANTS' STATEMENTS THAT LPL'S GROSS PROFIT WOULD**
   **DECLINE SLIGHTLY IN 4Q15 WERE FALSE AND MISLEADING WHEN**
21  **MADE**

22  73. Defendants' failure to disclose LPL's weak fourth quarter AUM

23  performance was particularly important because AUM was viewed as a primary driver

24  of the Company's gross profits. As Defendant Audette would state in February 2016,

25  "Assets, both brokerage and advisory, are the key driver of our gross profit." And

26  LPL's gross profit is primarily driven by net revenue.[3]  Together, advisory and

27  _____

28  [3]  As set forth in LPL's SEC filings, LPL's brokerage asset levels are one of the
     primary drivers of LPL's commission revenue, LPL's most important source of

1  brokerage assets drove approximately 79% of LPL's total net revenue and gross profit

2  for the nine months ended September 30, 2015.[4]

3       74.     Defendants made false and misleading statements regarding LPL's

4  expectations for the Company's gross profit for 4Q15.  In LPL's presentation on

5  December 8, 2015, Defendants stated that "Q4 [2015] gross profit is likely to decline

6  slightly on a sequential basis."  Defendant Audette punctuated that statement saying

7  "the key thing" that he "would underscore [is] the word *slightly*" with respect to the

8  expected sequential gross profit decline.  Audette added "that Q4 [2015] gross profit is

9  likely to decline slightly for a few reasons, including . . . that advisory fees are really

10  grounded in the prior quarter's [advisory asset] balances, meaning right on

11  September 30th [2015]" and that, consequently, "there will be a little bit of a lag of

12  that showing up in gross profit going forward [in 4Q15]."[5]

13       75.     Defendants' statements that LPL's gross profit was going to decline only

14  "slightly" were false and misleading when made because Defendants knew by their

15  December 8, 2015 conference call, that LPL's gross profit was declining substantially

16  in 4Q15, primarily as a result of falling commission revenue, and in particular

17  decreases in sales-based activity for alternative investments, equities, mutual funds,

18  fixed income, and variable annuities, which are subsets of total commission revenues.

19  As a result, in 4Q15, LPL's gross profit declined 5.1% from $339.8 million in 3Q15 to

20

21

_____

22  revenue, representing 47% of LPL's total net revenue for the nine months ended
    September 30, 2015.  LPL's advisory asset levels are the primary driver of LPL's
23  advisory revenue, LPL's second most important source of revenue, representing 32%
    of LPL's total net revenue for the nine months ended September 30, 2015.  For the
24  nine months ended September 30, 2015, gross profit was 31.8% of net revenue.

25  [4]  LPL's SEC filings explain, "Gross profit is calculated as net revenues less
    production expenses. Production expenses consist of the following expense categories
26  from our consolidated statements of income: (i) commission and advisory and (ii)
    brokerage, clearing, and exchange."

27  [5]  LPL explains in its SEC filings that, "Advisory revenue for a particular quarter is
28  predominantly driven by the prior quarter-end advisory assets under management."

1   $322.4 million in 4Q15, the Company's worst sequential gross profit decline in four
2   years.[6]

3         76.    Defendant Audette also falsely characterized commission revenue as only
4   "slow" but reassured it would be "more of the same [$480.3 million] that we saw in
5   the third quarter [3Q15]," when Defendants knew or were reckless in not knowing that
6   commission revenue was plummeting below those stated figures.   Commission
7   revenues for 4Q15 would be reported at $463.5 million, 3.5% below the "more of the
8   same" $480 million reported in 3Q15.  Given the centrality of this metric to LPL's
9   overall performance, by December 8, 2015, this adverse trend would have been
10  evident to Defendants.

11        77.    Defendants also knew by December 8, 2015 that the substantial decline
12  in commission revenue in 4Q15 was primarily attributable to decreases in sales-based
13  activity for alternative investments, equities, mutual funds, fixed income, and variable
14  annuities.  In particular, revenues from alternative investments and equities declined
15  sequentially by 37.6% and 12.3%, respectively, from 3Q15 to 4Q15.   In fact,
16  alternative investment revenue (including investment categories in which LPL had
17  paid substantial regulatory fines, settlements and penalties) would drop a staggering
18  $47.1 million or 74% year-over-year in 4Q15, from $63.4 million in 4Q14 to $16.3
19  million in 4Q15.   This decrease was particularly significant because alternative
20  investment products were particularly lucrative for LPL and had recently been the
21  focus of regulators and Company reforms.  The dramatic downturn thus signaled a
22  fundamental change in certain of the Company's major revenue streams, a fact
23  confirmed by an acceleration in the decline of LPL's alternative investment revenues
24  in the first quarter of 2016, which dropped nearly 87% to $7.8 million in 1Q16, a
25  greater than 50% sequential decline from 4Q15's already abysmal results.

26

---

27  [6]   Also in 4Q15, LPL's gross profit declined 3.9% year-over-year, from $335.4
    million in 4Q14 to $322.4 million in 4Q15, the Company's worst year-over-year gross
28  profit decline in four years.

78.     Financial analysts from William Blair cited in a February 12, 2016 report, declines in alternative investments as a major cause of the 4Q15 gross profit decline:

- Alternative investment commissions (largely non-traded REITs [Real Estate Investment Trusts]) were down 38% sequentially and likely will continue to decline from here due to where we are in the real estate cycle, new FINRA [Financial Industry Regulatory Authority] disclosure rules, and the upcoming DOL [Department of Labor] fiduciary standard rule.

*       *       *

LPL reported fourth-quarter adjusted EPS of $0.37, $0.14 below consensus as well as our estimate. Gross profit of $322 million was $12 million below our estimate ($0.07 EPS impact) due to a combination of items but particularly alternative lower investment revenues.

79.     Wells Fargo also noted the declining commissions, finding "all in all it was a very challenging quarter with revenue down over 7% year-after-year including commissions that were down 12% year-after-year."

80.     These substantial commission revenue declines did not suddenly and unexpectedly materialize in the last 23 days of 2015, immediately after Defendants' December 8, 2015 conference call. Defendants later acknowledged, for example, that "[a]lternative investment sales commissions were challenged throughout the year, in particular non-traded real estate investment trusts (REITs), due to a maturing real estate cycle and uncertainties regarding upcoming regulatory changes." Further, the category was a particular focus of LPL management given the regulatory settlements, fines and penalties and efforts to reform Company practices in alternative investment products in 2015.

81.     LPL's $464 million reported 4Q15 commission revenue represented a $26 million or 5.3% shortfall from LPL's expected level of $490 million commission revenue for 4Q15, based on 2Q15 and 3Q15 rates of return on brokerage assets. This $26 million shortfall was the same amount as LPL's miss of the Wall Street consensus estimate for 4Q15 total net revenue. LPL's reported total net revenue for 4Q15 was $1.02 billion, or $26 million less than the Wall Street consensus estimate of $1.046 billion for 4Q15 total net revenue. Consequently, essentially all of LPL's $26 million

1  total net revenue shortfall in 4Q15 was attributable to LPL's commission revenue

2  shortfall.

3  **DEFENDANTS' STATEMENTS REASSURING INVESTORS THAT LPL
   WOULD HAVE FINANCIAL FLEXIBILITY AFTER THE SHARE
4  REPURCHASE WERE FALSE AND MISLEADING WHEN MADE**

5      82.     As Defendant Audette noted during the December 8, 2015 conference

6  call, "EBITDA is a general proxy [for] the amount of cash we generate [and it's] the

7  primary driver of the amount of debt we're allowed to have."  Audette also said, "I

8  would just add that our debt plan and debt structure and buyback plan was [*sic*]

9  designed and built with having the flexibility to be dynamic as we execute it over

10 time."

11     83.     By representing that LPL had the ability to generate cash to service debt

12 that would fund the buy-back plan, Defendants misled investors into believing that the

13 Company's earnings would be strong enough to carry substantial debt loads and that

14 LPL would have considerable financial flexibility going forward.  Casady told

15 investors that LPL "can easily fit [new acquisitions] into this structure even if the full

16 buyback were completed . . . [s]o, if something bigger [*i.e.*, a new investment

17 opportunity] came along on the M&A [merger and acquisition] front, again, we should

18 be able to do that without a problem."  Casady also reiterated that the share repurchase

19 would be "the best use" of Company capital because of LPL's then-current share

20 "price," stressing that "we can buy our own stock at 8-to-9 times EBITDA" which

21 was purportedly better than what was "available to us in the M&A market [which]

22 appears to be more like 10-, 12-, 14-times EBITDA."  "***So it's just price***. . . . And,

23 quite simply, I think it's a question of allocation of capital, ***the best use***."

24     84.     When investors ultimately learned LPL's actual disappointing FY 2015

25 EBITDA, they recognized that LPL's earnings stream was not supported and that LPL

26 had far less financial flexibility than Defendants conveyed in their December 8, 2015

27 conference call.  As earnings fell, leverage ratios rose, jeopardizing LPL's compliance

28 with its debt covenants.  As UBS analysts noted:

1   [B]uybacks were outsized in the 4Q[15] and so far in the 1Q[16], they
2   will likely slow from here as the company is closing in on its debt
    covenants and management acknowledges the dire outlook.

3   Additionally, Wells Fargo analysts later noted:

4   Leverage will likely limit buybacks – . . . The company maintains nearly
    $250MM on its existing buyback authorization but, given elevated
5   leverage levels, we don't expect much in the way of repurchases going
    forward. We calculate [LPL] could begin to run up against its debt
6   covenant of 5x net debt to EBITDA with another 15% decline in
    EBITDA from the 4Q[15] level. Accordingly, further material declines
7   in EBITDA could result in excess cash flow going to debt reduction, in
    our view.

8

9   85.   Moreover, Defendants knew that, with only 23 days remaining before the

10  close of FY 2015, the $43.27 per share price for the LPL stock buyback (with an

11  implied market capitalization of $4.11 billion) announced December 10, 2015 was

12  vastly inflated. Defendants knew that LPL's reported 4Q15 and FY 2015 EBITDA,

13  EPS, gross profit, and total net revenue were going to be substantially below

14  expectations, and that FY 2016 results were likely to be weaker as well. Defendants

15  also knew as of their December 8, 2015 conference call (while they were in the

16  process of executing the stock buyback at an inflated price), that when 4Q15 and FY

17  2015 results were announced on February 11, 2016, LPL's stock price would likely

18  fall substantially.

19                    **ADDITIONAL INDICIA OF SCIENTER**

20  86.   In addition to the facts alleged herein and throughout, the following facts

21  provide additional indicia of scienter: (1) the Individual Defendants were beholden to

22  TPG; (2) the misrepresentations involved LPL's core operations and occurred near

23  quarter-end; (3) the magnitude of the financial disappointment contrasted with

24  Defendants' misstatements; (4) Defendants' purported reasons for the miss are

25  demonstrably false; (5) TPG had access to adverse inside information about LPL's

26  fourth quarter financial results, business and prospects; and (6) the suspect timing of

27  the share repurchase.

28

**The Individual Defendants Are Beholden to TPG**

87.     Private equity firm TPG has long had control over LPL's business and affairs and substantial influence over the Company's management.  TPG, along with private equity partner Hellman & Friedman, took LPL private in 2005 in a deal that valued the Company at $2.5 billion.  After it took private control of the Company, TPG elevated Defendant Casady to his current position as CEO and Chairman.  For five years, Casady oversaw TPG's multi-hundred million dollar investment in LPL as the Company's CEO and Chairman, and in this capacity worked closely with TPG personnel.  From 2006-2009, Casady earned over $10 million in compensation in his positions at LPL under TPG control and influence.

88.     TPG took LPL public in 2010, vaulting Casady into the ranks of the ultra wealthy.  Casady sold more than $58 million worth of his personal LPL shares in the IPO.   TPG also ensured that Casady remained as LPL's CEO and Chairman, providing him with an employment agreement that lasted through February 2014.  As part of this agreement, LPL was required to take steps to ensure Casady was elected to the board and remained its chairman.  The agreement also provided a generous severance provision that would require LPL to provide Casady with nearly $90 million in severance and stock options if he was terminated without cause.  Between 2010 and 2015, Defendant Casady made over $119 million as LPL's Chairman and CEO – positions he owed to TPG's oversight, influence and control over the Company:

| | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | Totals |
|---|---|---|---|---|---|---|---|
| Insider Sales Proceeds | $          0 | $          0 | $          0 | $23,452,413 | $ 600,000 | $64,467,480 | $ 88,519,893 |
| Salary | 900,000 | 885,479 | 800,000 | 800,000 | 800,000 | 800,000 | 4,985,479 |
| Option Awards | 3,519,400 | 3,079,998 | 2,799,991 | 2,800,000 | - | 2,677,905 | 14,877,294 |
| Non-Equity Incentive Comp. | 1,237,500 | 1,485,000 | 2,500,000 | 1,000,000 | 2,091,625 | 2,225,000 | 10,539,125 |
| Other Comp. | 52,475 | 71,440 | 48,842 | 57,553 | 47,673 | 39,820 | 317,803 |
| | $ 5,709,375 | $ 5,521,917 | $ 6,148,833 | $28,109,966 | $ 3,539,298 | $70,210,205 | $119,239,594 |

89.     TPG took an activist, hands-on approach through its control of LPL, particularly through TPG's control of LPL CEO and Chairman, Defendant Casady. As TPG partner and LPL director Schifter put it in a press release dated October 27, 2005, "We look forward to working closely with Mark Casady and the rest of his team in the coming years to strengthen and build upon the leading position that LPL and its advisors hold in the industry." Likewise, in an interview with TPG partner and LPL director Boyce, published September 26, 2012, Boyce said that with LPL he played a "governance role, a strategy role," as well as providing "support and operational issues."

90.     Following the IPO, TPG continued to control LPL's business and affairs and maintained substantial influence over its management. TPG continued to own more than 30% of LPL's common stock, the most of any investor after Hellman & Friedman exited its position in 2013. TPG also appointed two directors to LPL's board, Richard Boyce and Richard Schifter – both TPG partners when appointed – and maintained additional governance rights over LPL's board and board committees. Boyce served on LPL's compensation committee, and Schifter served on LPL's nominating and governance committee. In addition, TPG received "information rights" allowing it access to the same information as board members, the right to inspect the books and records of the Company, and access to LPL officers for real-time information regarding the Company's business and prospects, among other information rights. TPG also continued to receive millions of dollars in fees from LPL in exchange for various consulting services. As part of the influence and control over LPL, TPG ensured its position would not change by demanding significant amendments to the Stockholder Agreement in September 2014 to provide it with enhance governance and control rights even if TPG's share ownership of the Company substantially diminished. These changes were necessary to ensure TPG's control after it reduced its stake in LPL during the 2012-2014 time period. As stated in LPL's SEC filings, TPG retained "***significant influence*** over corporate

1  transactions" and the ability "to **effectively control LPL's decisions**," and that TPG

2  had interests that may differ from other shareholders and may even take actions in

3  service of those interests against the interests of other shareholders.

4       91.     Similarly, Defendant Audette was hired as LPL's CFO in September

5  2015, while TPG maintained substantial influence over the Company and its

6  management and Board.  In connection with LPL's recruitment of, and negotiations

7  with Audette, he was awarded 2015 equity awards and cash bonus awards.  Under

8  LPL governance policies and practices, the LPL Compensation Committee (that

9  included Compensation Committee member and TPG former partner Boyce), had

10  responsibility for the issuance of these awards to Audette.  Pursuant to the terms of his

11  employment offer letter, in connection with his commencement of employment,

12  Audette was granted 17,605 RSUs and 17,605 stock options with an exercise price of

13  $42.60, the closing price of LPL shares on October 30, 2015.  Audette's base salary

14  for 2015 was $600,000 and he was awarded a bonus of at least $250,000.

15       92.     Further, in early 2016 the Compensation Committee established long-

16  term incentive awards for both Casady ($3.15 million) and Audette ($1.05 million).

17  These awards are not based on LPL performance, but are designed to reward the

18  executive based on the executives' individual performance in 2015 and other retention

19  considerations.  Based on these factors, the Compensation Committee (of which TPG

20  former partner Boyce was then a member) awarded both Casady and Audette 100% of

21  the targeted awards.

22       93.     Just before the beginning of the Class Period, in early October 2015,

23  Casady's tenure as Chairman and CEO of LPL was "attracting a lot of conjecture" and

24  it was publicly reported that his "glory days" were behind him.  Given the long history

25  of TPG's control over LPL, Casady was well aware that his livelihood lay primarily in

26  TPG's hands.  Similarly, Defendant Audette knew that TPG would have influence

27  over Audette's continued employment and the amount of his compensation.

28

94.    Thus, it is no coincidence that in late 2015, as news was circulating that Casady may be in jeopardy of losing his job, and with yearly evaluations of the Individual Defendants in the hands of the Board, that TPG was able to push through an early termination of the accelerated share repurchase program in order to cash out its own LPL shareholdings at a time when LPL's stock price was historically high. The Individual Defendants were beholden to TPG and had a compelling incentive not to provide a full picture of LPL's disastrous fourth quarter results during the December 8 conference call, as Defendants knew or should have known the truth would almost certainly diminish TPG's insider selling proceeds by tens of millions of dollars.

**The Misrepresentations Involved LPL's Core Operations and Occurred Near Quarter End**

95.    LPL's gross profits, net new advisory assets, alternative investment revenues and its level of brokerage and advisory assets were key financial metrics that were closely followed by the Company, its management and the market.  Analysts reported on and followed these metrics, and investors viewed them as primary indicators of the Company's future expected earnings.

96.    Additionally, Casady and Audette had clear visibility into the Company's financial performance at the time they spoke to the investment community on December 8, 2015. Metrics such as net new advisory assets were tracked monthly, as were earnings and revenues, if not even more often on a weekly or daily basis.  The majority of LPL's revenue streams were recurring and fall into two categories: commission revenues and advisory revenues.  For fiscal 2015, commission revenues and advisory revenues generated 46% and 32%, respectively, of LPL's total net revenues.  Commission revenues derive from upfront advisor fees and commissions for investment products and, for certain products, a trailing commission.  Advisory revenues derive from fee-based advisory platforms and the provision of ongoing investment advisory services.  For fiscal 2015, 72% of LPL's revenue was recurring in

nature, providing the Company substantial visibility into its future revenue streams. In addition, for transaction-based commissions, the Company generates revenues "at the point of sale," providing the Company with further visibility into its commission-based revenues at a given point in time. Further, the Company's alternative investment revenues were a particular focus at the time in light of LPL's recent spate of regulatory problems and reforms regarding this revenue source.

97. LPL also had significant visibility into its expenses. For example, depreciation and amortization expenses are computed by taking the book values of long-lived assets, such as internally developed software, leasehold improvements, computers and software, and furniture and equipment (recorded at historical cost and reduced by accumulated depreciation and amortization), and then dividing those assets on a straight-line basis over the estimated useful lives of the assets - all things readily determined and anticipated and under the control of management.

98. By the time of the December 8, 2015 conference call, approximately 10 out of 13 weeks for LPL's fiscal fourth quarter had already occurred. To prepare for the investor conference, Defendants consulted the recent LPL books and records. As a result, Defendants had substantial knowledge as to the Company's fourth quarter performance and visibility into the remainder of the quarter. Later, in response to an analyst statement that LPL had a "pretty good line of sight" into its fourth quarter results, Defendant Casady would admit that he and the rest of management "certainly, we had insight into the quarter" and "knew we'd have challenges."

99. Thus, with only three weeks left in the quarter, Defendants knew their statements regarding LPL's key financial metrics were false and misleading when made, especially given the centrality of the metrics at issue to LPL's core operations and importance to the market.

**The Magnitude of LPL's Financial Disappointment
in Contrast to Defendants' Misrepresentations**

100.   The magnitude of Defendants' misrepresentations provides further indicia of scienter.  For example, Defendants' December 8 statements that LPL was averaging $1.5 billion in net new advisory assets per month during the fourth quarter implied a quarterly figure more than 45% greater than the $3.1 billion in net new advisory assets LPL actually achieved during the quarter.  Similarly, Defendants' representation that commission revenue in 4Q15 would be "more of the same" as LPL's 3Q15 results was far from the truth.  In fact, the Company's fourth quarter alternative investment revenue declined 74% year-over-year, contributing to an approximately $26 million commission revenue shortfall.  The magnitude of this miss was particularly significant because it occurred in formerly lucrative alternative investment products that had been the focus of regulatory scrutiny and Company reform in preceding quarters.  Consequently, the dramatic downturn in LPL's alternative investment revenues signaled a fundamental shift in LPL's primary revenue sources that would adversely impact the Company's ability to generate profits and cash flows going forward.  Indeed, 4Q15 represented the Company's worst sequential profit decline in four years – a reality sharply at odds with Defendants' false assurances on December 8 that gross profits would be down only "slightly" for the quarter and misleading emphasis to "underscore the word slightly."

101.   Defendants did not make minor errors, but substantial misrepresentations of their core financial metrics.  As Defendants were aware, analysts and investors paid close attention to these metrics and used them to assess the Company's expected future cash flows and evaluate the price of LPL stock.  Thus, on December 8, when Defendants reaffirmed the purported benefits of the share repurchase plan and stated that the Company's capital plan was in shareholders' "best interest" and indicative of "an earnings stream that is quite steady and produces cash flow over time" these statements were diametrically opposed to reality.  At the time, Defendants knew that

1    TPG would use the accelerated share repurchase plan to cash out at well above $40

2    per share – close to a two-year share price high and more than double the share price

3    after the truth was revealed in February 2016 – and thus that the buyback would result

4    in a wasteful and inefficient use of Company capital in order to benefit a favored and

5    controlling insider.

6        102.   Only eight weeks after Defendants' misrepresentations, it was disclosed

7    that the quarter had actually ended with drastically different negative results.  It defies

8    belief that so many different aspects of LPL's finances could have changed so

9    drastically in the short amount of time between Defendants' statements on December

10   8, 2015 and the disclosure of the actual financial results, and that a controlling insider

11   with access to internal Company information was able to coincidentally excise a

12   substantial portion of its LPL shareholdings at exactly the right time.

**Defendants' Purported Reasons for the Miss**
**Are Demonstrably False**

15       103.   Defendant Casady's unsupported excuse that it was simply a general

16   unforeseen market decline that caused LPL's poor 4Q15 results further shows his

17   complicity in the scheme to mislead and defraud investors in order for TPG, to whom

18   the Individual Defendants were beholden, to cash out at peak prices.

19       104.   Of six peer companies identified by LPL in its February 25, 2016 10-K

20   filing, those peers beat Wall Street analyst earnings expectations by 5.5% on average

21   for the fourth quarter of 2015.   But, LPL missed *by over 27%* in comparison.

22   Likewise, LPL's peers on average suffered a 3.7% stock price decline following the

23   release of their fourth quarter 2015 results using a ±1 trading day window.  But LPL

24   stock price declined by nearly 22% – almost seven times as much as its peers.

25       105.   The falsity of Casady's excuse that LPL's disastrous fourth quarter 2015

26   results were due only to an unforeseen market downturn is further demonstrated by

27   the fact that LPL's earnings performance and corresponding stock price decline was

28   substantially worse than the 16 comparable companies in the New York Stock

1   Exchange ARCA securities broker dealer index.  These companies on average for the

2   fourth quarter 2015 beat Wall Street analysts' earnings expectations by 3.8%, but LPL

3   missed by over **27.3%** in comparison.  Likewise, these 16 comparable companies on

4   average suffered a -.5% stock price decline following the release of fourth quarter

5   2015 results using a ±1 trading day window.  But LPL stock price dropped by 21.9% –

6   over twenty times as much.

7      106.   Likewise, analysts from JMP Securities and Wells Fargo highlighted

8   respectively that the 4Q15 results were also the result of "company-specific

9   headwinds," and "other [LPL specific] issues affecting results including a low level of

10  net recruiting and ongoing declines in alternative investment sales."

11     107.   LPL's drastically worse fourth quarter performance and stock price

12  decline in comparison to its market and industry peers shows that it was hardly a

13  purported unforeseen general market downturn that caused LPL's weak fourth quarter

14  results.  That Casady could offer only a widespread unsupported excuse for LPL's

15  fourth quarter results further demonstrates Defendants' complicity in deceiving

16  investors.

17  **TPG Had Access to Insider Information**

18     108.   TPG in its shareholder agreement with LPL also explicitly received "the

19  right to obtain **any** reports, documents, information or other materials . . . which a

20  member of the LPL Board has received or has the right to receive."  TPG also had the

21  right to receive additional information regarding LPL's business directly from the

22  Company's executive officers.  Effectively, this meant that by virtue of the fact that

23  TPG partners Boyce and Schifter served on LPL's Board of Directors, TPG as an

24  entity had the right **at any time** to access inside financial information regarding LPL's

25  financial results and prospects not available to other investors.  This special access

26  allowed TPG to have real-time visibility into LPL's financial performance and have

27  inside information upon which it could determine whether to trade or hold its LPL

28  shares.

109.   The Board, on which TPG former partners Boyce and Schifter sat, met 10 times in 2015.  In addition, a special meeting of the Board was held to approve the early termination of the accelerated share repurchase program in order to allow TPG to sell its LPL shares back to the Company around the time of the December 8, 2015 conference call.  Because TPG retained the right to access any information shared with the Board, it would have had access to inside information regarding LPL's unfavorable 4Q15 results at the time and a strong incentive to unload its shareholdings before the truth was disclosed to the market.

**The Highly Suspect Sequence of Events**

110.   The highly suspect sequence of events makes clear that the timing of TPG's sale of LPL stock at peak prices and the false and misleading nature of Defendants' statements on the December 8, 2015 conference call were not coincidental.

111.   LPL announced on October 29, 2015 that it would "maximize shareholder returns" by buying back $500 million worth of its own shares.  This announcement had the desired effect of signaling the Company's confidence in its business and forthcoming financial results which propelled the stock price over 10% in subsequent days.

112.   On November 24, 2015 LPL announced it had entered into an agreement with Goldman to carry out a $250 million accelerated share repurchase as part of the $500 million buyback.  The Company, however, cautioned even the accelerated buyback would take "several months" to complete.

113.   However, behind the scenes by at least the beginning of December 2015, LPL's financial results demonstrated that the Company would be facing a disastrous fourth quarter.  With only a few weeks left until quarter end, the financial metrics used by the Company to measure its financial performance indicated abysmal results far below market expectations.  At this time, TPG had the ability to influence and control LPL's decisions even to the detriment of other shareholders and had access to internal

financial information that would have shown a significant decline in LPL's business. Indeed, LPL's Board met ten times in 2015 and as discussed above, any information shared with Directors of the Board would automatically be made available to TPG as well.

114.   While LPL's stock was then trading well above $40 per share (near a two-year high), TPG understood that once the market was made aware that LPL's fourth quarter financial results would fall far short of Wall Street expectations, the stock price would decline substantially leading to massive losses in the value of TPG's LPL stock portfolio.

115.   Thus, in late November or early December, and prior to December 8, 2015, TPG approached Goldman to carry out the repurchase of more than 4 million shares while the stock was still trading at historically high levels.

116.   Prior to the sale being publicly disclosed, on December 8, 2015, LPL provided investors with a near end-of-quarter financial update during which Casady and Audette falsely assured investors that the Company was performing as expected – hiding the Company's true financial results and prospects.  Following the statements made at the conference, LPL's stock traded as high as $45.89 per share.

117.   Two days later, and contrary to LPL's previous statement that the share repurchase program "***will take several months to complete***," the Company announced that TPG had cashed out 4.3 million shares of its LPL common stock at $43.27 per share, comprising more than three quarters of the accelerated buyback, and that the entire $250 million accelerated share repurchase program had been completed in a ***matter of days***.  TPG was thus able to cash out at peak prices, and at the precise time that LPL's internal results experienced adverse trends but before these results were disclosed to the market.

118.   The following chronology illustrates the fraud:



119.  Thus, TPG's access to LPL's financial information, and its ability to control and influence LPL's financial decisions, allowed it to dispose of approximately one-third of its stake in LPL at a historically high stock price, generating approximately $187 million in insider sales proceeds.  If TPG had been forced to sell its shares after the fourth quarter results were disclosed, its insider trading proceeds would have been diminished by approximately $115 million.

## LOSS CAUSATION/ECONOMIC LOSS

120.  During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions of material facts necessary to render those statements not false and misleading, which artificially inflated the price of LPL common stock.

121.   As set forth in detail in ¶¶56-85 LPL's false and misleading statements and omissions focused on LPL's key business metrics such as net new advisory assets, brokerage and advisory assets, and gross profits.

122.   Plaintiff and investors purchased LPL stock at inflated prices and suffered damages when the price of LPL stock declined upon the revelations of the truth in contrast to Defendants' earlier misstatements.  The timing and magnitude of LPL's significant price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

123.   On February 11, 2016, LPL announced its fourth quarter and full year 2015 financial results and revealed the falsity of its December 8, 2015 misrepresentations.  LPL disclosed that gross profits had fallen 35% in the quarter and 5% for the year and that it had generated only $0.37 per share in adjusted EPS, 27% below consensus analyst estimates of $0.51 per share.  The Company further revealed that reported net new advisory asserts for the fourth quarter were only $3.1 billion, $1.4 billion less than Defendants misled investors to believe on December 8, 2015. The Company also disclosed that the negative performance in LPL's advisory and brokerage asserts resulted in reported earnings being worse than expected – in contrast to their December 8, 2015 statements that advisory and brokerage assets had recovered and would trend upwards.  Finally, LPL disclosed that in 4Q15, LPL's gross profit declined 5.1% from $339.8 million in 3Q15 to $322.4 million in 4Q15, the Company's worst sequential gross profit decline in four years, primarily as a result of falling commission revenues, in contrast to their December 8, 2015 statements that gross profits would decline only "slightly."

124.   Numerous analysts recognized the financial impact of this previously concealed information.  William Blair highlighted that: (i) "[g]ross profit of $322 million was $12 million below our estimate ($0.07 EPS impact) due to a combination

of items but particularly lower alternative investment revenues"; (ii) "[n]et new advisory assets totaled $3.1 billion in the quarter and $16.7 billion for the year"; and (iii) "[a]lternative investment commissions (largely non-traded REITs) were down 38% sequentially and likely will continue to decline." Wells Fargo stressed that "all in all it was a very challenging quarter with revenue down over 7% year-after-year including commissions that were down 12% year-after-year." Credit Suisse emphasized that the "well below expectations" earnings miss was driven by "weaker gross profits . . . characterized by a pull-back in brokerage sales, [and] weak advisor growth trends."

125.   As a result of this news, the price of LPL common stock dropped nearly 35% to close at $16.50 per share on unusually high trading volume of over 11.4 million shares. Analysts from UBS described the results as "[u]gly" and JP Morgan noted a "lack of confidence in management," and that "management looks bad here." Indeed, Wells Fargo's analysts expressed skepticism that LPL had no previous knowledge of the disappointing financial results, and noted the suspicious timing of the share repurchase from TPG:

> The follow-up I had really had to do with the buyback, and I know you guys tend to have a pretty good line of sight in your business. And so I would imagine when you guys had some idea that the fourth quarter was going to be pretty challenging.

126.   Defendant Casady rebuffed any suggestion of knowledge and attempted to blame LPL's poor results on an unforeseen market downturn. However, analysts from JMP Securities and Wells Fargo highlighted respectively that the 4Q15 results were also the result of "company-specific headwinds," and "other [LPL specific] issues affecting results including a low level of net recruiting and ongoing declines in alternative investment sales."

127.   Casady's attempt to blame LPL's disastrous financial results on the general market downturn is belied by the fact that LPL's results and stock price decline were drastically worse than its market and industry peers.

128.   Six quarterly reporting public companies LPL listed in its February 25, 2016 10-K filing as its peers beat Wall Street analyst earnings expectations by 5.5% on average for the fourth quarter of 2015.   But, LPL missed *by over 27%* in comparison:



129.   Likewise, analyzing the earning release date of ±1 trading day, LPL's peers on average suffered a 3.7% stock price decline following the release of their fourth quarter 2015 results.   But LPL stock price declined by nearly *22%* – almost seven times as much as its peers:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    130.    The fallacy of Casady's excuse that LPL's disastrous fourth quarter 2015

17 results were due only to an unforeseen market downturn is further proven by the fact

18 that LPL's earnings performance and corresponding stock price decline was

19 substantially worse than the 16 comparable companies in the New York Stock

20 Exchange ARCA securities broker dealer index. These companies on average for the

21 fourth quarter 2015 beat Wall Street analysts' earnings expectations by 3.8%, but LPL

22 missed by over **27%** in comparison.

23    131.    Likewise, analyzing the earning release date of ±1 trading day, these 16

24 comparable companies on average suffered a -.5% stock price decline following the

25 release of fourth quarter 2015 results.  But LPL stock price dropped by **21.9%** – over

26 twenty times as much:

27
28



## Stock Price Decline – Industry Group

**Average stock price decline during earnings release window**
Timeframe: Earnings release date ±1 trading day

Source: Bloomberg.

132.   As a result of Defendants' false statements, LPL common stock traded at artificially inflated prices during the Class Period.  However, when the previously concealed truth was finally disclosed to the market, the Company's stock suffered massive sales, sending the price down 63% from its Class Period high and causing economic harm and damages to Plaintiff and Class Members.

<div align="center">

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE
AND FRAUD ON THE MARKET**

</div>

133.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased LPL common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

134.   At all relevant times, the market for LPL common stock was efficient for the following reasons, among others:

(a)     LPL stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, LPL filed periodic public reports with the SEC; and

(c)     LPL regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

135.   Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

136.   LPL did not issue verbal "Safe Harbor" warnings to accompany its oral FLS issued during the Class Period and, in any event, any warnings were ineffective to shield those statements from liability.

137.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of LPL who knew that the FLS was false.  Further, none of the historic or present tense

statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

138.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased LPL common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

139.   The members of the Class are so numerous that joinder of all members is impracticable.  LPL stock is actively traded on the NASDAQ and there are nearly 89 million shares of LPL common stock outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LPL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

140.   Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of LPL common stock and the extent and appropriate measure of damages.

141.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

142.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

143.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<div align="center">

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

</div>

144.   Plaintiff incorporates all allegations in ¶¶1-143 above by reference.

145.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

146.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of LPL common stock during the Class Period.

147.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LPL common stock. Plaintiff and the Class would not have purchased LPL common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

148.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of LPL common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

149.   Plaintiff incorporates all allegations in ¶¶1-148 above by reference.

150.   The Individual Defendants acted as controlling persons of LPL within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of LPL common stock, the Individual Defendants had the power and authority to cause LPL to engage in the wrongful conduct complained of herein.

151.   LPL controlled the Individual Defendants and all of its employees.

152.   By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Determining that this action is a proper class action, and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.   Awarding damages and interest;

1       C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

2       D.     Awarding such equitable/injunctive or other relief as the Court may deem

3 just and proper.

4                         **JURY DEMAND**

5       Plaintiff demands a trial by jury.

6 DATED: September 19, 2016       ROBBINS GELLER RUDMAN
                                                               & DOWD LLP
7                                     JONAH H. GOLDSTEIN
                                     SUSAN G. TAYLOR
8                                     BRIAN E. COCHRAN

9

10                                   s/ JONAH H. GOLDSTEIN
                                       JONAH H. GOLDSTEIN

11

12                              655 West Broadway, Suite 1900
                              San Diego, CA  92101-8498
13                              Telephone:  619/231-1058
                              619/231-7423 (fax)

14                              Lead Counsel for Lead Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 19, 2016.

  s/ JONAH H. GOLDSTEIN
JONAH H. GOLDSTEIN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:   jonahg@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-00685-BTM-BGS Charter Township of Clinton Police and Fire Retirement System v. LPL Financial Holdings Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard Lawrence Gallagher**
  richard.gallagher@ropesgray.com,Matthew.Tolve@ropesgray.com,courtalert@ropesgray.com,rogelio.jose@ropesgray.com

- **Jonah H. Goldstein**
  JonahG@rgrdlaw.com,e_File_SD@rgrdlaw.com

- **Tricia L McCormick**
  TriciaM@rgrdlaw.com,DHouck@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan Goss Taylor**
  STaylor@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David C Walton**
  davew@rgrdlaw.com,hectorm@rgrdlaw.com,hstmartin@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)