ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN (193777)
SUSAN G. TAYLOR (190753)
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com
susant@rgrdlaw.com
bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>LPL FINANCIAL HOLDINGS INC., et al.,<br><br>                    Defendants. | Case No. 3:16-cv-00685-BTM-BGS<br><br><u>CLASS ACTION</u><br><br>LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT<br><br>DATE:  April 14, 2017<br>TIME:  11:00 a.m.<br>JUDGE:  Hon. Barry Ted Moskowitz<br>CTRM:  15B (15th Floor Carter/Keep) |

1225005_1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  STATEMENT OF FACTS .................................................... 4

III. ARGUMENT .......................................................................... 7

   A.   The Complaint Amply Pleads Defendants' Materially False and Misleading Statements and Omissions ................................... 7

      1.   Defendants' False and Misleading Statements Regarding the Company's Capital Plan and Net New Advisory Assets ................................................................... 8

      2.   Defendants' False and Misleading Statements Regarding Gross Profits, Asset Growth and Expenses ............................ 12

      3.   Defendants' Contemporaneous Awareness of Falsity.............. 14

   B.   Defendants' Statements Are Not Forward-Looking and Are Not Protected by the PSLRA Safe Harbor.................................. 15

   C.   The Complaint Alleges a Strong Inference of Scienter ...................... 17

   D.   None of Defendants' Remaining Challenges Undermine the Sufficiency of the Complaint ................................................. 24

      1.   Plaintiffs Do Not Allege a Breach of Fiduciary Duty .............. 24

      2.   Defendants' Statements Are Not Inactionable Puffery ........... 24

   E.   Section 20(a) Control Person Liability is Properly Pled ................... 25

IV.  CONCLUSION .......................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................ 7

*Backe v. Novatel Wireless, Inc.*,
  642 F. Supp. 2d 1169 (S.D. Cal. 2009) ........................................... 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................... 7

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................... *passim*

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ........................................................... 8

*Bruce v. Suntech Power Holdings Co.*,
  64 F. Supp. 3d 1365 (N.D. Cal. 2014) ............................................ 20

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) .......................................... 24

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................... 8

*Flynn v. Sientra*,
  No. 15-07548 SJO, 2016 U.S. Dist. Lexis 83409
  (C.D. Cal. June 9, 2016) ............................................................ 18, 19

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ......................................................... 24

*In re Airgate PCS, Inc. Sec. Litig*,
  389 F. Supp. 2d 1360 (N.D. Ga. 2005) ........................................... 24

*In re Am. Apparel, Inc. S'holder Litig.*,
  No. CV 10-06352 MMM, 2013 U.S. Dist. LEXIS 6977
  (C.D. Cal. Jan. 16, 2013) ............................................................... 20

*In re Amylin Pharms., Inc. Sec. Litig.*,
   No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667
   (S.D. Cal. May 1, 2003) (Moskowitz, J.) ........................................ 16

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ........................................................ 17

*In re Aspeon, Inc. Sec. Litig.*,
   168 F. App'x 836 (9th Cir. 2006) .................................................... 20

*In re Bridgepoint Educ. Inc. Sec. Litig.*,
   No. 3:12-CV-1737 JM (WMC), 2013 U.S. Dist. LEXIS 131423
   (S.D. Cal. Sept. 13, 2013) ............................................................... 15

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ........................................................ 16

*In re Infosonics Corp. Sec. Litig.*,
   No. 06cv1231 BTM, 2007 U.S. Dist. LEXIS 57784
   (S.D. Cal. Aug. 7, 2007) (Moskowitz, J.) ........................................ 17

*In re MGM Mirage Sec. Litig.*,
   No. 2:09-cv-01558-GMN-VCF, 2013 U.S. Dist. LEXIS 139356
   (D. Nev. Sept. 26, 2013) ................................................... 16, 17, 25

*In re Questcor Sec. Litig.*,
   SA CV 12-01623 DMG (FMOx), 2013 U.S. Dist. LEXIS 142865
   (C.D. Cal. Oct. 1, 2013) .................................................................. 22

*In re Rexall Sundown, Inc. Sec. Litig.*,
   No. 98-8798-CIV-DIMITROULEAS, 2000 U.S. Dist. LEXIS
   20748 (S.D. Fla. Mar. 29, 2000) .................................................... 23

*In re Thoratec Corp. Sec. Litig.*,
   No. C-04-03168 RMW, 2006 U.S. Dist. LEXIS 30602
   (N.D. Cal. May 11, 2006) ............................................................... 23

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ............................................................ 7

*In re Wash. Mut., Inc. Sec.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009) ....................................... 19

*Kelly v. Elec. Arts, Inc.*,
No. 13-cv-05837-SI, 2015 U.S. Dist. LEXIS 57130
(N.D. Cal. Apr. 30, 2015) .................................................................... 19

*Lifschitz v. NextWave Wireless Inc.*,
No. 3:08cv01697 AJB (WMC), 2011 WL 5839682
(S.D. Cal. Nov. 21, 2011) ................................................................... 19

*Maiman v. Talbott*,
No. SACV 09-0012 AG (ANx), 2010 U.S. Dist. LEXIS 142712
(C.D. Cal. Aug. 9, 2010) ..................................................................... 17

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012) ............................................... 19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .............................................................................. 12

*Morse v. McWhorter*,
200 F. Supp. 2d 853 (M.D. Tenn. 2000) ............................................. 23

*Newcal Indus. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ............................................................ 24

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W.
Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .............................................................. 23

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ............................................................... 24

*Olenicoff v. UBS AG*,
No. SACV 08-1029 AG (RNBx), 2010 U.S. Dist. LEXIS 144474
(C.D. Cal. Mar. 16, 2010) ................................................................... 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund*,
__ U.S. __, 135 S. Ct. 1318 (2015) ....................................... 8, 9, 14

*Osher v. JNI Corp.*,
256 F. Supp. 2d 1144 (S.D. Cal. 2003) .............................................. 9

*Patel v. Axesstel*,
   No. 3:14-CV-1037-CAB-BGS, 2015 U.S. Dist. LEXIS 18385
   (S.D. Cal. Feb. 13, 2015) ........................................................................ 19

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer
   Holdings, Inc.*,
   673 F. Supp. 2d 718 (S.D. Ind. 2009) .................................................... 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .................................................................. 16

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ...................................................... 17, 18, 19, 22

*Rihn v. Acadia Pharms.*,
   No. 15cv00575 BTM(DHB), 2016 U.S. Dist. LEXIS 128291
   (S.D. Cal. Sept. 19, 2006)................................................................*passim*

*Schuneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .................................................................... 12

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ......................................................................*passim*

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................ 24

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ...................................................................... 24

*Willis v. Big Lots, Inc.*,
   No. 2:12-cv-604, 2016 U.S. Dist. LEXIS 8028
   (S.D. Ohio Jan. 21, 2016) ............................................................ 16, 21, 22

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .................................................................... 24

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78u-4 ................................................................................................. 4, 7, 15, 20
  §78u-4 (b)(2)(A) ...................................................................................... 17
  §78u-5(c) ................................................................................................. 15
  §78u-5(c)(2) ............................................................................................ 16

Federal Rules of Civil Procedure
  Rule 9(b) ................................................................................................. 4, 7
  Rule 12(b)(6) ........................................................................................... 7

Code of Federal Regulations
  17 C.F.R.
  §240.10b-5 .............................................................................................. 25

# APPENDIX OF DEFINED TERMS

| | |
|---|---|
| "AUM" | "Brokerage and Advisory Assets" under management. |
| "CEO" | Chief Executive Officer. |
| "CFO" | Chief Financial Officer. |
| "Complaint" | All "¶" or "¶¶" references are to the Consolidated Complaint for Violation of the Federal Securities Laws (Dkt. No. 16). |
| "EPS" | earnings per share. |
| "H&F" | Hellman & Friedman, LLC. |
| "IPO" | initial public offering. |
| "LPL" | LPL Financial Holdings Inc. or the Company. |
| "MTD" | Memorandum of Points & Authorities in Support of Defendants LPL Financial Holdings Inc., Mark S. Casady, and Matthew J. Audette's Motion to Dismiss Lead Plaintiff's Consolidated Complaint (Dkt. No. 17-1). |
| "PSLRA" | Private Securities Litigation Reform Act of 1995. |
| "RJN" | Defendants' Request for Judicial Notice in Support of Motion to Dismiss Lead Plaintiff's Consolidated Complaint (Dkt. No. 17-2);<br><br>Exhibits A to N are attached to the RJN (Dkt. Nos. 17-4 to 17-17). |
| "TPG" | TPG Capital. |

## I.    INTRODUCTION

This is a straightforward case of securities fraud.  Since 2013, and well into 2015, LPL had been subjected to numerous regulatory enforcement actions that harmed its reputation and business prospects and drove down its stock price.  On October 29, 2015, the Company announced that it would repurchase $500 million of its shares, touting it as a "bargain" and the "key" to "turn the page" on these problems. This massive repurchase would require LPL to incur hundreds of millions of dollars of debt, and to achieve steady earnings and cash flows to service that debt.  Market analysts highlighted that "the buyback program clearly signals management's confidence in the outlook."

Only five weeks later, on December 8, 2015, the beginning of the Class Period, defendants made materially false and misleading statements regarding LPL's fourth quarter performance that conveyed the misleading message that nothing had changed since the prior quarter and that LPL's earnings were sufficient to execute the share repurchase plan and drive shareholder value.  For example, defendants told the public that LPL's capital plan was driven by a "strong earnings stream" and "cash flow" in "the last two months," and also highlighted that "net new advisory assets continue to flow in well," "averaging about $1.5 [billion] a month."  Defendants' statements were received positively by the market and inflated the price of LPL shares.

At the time of defendants' statements, only three weeks remained in the fourth quarter, and they knew, or were reckless in not knowing, that the Company was in the midst of a disastrous fourth quarter and would suffer significant declines in each of the key financial areas about which they positively spoke.  After the market closed, on February 11, 2016 – only two months after defendants' statements – the Company revealed the previously concealed truth about its severely disappointing fourth quarter performance.  The next day, the price of the LPL's shares immediately plummeted

1  more than 35%, and over 63% from Class Period highs – well beyond any general

2  market and industry related declines.

3  Faced with the well-pled allegations detailing the "who, what, when, where and

4  why" of the fraud, defendants resort to ignoring the plain words they spoke and

5  misdirecting the Court to impermissibly accept that they meant something different

6  than what they actually said.   They assert that their December 8th statements

7  conveyed only the Company's historical performance through the first month of 4Q15

8  (October), and absolutely nothing about the Company's already completed November

9  performance or any expectations for the remaining three weeks left in December.  But,

10  defendants' plain words belie this assertion.   Their December 8th statements

11  specifically referenced a "steady earnings stream" and "cash flow" over "the last two

12  months" and cannot be reasonably read to refer only to LPL's October performance.

13  Moreover, defendants' December 8th reassurances that "net new advisory assets

14  continue to flow in well," and that LPL is "averaging about $1.5 billion a month,"

15  occurred after the Company's November performance was complete, and defendants'

16  positive present-tense statement, with only three weeks remaining in 4Q15, gave no

17  indication whatsoever of any deviation from the $1.5 billion monthly average.  No

18  matter how these statements are read, they are objectively false.  Defendants earned

19  only $3.1 billion in net new advisory assets for the quarter ($1 billion per month and a

20  33% decline from the $1.5 billion average).  LPL could not reasonably have suffered

21  such an enormous decline only in the last three weeks of the quarter after defendants'

22  statements, having averaged $1.5 billion so far for all of 2015.  Thus, a significant part

23  of the 33% fourth quarter decline must have occurred prior to their December 8th

24  statements, and defendants offer nothing to contest this conclusion.  Having chosen to

25  speak positively about the Company's $1.5 billion "average" on December 8th and

26  explicitly reassure investors that these assets "continue to flow in well," defendants

27  were required under the federal securities laws to disclose the significant decline that

28

1   had already necessarily occurred.  Not doing so rendered their statements false and

2   misleading when made.

3   Defendants implausibly contend that when they spoke on December 8th they

4   had zero visibility into the disastrous fourth quarter results.  But, when pressed on

5   February 11th to explain its disappointing 4Q15 results, given LPL's "pretty good line

6   of sight in your business . . . and some idea that the fourth quarter was going to be

7   pretty challenging," CEO defendant Casady candidly ***admitted*** the obvious: "***certainly***

8   ***we had insight into the quarter and you knew we would have challenges*** . . . ."

9   In addition, contrary to defendant Casady's post-mortem excuse that it was a

10  sudden drastic and unforeseen market downturn that caused their disastrous fourth

11  quarter results, the Complaint details that analysts attributed LPL's poor performance

12  to "company-specific headwinds" and "other [LPL specific] issues."  The Complaint

13  provides numerous detailed statistical analyses – which defendants fail to contest –

14  that show that LPL's poor 4Q15 results and stock price decline were company specific

15  and drastically worse than LPL's market and industry peers.

16  The Complaint also pleads the requisite strong inference of scienter.  On

17  December 8th, 10 of the 13 weeks in 4Q15 were completed, and defendants Casady

18  and Audette, the CEO and CFO, respectively, had a clear indication of the fourth

19  quarter results, or were reckless in speaking positively about the Company's key

20  operating metrics without any visibility.  Indeed, the importance of the subjects of

21  defendants' positive statements is shown by the fact that the significant

22  underperformance in each of these financial metrics revealed on February 11th caused

23  LPL's stock price to drastically decline.  In addition, any doubt about defendants'

24  concealed knowledge is defeated by Casady's admission that "***certainly we had***

25  ***insight into the quarter***" and "***knew we would have challenges***."  As this Court

26  recognized in *Rihn v. Acadia Pharms.*, No. 15cv00575 BTM(DHB), 2016 U.S. Dist.

27  LEXIS 128291, at *25-*26 (S.D. Cal. Sept. 19, 2006), "it would be incredible to

28  conclude that the CEO [and] CFO . . . were not aware of the information at issue that

made their . . . representations misleading." A strong inference of scienter is further bolstered by the fact that only two months after defendants' positive statements, LPL suffered significantly disappointing results across each of the financial metrics upon which defendants positively spoke.

Last, plaintiff has pled a cogent theory that is at least as compelling as any opposing inference: that LPL hid the truth to allow its controlling shareholder TPG – who at the time of defendants' statements had explicit "significant influence" and the ability "to effectively control LPL's decisions" – to unload 4.3 million shares at near record and inflated prices as part of the share repurchase. Defendants fail to provide a more compelling, non-culpable inference of scienter.

In sum, because plaintiff's Complaint amply satisfies the pleading requirements of the PSLRA and Rule 9(b), defendants' motion to dismiss should be denied.

## II.   STATEMENT OF FACTS

Defendant LPL provides a platform of brokerage and investment advisory services to independent financial advisors. Complaint ¶¶1, 43-44. LPL generates revenues primarily from fees and commissions on clients' brokerage and advisory assets, and LPL's real-time accounting gives LPL good visibility into its revenues and related asset levels at any particular point in time. ¶¶1, 44, 97.

In 2005, LPL sold a controlling stake to two private equity firms, TPG and H&F. ¶2. TPG immediately elevated defendant Casady to CEO and Chairman of LPL (positions in which he would personally reap more than $100 million) and gained on-going rights to LPL's internal non-public information. ¶¶2, 4, 6, 49.

In November 2010, TPG and H&F took LPL public for approximately $470 million (the "IPO"), a transaction that netted Casady $58 million. ¶¶3, 46, 88. After the IPO, TPG retained "significant influence over corporate transactions," the ability "to strongly influence or effectively control LPL's decisions" and "continue[d] to be able to influence [LPL's] decisions regardless of whether or not the stockholders

believe that the transaction is in their own best interests." ¶¶4, 13, 16, 48, 90. TPG received "the right to obtain any reports, documents, information or other materials . . . which a member of the LPL Board" may receive. ¶¶5, 49, 108.

By October 2015, LPL had formulated a capital plan that it represented to the market would "turn the page" on LPL's recent regulatory problems that had harmed its reputation, financial outlook and share price. ¶¶9, 56. Under this plan, LPL touted that it would "maximize shareholder returns" by buying back $500 million worth of its own shares. ¶¶9, 52. Defendant Casady said the repurchase was a "bargain" because LPL shares were trading "at a significant discount to what we believe is their intrinsic value." *Id.* The market recognized that "the [LPL] buyback program clearly signals management's confidence in the outlook," and LPL's share price increased over 10% in the following days. ¶¶9, 53.

On November 24, 2015, LPL announced that Goldman Sachs & Co. would help LPL carry out half [$250 million] of the $500 million share repurchase on a schedule that "will take several months to complete." ¶¶11, 17, 54, 112, 117. On December 8, 2015 – the start of the Class Period – LPL provided a "mid-quarter operational update," that was particularly important to investors in light of the ongoing share repurchase plans. ¶¶15-16, 58-59. During the "update," defendants used a slide presentation that noted that they had access to real-time information as of December 8th. RJN, Ex. I at 298. Defendants provided insight into the quarter, and falsely reassured investors that the Company's capital model was performing well with an "earnings stream that is quite steady," that "produces cash flow," and that the Company had been "executing it all well" over "the last two months [October and November 2015]." ¶¶15, 57, 59, 61, 69, 74, 76, 82-83. Defendants went so far as to say that "very broadly we saw more of the same that we saw in the third quarter." RJN, Ex. J at 333. Unbeknownst to investors, LPL was in the midst of a disastrous quarter and experiencing substantial declines in the Company's net new advisory assets, brokerage and advisory assets and gross profits. ¶12.

1   Meanwhile, TPG had access to non-public, insider information about LPL's

2   results. ¶¶5, 16, 90. Only two days after LPL's mid-quarter update, on December 10,

3   2015, and contrary to LPL's statement only two weeks earlier that the share

4   repurchase "will take several months to complete," LPL announced it had completed

5   $250 million of the share repurchase, allowing TPG to cash out 4.3 million LPL

6   common shares at an artificially inflated price of $43.27 per share. ¶¶17, 85, 117.

7   On February 11, 2016 – the end of the Class period – LPL announced

8   disappointing fourth quarter and full year 2015 results that revealed the false and

9   misleading nature of defendants' December 8, 2015 statements. The Company

10  reported net new advisory assets of only $3.1 billion, far less than the $1.5 billion

11  monthly average defendants had represented to investors. ¶¶63, 65. LPL disclosed

12  that gross profits had declined not "slightly," but 5.1% from $339.8 million in 3Q15 to

13  $322.4 million in 4Q15, the Company's worst sequential gross profit decline in four

14  years, primarily as a result of falling commission revenues. ¶¶18, 75, 123. As a

15  result, LPL generated only $0.37 per share in adjusted EPS, 27% below consensus

16  analyst estimates of $0.51 per share. ¶18. The Company also disclosed negative asset

17  performance that caused reported earnings being worse than expected. ¶¶64-65, 69.

18  As a result of this news, on February 12, 2016, the price of LPL common stock

19  dropped $8.76 per share, nearly 35% in one day, on record volume, to close at $16.50

20  per share. ¶19. The price fell almost 63% from its Class Period high. ¶31. Market

21  analysts described LPL's 4Q15 results as "ugly" and "very weak," expressed "a lack

22  of confidence in management," and noted that "management looks bad here." ¶¶20-

23  21. The Wells Fargo analyst pressed Casady on the call:

24      I know you guys tend to have a pretty good line of sight in your business.
        And so I would imagine when you guys had some idea the fourth quarter
25      was going to be pretty challenging. So not sure why then you buy so
        much stock ahead of that print as opposed to waiting until after the fact
26      and then you have all kinds of dry powder.

27  ¶21. Casady did not contest defendants' "pretty good line of sight" or that defendants

28  "had some idea that the fourth quarter was going to be pretty challenging." Instead,

1   he candidly admitted the obvious: that LPL had "insight into the quarter and . . . knew

2   we would have challenges," but offered the excuse that "I think the surprise is the

3   market downturn.  No one predicted the Spanish Inquisition."  ¶22.

4       Contrary to Casady's excuse, analysts noted that LPL's poor results were not

5   due solely to a volatile market but "company specific headwinds."  ¶23.  The

6   Complaint also provides numerous uncontested statistical analyses showing LPL's

7   financial performance and stock price were drastically worse than its market and

8   industry peers.  ¶¶24-29.

9   **III.   ARGUMENT**

10      **A.    The Complaint Amply Pleads Defendants' Materially False
            and Misleading Statements and Omissions**

11

12      Under Fed. R. Civ. P. 12(b)(6), a court must "consider the complaint in its

13  entirety," "accept all factual allegations . . . as true," and construe those allegations in

14  the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

15  551 U.S. 308, 322-23 (2007).  A complaint need only allege "enough facts to state a

16  claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

17  555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual

18  content that allows the court to draw the reasonable inference that the defendant is

19  liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

20  "[T]he Court's job is not to scrutinize each allegation in isolation but to assess all the

21  allegations holistically." *Tellabs*, 551 U.S. at 326.

22      Along with Rule 12(b)(6)'s requirements, a complaint alleging securities fraud

23  must satisfy the requirements of Rule 9(b) and the PSLRA.  *In re VeriFone Holdings,*

24  *Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Rule 9(b) requires a plaintiff to

25  "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ.

26  P. 9(b).  Likewise, the PSLRA requires a plaintiff to specify the alleged false

27  statements, identify the "'reasons why the statement is misleading'" and "'state with

28  particularity facts giving rise to a strong inference that the defendant acted with

scienter.'"  *Rihn*, 2016 U.S. Dist. LEXIS 128291, at *14, *24.[1]  "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Id*. (citing *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "[W]hether an omission makes an expression of opinion misleading always depends on context."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1330 (2015)).[2]

### 1. Defendants' False and Misleading Statements Regarding the Company's Capital Plan and Net New Advisory Assets

During the December 8th 4Q15 "mid-quarter" update, defendants reassured investors that LPL's capital plan and operations were generating an "earnings stream that is quite steady" that "produces cash flow over time," and that "the last two months [October and November] have shown that that opportunity absolutely was there.  We're executing it all well."  ¶57.

Defendants further highlighted the Company's then-current financial strength, stating that "our net new advisory assets continue to flow in well.  And we are averaging about $1.5 billion a month."  ¶61.  Defendants' statements reassured investors that LPL would continue to achieve positive growth in the fourth quarter, and that nothing had materially changed in the month since they announced the $500 million buyback on October 29th. ¶58.  It was paramount that LPL's earnings stream and cash flows had in fact remained "steady" to successfully execute the massive share repurchase plan at then-current prices and pay down the debt associated with a large repurchase.  ¶¶58, 82-83.

---

[1]  Here, as elsewhere, emphasis is added and citations are omitted.

[2]  A §10(b) claim has six elements: (i) a material misrepresentation or omission by the defendants; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Defendants' motion challenges only the first two elements of §10(b): falsity and scienter.

The Complaint specifically alleges that at the time of their December 8th statements, defendants concealed that it was suffering a disastrous 4Q15 in which earnings and cash flows were dramatically declining:

- Net new advisory assets for the fourth quarter had tailed off dramatically, hurting LPL's ability to generate earnings and cash flows. LPL achieved only $3.1 billion in these assets in 4Q15 – $1.4 billion less than represented (¶¶12, 18, 20, 59(a), 63-64, 66);

- LPL's commission revenues and gross profits were in serious decline, hurting LPL's earnings and cash flows (¶¶18, 76, 123). LPL suffered a 5% decline in quarter-to-quarter gross profits, its worst in **four** years (¶123); and

- The mix of LPL's level of advisory/brokerage assets was changing in a negative fashion, hurting LPL's ability to generate earnings and cash flows (¶¶70-71). LPL announced earnings of $0.37 per share for 4Q15 – well below consensus estimates of $0.51 per share due primarily to falling commission revenues.[3]

Defendants' failure to disclose these material facts rendered their statements false and misleading. *See Omnicare*, 135 S. Ct. at 1331 ("An issuer must as well desist from misleading investors by saying one thing and holding back another."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of.").

The alleged false and misleading statements are analogous to those upheld by this Court just recently in *Rihn*, 2016 U.S. Dist. LEXIS 128291, at *16. In *Rihn*, defendants' reassurances that the company was on track to submit its new drug application "created an impression of a state of affairs that differed in a material way from the one that actually existed." *Id*. at *18. Here, defendants reassured investors that nothing had materially changed in the four weeks since the announcement of

---

[3]   The specificity of this undisclosed information distinguishes this case from the facts alleged in *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144 (S.D. Cal. 2003), where the plaintiffs failed to "specify the severity or time frame of the alleged decline." *Id*. at 1154.

positive 3Q15 results and the $500 million repurchase, touting that: (i) LPL's earnings stream is "quite steady" and produces "cash flow over time"; (ii) "the last two months have shown that the opportunity absolutely was there"; (iii) "[w]e're executing it all well"; (iv) "net new advisory assets continue to flow in well;" and (v) "what we said on the [October 29, 2015] earnings call is we are still on track to do . . . [j]ust reiterating that what we said on the call is still the case." ¶¶57, 61.  Thus, defendants' statements were materially false or misleading.  *See id*.

Defendants ask the Court to read their December 8th statements as strictly limited to performance through the end of October 2015.  MTD at 11, 13.  But defendant Audette made clear that he was talking about the strength of the Company's performance to include the months of October *and* November: (i) "[A] capital-lite model, *an earnings stream that is quite steady*. . . . Hopefully, the *last two months* have shown that that opportunity absolutely was there.  We're executing it all well"; and (ii) "Being here for these *two months* and spending a lot of time . . . .  [B]ut I think it's a lot more powerful and compelling than I thought from the outside."[4]  ¶57.  Audette's statements that "net new advisory assets *continue to flow* in well"; that LPL has an "earnings stream *that is quite steady*," "[w]e're *still on track*," and "[w]e're *executing it* all well," were made in the present tense.  Further, there was no qualification that those statements had no applicability after October 2015.  Defendants' requested inference that Audette, as LPL's CFO, expressed only "'hope[]' that investors could see that LPL had been effectively implementing its previously announced capital management plan" (MTD at 11) is simply not plausible.  The Complaint's allegations must be taken as true at this stage, with all inferences drawn in plaintiff's favor.  *See Tellabs*, 551 U.S. at 322-23.[5]

---

[4]   Defendant Audette joined LPL in late September and thus could only have been speaking about October and November 2015 when referring to "the last two months." ¶59(d).

[5]   Similarly, defendants' assertion that plaintiff's case rests upon "color commentary," reading "deep meaning into generic words – 'good,' 'well,' 'nice'" is

Defendants' statements that "new advisory assets continue to flow in well" and that LPL "is averaging about 1.5 billion" are also demonstrably false under a simple objective analysis.  As ultimately disclosed on February 11th, LPL's net new advisory assets grew in 4Q15 by only $3.1 billion – a $1.03 billion per month average and nearly 33% lower than the monthly average represented by defendant Audette.  On December 8th, October and November were obviously already completed.  If LPL had actually been averaging $1.5 billion a month for 2015, it had already accumulated over $3 billion in net new advisory assets for 4Q15 by December 8th.  But, LPL ended the quarter with just $3.1 billion, meaning it would have had to incur essentially negative net new advisory assets for the balance of December.  It defies reason to believe that LPL suffered such a drastic decline from a monthly average of $1.5 billion for the entirety of 2015, including October and November, to negative assets in December, without defendants having any knowledge of such a decline on this key measure when they spoke on December 8th.

Faced with this inescapable conclusion demonstrating falsity, defendants assert that their statements conveyed only the historical monthly average for net new advisory assets for October and the first nine months of the year (January to September), even though as of December 8th, LPL knew what it had already earned in new net advisory assets for November and the beginning of December.  MTD at 12-13.  But Audette spoke of LPL's performance over "the last two months" and stated that "net new advisory assets *continue to* flow in well" – a present tense statement indicating that such growth would continue to conform to the $1.5 billion monthly average and that he had no indication of any significant deviation.  *Id*. at 11, 13.

---

simply wrong.  MTD at 1.  Defendants flatly ignore the Complaint's allegation that Audette's statements referencing an "earnings stream that is quite steady and produces cash flow" over "the last two months" were misleading and reassured investors that nothing had materially changed since the announcement of the repurchase, all while concealing the fact that the Company was suffering a disastrous fourth quarter.  ¶¶57-59.

1    Moreover, even were the Court to impermissibly draw inferences in defendants'

2    favor, defendants' statements are still false and misleading.  LPL earned only $3.1

3    billion in net new advisory assets for the entire fourth quarter – an average of $1

4    billion per month and 33% less than the $1.5 billion monthly average.  If defendants

5    were speaking only about October being in line with the $1.5 billion average, a

6    significant part of the 33% decline suffered in 4Q15 would still have had to have

7    already taken place in November, prior to defendants' statements, because the entirety

8    of the decline simply could not have taken place in December after they spoke.

9    Defendants provide nothing to contest this conclusion.  In fact, Casady admitted that

10   "certainly we had insight . . . and knew we would have challenges."  ¶12.

11       Thus, defendants knew of such a decline, or were severely reckless in not

12   knowing.  Having chosen to speak positively about the $1.5 billion monthly "average"

13   and explicitly reassure investors that "net new advisory assets continue to flow in

14   well," defendants were required under Supreme Court and Ninth Circuit authority to

15   disclose the "challenges" in net new advisory assets that had already necessarily

16   occurred.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (given

17   defendants' positive statements to the market, their failure to disclose adverse

18   information rendered statements misleading); *Schuneman v. Arena Pharms., Inc.*, 840

19   F.3d 698, 705-06 (9th Cir. 2016) ("'[O]nce defendants cho[o]se to tout positive

20   information to the market, 'they [are] bound to do so in a manner that would not

21   mislead investors,' including disclosing adverse information that cuts against the

22   positive information.'") (citing *Berson*, 527 F.3d at 987).

**2.    Defendants' False and Misleading Statements Regarding Gross Profits, Asset Growth and Expenses**

24   Defendants' statements surrounding gross profits were material because, as

25   defendants explained, "LPL views growth of assets and gross profits as more

26   representative of its business growth than revenue growth."  ¶71.  On December 8th,

27   defendants stated that 4Q15 gross profits would decline only "slightly," and primarily

1  because profits were driven by 3Q15 asset balances.[6]  ¶74.  Defendants reassured

2  investors that LPL had "good advisory asset growth overall" and that LPL had seen

3  "asset levels recover nicely" – sending a clear message that a key driver of gross

4  profits was performing well in 4Q15.  ¶69.  Audette also reassured investors that

5  commission revenue – another component of gross profits – would be "more of the

6  same [$480.3 million] that we saw in the third quarter [3Q15]."  ¶76.  Defendants

7  added that the stability of assets and profits was supported by "expenses" "still on

8  track" with earlier guidance, while providing a range of "core G&A" levels that was

9  also "still on track."  ¶57.

10       These statements were false and misleading when made.  Although assets were

11  growing, they were growing in a negative fashion, with the mix of assets shifting

12  away from more favorable commission-based revenues, signaling a fundamental

13  change in LPL's major revenue streams.  ¶77.  Defendants do not address this key

14  allegation.  In fact, commission revenues for 4Q15 would be reported at only $463.5

15  million, 3.5% below the "more of the same" ($480 million reported in 3Q15) that

16  Audette reported with only three weeks left in 4Q15.[7]  ¶¶76-77.

17       Defendants, therefore knew, or were reckless in not knowing, that by December

18  8, 2015 the substantial decline in commission revenue in 4Q15 was primarily

19  attributable to decreases in sales-based activity for alternative investments (which

20  declined *74%* year-over-year), equities, mutual funds, fixed income, and variable

21  annuities.  ¶77.

22

---

23  [6]  Defendants point to the fact that gross profits increased 2% for the entire year
24  (MTD at 15 n.4), but this only highlights the magnitude of the fourth quarter decline
     of over 5%.

25  [7]  At a "more of the same" rate of $480 million per quarter up to the date of the
26  investor call (about $37 million per week), commission revenues would have been
     about $94 million in the final three weeks of 4Q15 (about $31 million per week) – a
27  16% drop in weekly commission revenue.  Given the connection of commission
     revenues to asset levels, this level of drop within the last few weeks is implausible,
28  and therefore must have been occurring prior to the December 8th investor call.

1    Defendants also assert their statements about expenses were true.  MTD at 14-

2   15.  But, the additional statements about "core G&A" being "on track" and growing

3   AUM levels at October 2015 – although literally true – were highly misleading

4   because they sent a message of profit stability, and concealed material factors that

5   were hurting gross profits, including the changing asset mix and falling commission

6   revenue, LPL's most important source of revenues.  ¶73.  *See Omnicare*, 135 S. Ct. at

7   1331; *Berson*, 527 F.3d at 987.

8    Defendants do not argue about the falsity of Audette's "more of the same"

9   statement about commission revenues; instead they simply respond that LPL had

10   previously disclosed that "sales commissions were challenged by a mature real estate

11   market."  MTD at 22.  This earlier disclosure overlooks plaintiff's allegation that

12   falling commission revenues were attributable to a changing mix of revenue

13   components, and that therefore it was becoming increasingly important that LPL show

14   greater and growing advisory assets to counterbalance declining brokerage revenues

15   (*i.e.*, commissions).  ¶72.  These factors have little to do with the real estate market.

16   **3.   Defendants' Contemporaneous Awareness of Falsity**

17    Defendants argue that the statements cannot be upheld because the Complaint

18   fails to identify particular records in defendants' possession, as of December 8th, that

19   indicated disappointing November and December results.  MTD at 15, 22.  But, the

20   subject of the misstatements were the key financial metrics that defendants tracked

21   closely, and LPL repeatedly extolled its real time accounting and point of sale revenue

22   recognition as giving the Company good visibility into its revenues, expenses and

23   client balances at any particular point in time.  ¶¶44-45, 70, 96.  By December 8th, 10

24   out of the 13 weeks for 4Q15 had been completed, and as the CEO and CFO, Casady

25   and Audette either had a clear indication of the fourth quarter results or were reckless

26   in speaking positively on the Company's key financial metrics without possessing

27   such an indication.  As this Court explicitly found in *Rihn*, "it would be incredible to

28   conclude that the CEO, [and] CFO were not aware of the information at issue that

made their 'on track' representations misleading." 2016 U.S. Dist. LEXIS 128291, at *25-*26.  The Ninth Circuit applied similar reasoning in *Berson*, 527 F.3d at 987-88, holding that the complaint sufficiently alleged falsity, even in the absence of "particular facts indicating that [defendants] knew about the stop work orders," because defendants "must have known about the orders because of the devastating effect on the corporation's revenues."[8]  *Id.*

Moreover, when pressed by an analyst to explain the disappointing 4Q15 performance, Casady did not contest that LPL had a "pretty good line of sight in [its] business," and that LPL had "some idea that the fourth quarter was going to be pretty challenging."   Rather, he flatly ***admitted*** that "certainly we had insight into the quarter" and "knew we would have challenges." ¶¶21-22, 59(a).  In *Rihn*, this Court found that the CFO's admission that the company "did not start the process early enough" and "should have been better prepared" was indicative of defendants' knowledge that his statements were misleading.  2016 U.S. Dist. LEXIS 128291, at *17.  Here, Casady's frank admission is no different, and likewise demonstrates contemporaneous falsity.

## B.  Defendants' Statements Are Not Forward-Looking and Are Not Protected by the PSLRA Safe Harbor

Defendants argue that their statements are protected under the PSLRA "safe harbor."  MTD at 16 n.6; *see* 15 U.S.C. §78u-5(c).  However, defendants' statements were about "the ***current*** state of affairs . . . which were within Defendants' knowledge and control," and therefore are not forward-looking.  *Rihn*, 2016 U.S. Dist. LEXIS 128291, at *19.  Defendants' representations including that (i) LPL has an "earnings

---

[8]   Defendants' reliance on *In re Bridgepoint Educ. Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC), 2013 U.S. Dist. LEXIS 131423 (S.D. Cal. Sept. 13, 2013) is misplaced. *See* MTD at 22-23.  *Bridgepoint* merely states that information critical to a company's "'core operations or an important transaction'" may be inferred to key officers, and that the "'core operations' doctrine does not apply to predictions of future events." 2013 U.S. Dist. LEXIS 131423, at *70-*71.  Neither finding undermines plaintiff's allegations here.

stream that is quite steady and produces cash flow over time"; (ii) "net new advisory assets continue to flow in well"; (iii) "Q4 gross profit is likely to decline slightly"; and (iv) "we did see market levels and asset levels recover nicely," were statements of LPL's "*current* state of affairs" as of December 8, 2015 – not only October 2015. *See* MTD at 6, 13-15; *In re MGM Mirage Sec. Litig.*, No. 2:09-cv-01558-GMN-VCF, 2013 U.S. Dist. LEXIS 139356, at *25 (D. Nev. Sept. 26, 2013) (holding statements that a construction project is "'on-track'" or "'on-schedule'" are not forward-looking "but statements relating to current conditions").

Moreover, while defendants' written materials at the December 8th conference contained purported cautionary disclosures (RJN, Ex. I at 298), defendants never provided any cautionary oral disclosures or any statement directing call participants to written warnings. *See* RJN, Ex. J. Defendants simply have not satisfied the statutory requirements to protect their statements. 15 U.S.C. §78u-5(c)(2); *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 U.S. Dist. LEXIS 8028, at *72 (S.D. Ohio Jan. 21, 2016) (if no "oral warning" is made "during the conference call, the statements are not protected under the PSLRA's safe harbor").

In any event, the defendants' warnings, buried in tiny font in one single paragraph (*see* RJN, Ex. I at 298), are far too vague to be meaningful because they did nothing to warn investors of the specific risks that had already materialized. *In re Amylin Pharms., Inc. Sec. Litig.*, No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667, at *21-*22 (S.D. Cal. May 1, 2003) (Moskowitz, J.) ("[C]autionary statements must be 'substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge.'"). Finally, Casady admitted that defendants "had insight into [4Q15]" and knew 4Q15 would have "challenges." ¶¶12, 21-22.[9] Defendants' knowledge of falsity renders the safe harbor inapplicable. *See*

---

[9] Defendants' reliance on *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) and *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) are inapposite given the historical nature of the statements, and defendants' lack of reasonable bases and knowledge of falsity. MTD at 14, 16.

1   §III.C., *infra*; *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989);

2   *In re Infosonics Corp. Sec. Litig.*, No. 06cv1231 BTM (WMc), 2007 U.S. Dist. LEXIS

3   57784, at *29, *31 n.4 (S.D. Cal. Aug. 7, 2007) (Moskowitz, J.); *MGM Mirage*, 2013

4   U.S. Dist. LEXIS 139356, at *26.

5       **C.   The Complaint Alleges a Strong Inference of Scienter**

6           To plead scienter, a complaint must "state with particularity facts giving rise to

7   a strong inference that the defendant made the statements intentionally or with

8   deliberate recklessness."   15 U.S.C. §78u-4(b)(2)(A).   Deliberate recklessness is

9   defined as "'a highly unreasonable omission, involving . . . an extreme departure from

10   the standards of ordinary care, and which presents a danger of misleading buyers or

11   sellers that is either known to the defendant or is so obvious that the actor must have

12   been aware of it.'"   *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th

13   Cir. 2009), *aff'd*, 563 U.S. 27 (2011).

14           In assessing scienter, a court must: (i) accept all factual allegations in the

15   complaint as true; (ii) consider all of the allegations collectively; and (iii) entertain

16   only those plausible opposing inferences that can be "rationally drawn from the facts

17   alleged." *Tellabs*, 551 U.S. at 314; *Reese v. Malone*, 747 F.3d 557, 568-69 (9th Cir.

18   2014).   "The inference that the defendant acted with scienter need not be irrefutable,

19   *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing

20   inferences.'" *Tellabs*, 551 U.S. at 324.   A court must conclude that a strong inference

21   of scienter has been pled "if a reasonable person would deem the inference of scienter

22   cogent and at least as compelling as any opposing inference one could draw from the

23   facts alleged." *Id*.   "'The Supreme Court has now made clear . . . a tie goes to the

24   Plaintiff.'"   *Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2010 U.S. Dist.

25   LEXIS 142712, at *15 (C.D. Cal. Aug. 9, 2010).

26           The Complaint more than sufficiently pleads scienter.   To begin, the alleged

27   statements were made by LPL's top two executives and concerned the Company's key

28

financial metrics.[10]  Casady and Audette had up-to-date information about the metrics they misrepresented, including LPL's brokerage and advisory assets, net new advisory assets, gross profits and the likely impact of the share repurchase.  *E.g.*, ¶¶95-99.  For example, in 2015, **72%** of LPL's revenue was recurring in nature and transaction-based commissions were generated at the point of sale, which provided management significant visibility into LPL's ongoing performance.  ¶96.  Likewise, on December 8th, defendants repeatedly represented they had access to up-to-date information: "We're still on track"; "Just reiterating that what we said on the [October 29, 2015] call is still the case"; "We're executing it all well"; "[LPL has] an earnings stream that is quite steady"; and "[N]et new advisory assets continue to flow in well."  ¶¶57, 61.

Defendants' assertion that – with only three weeks left in a 13 week quarter – they had no indication of the disastrous fourth quarter performance is not credible. *See Reese*, 747 F.3d at 575-76 (scienter shown when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter").  In *Rihn*, this Court similarly found that "it would be incredible to conclude that the CEO, CFO and Chief Medical Officer . . . were not aware of the information at issue that made their 'on track' representations misleading."  2016 U.S. Dist. LEXIS 128291 at *25-*26; *Berson*, 527 F.3d at 987-88 (strong inference of scienter pled based on officers' positions even though no specific facts alleged that officers actually knew of negative information); *Flynn v. Sientra*, No. 15-07548 SJO (RAOx), 2016 U.S. Dist. Lexis 83409 (C.D. Cal. June 9, 2016). Here, the metrics at issue were even more clearly a focus for defendants than in *Rihn* and *Applied Signal* because of LPL's need to stay on track with operational targets in

---

[10]   Advisory and brokerage assets constituted approximately 79% of LPL's total net revenue and gross profit through the first three quarters of 2015.  ¶¶67, 73.  Analysts noted these metrics as important to 4Q15 results.  ¶72.  Commission revenue was also of particular importance, as it provided 46% of LPL's total net revenues for fiscal 2015 and was partially derived from sales-based activity for alternative investments, which had been the recent focus of LPL's regulatory troubles.  ¶¶12, 44, 75, 77, 80.

1  order to "turn the page" on LPL's recent regulatory problems through the $500

2  million share repurchase.  ¶¶8-10, 52, 56.

3       Moreover, a market analyst explicitly noted that defendants "tend to have a

4  pretty good line of sight in your business," and "had some idea the fourth quarter was

5  going to be pretty challenging."  Casady concurred, admitting: "*certainly we had*

6  *insight into the quarter*" and "*knew we would have challenges*."[11]  ¶¶21-22.  This

7  admission is akin to that in *Rihn*, which this Court found evidenced defendant's

8  knowledge that his statements were misleading.  2016 U.S. Dist. LEXIS 128291, at

9  *18 (defendants' admission that they "did not start the process early enough" and that

10 they "should have been better" show knowledge); *see also In re Wash. Mut., Inc. Sec.*,

11 694 F. Supp. 2d 1192, 1211 (W.D. Wash. 2009) (finding inference of scienter where

12 individual defendant's "own statements show the extent to which he … had actual

13 knowledge of the falsity of his statements").[12]

14      A strong inference of scienter is further bolstered by the fact that only two

15 months after defendants' statements, the Company disclosed significantly

16 disappointing results across each of the financial metrics they spoke positively about

17 on December 8th.  As this Court recognized, the "'[t]emporal proximity of an

18 allegedly fraudulent statement or omission and a later disclosure can be circumstantial

19 evidence of scienter.'" *Rihn*, 2016 U.S. Dist. LEXIS 128291, at *28; *Reese*, 747 F.3d

20 ─────────────
[11]  Defendants assert that plaintiff has alleged fraud by hindsight, citing *Lifschitz v. NextWave Wireless Inc.*, No. 3:08cv01697 AJB (WMC), 2011 WL 5839682, at *1
21 (S.D. Cal. Nov. 21, 2011) (dismissing Third Amended Complaint) and *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111 (S.D. Cal. 2012).  MTD at 16.  But,
22 this assertion overlooks the allegations that LPL was already experiencing the
23 "challenges" that Casady would later admit to.

24 [12]  Defendants' reliance on *Kelly v. Elec. Arts, Inc.*, No. 13-cv-05837-SI, 2015 U.S. Dist. LEXIS 57130 (N.D. Cal. Apr. 30, 2015) is off the mark, because in that case, the
25 "admission" did not contradict the alleged misstatements.  *Id.* at *28-*30.  Here, however, the Complaint alleges defendants' "admission" is directly on point with
26 plaintiff's theory of fraud.  ¶¶21-22.  *See also Patel v. Axesstel*, No. 3:14-CV-1037-CAB-BGS, 2015 U.S. Dist. LEXIS 18385, at *22-*24 (S.D. Cal. Feb. 13, 2015)
27 (finding CEO and CFO deliberately reckless when they failed to obtain readily available information regarding sales contracts about which they spoke on calls with
28 investors).

at 574; *Berson*, 527 F.3d at 988 n.5.  The magnitude of the financial miss further shows scienter.  *See In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM (JCGx), 2013 U.S. Dist. LEXIS 6977, at *75 (C.D. Cal. Jan. 16, 2013) (finding "magnitude" of violations regarding "central" metrics supported finding of scienter).[13] These myriad allegations of scienter, viewed holistically, are enough to satisfy the PSLRA.  *See Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1374 (N.D. Cal. 2014) (a complaint "need not allege . . . some pecuniary motive for making the challenged statements").[14]

Plaintiff has also pled a cogent theory of motive and opportunity that is at least as compelling as any opposing inference.  *See Tellabs*, 551 U.S. at 325 (allegations of motive, while not necessary under the PSLRA, "may weigh heavily in favor of a scienter inference").  Defendants do not contest the basic facts alleged, including that TPG: (i) owned and controlled LPL; (ii) retained substantial influence over LPL's affairs at the time of the December 8 conference call; (iii) had multiple members on LPL's board; (iv) maintained special information access rights that provided TPG with negative, non-public information about LPL's performance; (v) expressly stated it may act against LPL's interests in service of its own; and (vi) and installed defendant Casady in his then-current position as LPL CEO (allowing Casady to amass more than $100 million in personal wealth) and influenced the hiring and lucrative compensation for Audette in late 2015.  ¶¶87-94, 108-109.  Defendants also fail to address the highly suspect sequence of events, wherein defendants rushed through in a

---

[13]  Defendants assert that the magnitude of LPL's missed targets are not high enough to evidence scienter.  MTD at 24, n.9 (citing *In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 839 (9th Cir. 2006)).  In *Aspeon*, the company restated 1.5% of its revenues over three quarters.  The "misses" alleged here are much more material both qualitatively and quantitatively.  For example, gross profits (not merely revenues) declined quarter-to-quarter by over 5%.  ¶18.

[14]  Defendants' contention that plaintiff must allege a specific witness or document irrefutably demonstrating scienter (MTD at 22-23) is wrong.  *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1183 (S.D. Cal. 2009) (scienter allegations need not be of the "'smoking-gun' genre") (quoting *Tellabs*, 551 U.S. at 324).

1    matter of days following their December 8th statements a share repurchase plan that

2    was slated to take "months," in order to allow TPG to perfectly capture peak prices

3    immediately following a conference call organized by the same investment bank,

4    Goldman Sachs, that was involved in the accelerated share repurchase program.

5    ¶¶110-119.[15]

6            On the totality of these facts, the Complaint offers a cogent inference of scienter

7    that is at least as compelling as any other inference: after TPG became privy to non-

8    public information regarding LPL's underperformance, it rushed to exit its stake, and

9    defendants failed to disclose the truth on December 8th so as to avoid massive

10   investment losses for this favored insider.  *See Big Lots*, 2016 U.S. Dist. LEXIS 8028,

11   at *97-*98 (finding share repurchase at artificially inflated prices supported inference

12   of scienter).   Indeed, a market analyst who regularly covered LPL endorsed the

13   validity of plaintiff's scienter theory when, on the February 11, 2016 conference call,

14   he expressed skepticism that LPL had no knowledge of the disappointing financial

15   results at the time of the share repurchase and noted the suspicious timing:

16           The follow-up I had really had to do with the buyback, and I know you
             guys tend to have a pretty good line of sight in your business.  And so I
17           would imagine when you guys had some idea that the fourth quarter was
             going to be pretty challenging.  So not sure why then you buy so much
18           stock ahead of that print as opposed to waiting until after the fact and
             then you have all kinds of dry powder.
19
     ¶21.
20
             Not only do defendants not provide a ***more compelling*** non-culpable inference,
21
     they fail to provide ***any*** explanation, and chalk up the suspicious circumstances to
22
     mismanagement and poor timing, with TPG cast as a run-of-the-mill shareholder that
23
     coincidentally cashed out at the exact right time.  MTD at 18-20.  However, what
24

---

25   [15]  Defendants erroneously argue plaintiff fails to allege TPG actually received
26   negative inside information. MTD at 20.  To the contrary, plaintiff alleges many such
     facts, including: (i) TPG's sale at peak prices; (ii) the unexplained acceleration of the
27   share repurchase; (iii) the fact that the board (on which TPG members sat) met soon
     before the sale; and (iv) the fact that a subsection of the board signed off on the sale –
28   all facts defendants do not contest.  ¶¶17, 109, 117-118.

1   defendants completely ignore (but the Court cannot) is TPG's special history,

2   relationship with, and influence over LPL and the Company's management, and the

3   suspect timing and circumstances of the share repurchase – which was inexplicably

4   accelerated to allow TPG to profit by more than $115 million at the end of a disastrous

5   fourth quarter into which defendants admitted visibility.  "'[F]ederal courts certainly

6   need not close their eyes to circumstances that are probative of scienter viewed with a

7   practical and commonsense perspective.'"  *Reese*, 747 F.3d at 575.

8       Moreover, the fallacy of defendants' proffered non-culpable explanation that it

9   was simply an unforeseen market downturn that caused the disastrous 4Q15 results is

10  demonstrated by (i) the fact that market analysts considered the miss the result of

11  "company-specific" issues (¶¶103-107, 125-131); and (ii) the Complaint's statistical

12  analyses show that LPL's 4Q15 was drastically worse than its market and industry

13  peers.  ¶¶24-29.  Defendants' failure to provide cogent, non-culpable inference of

14  scienter is fatal to their motion.  *See Olenicoff v. UBS AG*, No. SACV 08-1029 AG

15  (RNBx), 2010 U.S. Dist. LEXIS 144474, at *61 (C.D. Cal. Mar. 16, 2010) (finding a

16  party cannot "ignore[] the many other allegations . . . that, if true, add up to a strong

17  inference of [scienter]").

18      With no compelling counter inference available from the facts, defendants

19  claim a share repurchase provides some talismanic defense.  MTD at 19.  Not so.

20  Scienter allegations must be viewed holistically and in context.  *See Tellabs*, 551 U.S.

21  at 326.  Where share repurchases are used to effectuate a fraud, they may further

22  support a finding of scienter.  *See Big Lots*, 2016 U.S. Dist. LEXIS 8028, at *97-*98

23  (share repurchase used to artificially inflate stock price).

24      Defendants cite *In re Questcor Sec. Litig.*, SA CV 12-01623 DMG (FMOx),

25  2013 U.S. Dist. LEXIS 142865 (C.D. Cal. Oct. 1, 2013) for the proposition that "stock

26  repurchase programs are irrelevant to the scienter analysis."  MTD at 19.  But, the

27  court in *Questcor* actually found that the repurchase allegations neither weighed in

28  favor of nor against an inference of scienter.  2013 U.S. Dist. LEXIS 142865, at *55.

1   While defendants are correct that there have been cases in which the allegations

2   regarding repurchase programs have negated scienter, those involve factually distinct

3   scenarios not even close to analogous to the unique facts of this case. *See* MTD at 19

4   n.7.  In those cases, either the defendant companies had a long standing repurchase

5   program in place prior to the class period,[16] plaintiffs failed to allege anything to show

6   scienter other than the fact of the repurchase itself,[17] or the motive allegations were

7   too general and vague.[18]

8         Here, plaintiffs allege the share repurchase was designed to allow a favored and

9   influential shareholder with negative inside information to unload LPL stock at peak

10  prices and avoiding more than $115 million in investment losses.  Indeed, in

11  analogous circumstances, the Ninth Circuit has previously found that TPG's and other

12  influential shareholders' access to inside information at the time of suspect stock sales

13  may support a compelling inference of scienter – ***even though*** "the officers who made

14  the misleading statements did not sell stock during the class period." *See No. 84*

15  *Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d

16  920, 943 (9th Cir. 2003) (finding allegations that TPG had insider access to company-

17  specific information supported inference of scienter, even though company officers

18  did not sell their personal shareholdings).  Here, plaintiff has established the strong

19  link between TPG and LPL's access to real-time insider information, and the specific

20  reasons that Casady and Audette were motivated to ensure TPG was able to cash out

21

22

23  [16]  *See In re Cisco Sys. Inc. Sec. Litig.*, No. C11-1568 SBA, 2013 U.S. Dist. LEXIS

24  53137, at *25 (N.D. Cal. Mar. 29, 2013); *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009).

25  [17]  *See In re Rexall Sundown, Inc. Sec. Litig.*, No. 98-8798-CIV-DIMITROULEAS,

26  2000 U.S. Dist. LEXIS 20748, at *13 (S.D. Fla. Mar. 29, 2000).

27  [18]  *See In re Thoratec Corp. Sec. Litig.*, No. C-04-03168 RMW, 2006 U.S. Dist. LEXIS 30602, at *36 (N.D. Cal. May 11, 2006); *Morse v. McWhorter*, 200 F. Supp.

28  2d 853, 864 (M.D. Tenn. 2000).

1  at inflated prices.  These facts raise a cogent inference of scienter that is at the very

2  least "as compelling as any opposing inference."  *See Tellabs*, 551 U.S. at 324.[19]

### D.  None of Defendants' Remaining Challenges Undermine the Sufficiency of the Complaint

#### 1.  Plaintiffs Do Not Allege a Breach of Fiduciary Duty

Defendants' assertion that this case is "a classic breach of fiduciary duty claim"

(MTD at 3) is baseless.  Indisputably, the common class contention stems not from a

breach of fiduciary duty, but defendants' fraudulent statements that caused the price of

LPL shares to be artificially inflated.[20]  ¶¶31, 42, 58-85, 120.  *See Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 389-90 (2011).

#### 2.  Defendants' Statements Are Not Inactionable Puffery

Defendants assert that their statements concerning the "flexibility" of LPL's

Capital Plan and that the share repurchase was the "best use of Company's capital" are

inactionable puffery.[21]  MTD at 16.  To determine whether a statement is inactionable

---

[19]   The specificity with which plaintiff pleads a multitude of scienter allegations, including, but not limited to, motive, and defendants' failure to provide any compelling competing inference of scienter that explains all of the alleged facts distinguishes this case from the allegations in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), and *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008).  MTD at 18-19.

[20]   Defendants rely on *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1138 (N.D. Cal. 2013), citing the *Hewlett Packard* court's discussion of materiality.  Here, plaintiff has alleged materiality.  *See* ¶¶58-60, 67, 121, 133.  Further, the Hewlett Packard shareholder sued under §10(b) for false statements and disclosures surrounding breach of Hewlett Packard's ethics policies.  *Hewlett Packard*, 964 F. Supp. 2d at 1135.  Here, plaintiff is not alleging a breach of LPL's ethics policies.

[21]   Defendants rely on *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) and *In re Airgate PCS, Inc. Sec. Litig*, 389 F. Supp. 2d 1360 (N.D. Ga. 2005) because of the use of and reference to the term "flexibility."  MTD at 17.  However, in *Airgate*, the analysis specifically focused on the use of the term "flexibility" in the context of defendants touting the "strategic combination," "'additional operating efficiencies, financial flexibility, and growth potential'" of a merger.  389 F. Supp. 2d at 1379.  The court noted that where statements were more specific and defendants had contrary information in their possession, that phrases such as "good shape" or "under control" were actionable.  *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000); *Warshaw v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996).  Similarly, *Newcal* emphasized that the term was untethered to any verifiable business actions, unlike the specific actions and objective metrics implicated here.  513 F.3d 1038.

puffery, "'the court must analyze the context in which the statements were made.'" *Rihn*, 2016 U.S. Dist. LEXIS 128291, at *21. Here, defendants claimed a sound fiscal footing where LPL had a "steady" "earnings stream" and cash flow over the "last two months," and that "assets continue to flow in well." ¶¶57-59, 61. "By representing that LPL had the ability to generate cash to service debt that would fund the buy-back plan Defendants misled investors into believing that the Company's earnings would be strong enough to carry substantial debt loads and that LPL would have considerable financial flexibility going forward." ¶83. Such statements are like those found to be actionable in *MGM Mirage*, 2013 U.S. Dist. LEXIS 139356. There, defendants represented that the company possessed a good balance sheet and strong cash flows which would give MGM flexibility in credit markets to obtain financing. *Id*. at *18. The court found such statements "created an impression of sound fiscal footing that materially differed from the actual financial state of the company," just as plaintiff has alleged here. *Id*.; *see also Rihn*, 2016 U.S. Dist. LEXIS 128291, at *22 (finding statements defendant remained "'on track'" to submit NDA application were not "vague statements of optimism, but, rather [actionable] statements premised on facts").

### E.   Section 20(a) Control Person Liability is Properly Pled

Because plaintiff has sufficiently alleged a primary violation of §10(b) and Rule 10b-5, the Complaint properly pleads control person liability under §20(a) as well.

## IV.   CONCLUSION

For the reasons set forth above, plaintiff has satisfied all applicable pleading standards and defendants' motion to dismiss should be denied in its entirety.

DATED:  January 17, 2017                    Respectfully submitted,

                                ROBBINS GELLER RUDMAN
                                  & DOWD LLP

                                    s/ Jonah H. Goldstein
                                JONAH H. GOLDSTEIN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JONAH H. GOLDSTEIN
SUSAN G. TAYLOR
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 17, 2017.

                                        s/ Jonah H. Goldstein
                                        JONAH H. GOLDSTEIN

                                        ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101-8498
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        E-mail:  jonahg@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-00685-BTM-BGS Charter Township of Clinton Police and Fire Retirement System v. LPL Financial Holdings Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard Lawrence Gallagher**
  richard.gallagher@ropesgray.com,Matthew.Tolve@ropesgray.com,courtalert@ropesgray.com,rogelio.jose@ropesgray.com

- **Jonah H. Goldstein**
  JonahG@rgrdlaw.com,e_File_SD@rgrdlaw.com

- **Tricia L McCormick**
  TriciaM@rgrdlaw.com,DHouck@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan Goss Taylor**
  STaylor@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David C Walton**
  davew@rgrdlaw.com,hectorm@rgrdlaw.com,hstmartin@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)