CHARTER TOWNSHIP OF
CLINTON POLICE AND FIRE
RETIREMENT SYSTEM,
individually and on behalf of all
others similarly situated,

                              Plaintiff,

v.

LPL FINANCIAL HOLDINGS INC.,
et al.,

                              Defendants.

Case No.: 16-cv-0685-BTM-BGS

**ORDER GRANTING IN PART AND
DENYING IN PART
DEFENDANTS' MOTION TO
DISMISS AND DISMISSING
CONSOLIDATED COMPLAINT
FOR VIOLATION OF FEDERAL
SECURITIES LAWS WITH LEAVE
TO AMEND**

**[ECF NO. 17]**

Defendants LPL Financial Holdings, Inc., Mark S. Casady, and Matthew J. Audette (collectively, "Defendants") have filed a motion to dismiss the Consolidated Complaint for Violation of the Federal Securities Laws (ECF No. 16) (the "Complaint"). The Court held a hearing on Defendants' motion on April 17, 2017. For the reasons discussed below, Defendants' motion will be granted in part and denied in part, and Plaintiff's Complaint will be dismissed with leave to amend.

## I.    BACKGROUND

This is a putative securities class action filed on behalf of all purchasers of common stock of LPL Financial Holdings Inc. ("LPL") between December 8, 2015 and February 11, 2016, inclusive (the "Class Period"). Plaintiff alleges that on December 8, 2015, Defendants made false and misleading statements regarding LPL's business and prospects, artificially inflating common stock prices during the Class Period. The Complaint states claims for violation of section 10(b) of the

Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, as well as section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

LPL is an independent broker-dealer that provides a platform of brokerage and investment advisory services to independent financial advisors, and generates revenues primarily from fees and commissions on clients' brokerage and advisory assets. (Compl. ¶ 1.) LPL was founded in 1989 and in 2005 sold a majority stake to two private equity firms, TPG Capital ("TPG") and Hellman & Friedman LLC ("Hellman"). (Id. ¶ 2.) TPG thereafter elevated defendant Mark S. Casady ("Casady") to Chairman and CEO of LPL. (Id.) Over the course of his tenure with LPL, Casady has earned more than $119 million in stock proceeds and compensation. (Id. ¶¶ 2, 3, 6.)

In November 2010, TPG and Hellman took LPL public in an initial public offering that generated approximately $470 million. (Id. ¶ 3.) After Hellman exited LPL stock in 2013, TPG became LPL's largest shareholder. It appointed two directors to LPL's Board, former TPG partner Richard Schifter, who served as Lead Director, and Richard Boyce, who served on LPL's compensation committee. (Id.) TPG also entered into a shareholder agreement that gave it "the right to obtain any reports, documents, information or other materials … which a member of the LPL Board has received or has the right to receive." (Id. ¶ 5.) Plaintiff alleges that by virtue of this provision, TPG had the ability "at any time to access inside financial information regarding LPL's financial results…." (Id.)

From February 2013 through September 2015, LPL faced, and settled, a number of regulatory actions and investigations into its business practices, including allegations it failed to adequately supervise brokers' sales of real estate investment trusts ("REITs"), improperly sold risky exchange-traded funds, and failed to properly supervise the sale of complex financial products. (Id. ¶ 7.) Plaintiff alleges the regulatory actions and investigations put Casady's future with

2

LPL at risk.  (Id. ¶ 8.)

On October 29, 2015, in a move allegedly meant to reassure investors, LPL announced a plan to buy back $500 million of its own shares, a deal it called a "bargain" because LPL shares were trading "at a significant discount to what we believe is their intrinsic value."  (Id. ¶ 9.)  This was taken as a signal of management's confidence in LPL's outlook, and in the days following the announcement, LPL's stock price rose more than 10%.  (Id. ¶ 10.)

On November 24, 2015, LPL announced it had entered into an agreement with Goldman Sachs & Co. ("Goldman Sachs") whereby Goldman Sachs would carry out $250 million of the $500 million share repurchase on a schedule that LPL said "will take several months to complete."  (Id. ¶ 11.)

Meanwhile, by "at least the beginning of December 2015," with less than a month left in the fourth quarter ("Q4") of 2015 ("4Q15"), Plaintiff alleges LPL's internal financial results showed it was in the midst of a "disastrous" quarter.  (Id. ¶ 12.)  Plaintiff further contends TPG had access to LPL's "financial information" by virtue of its shareholder agreement, Board connections, and relationship with Casady.  (Id. ¶ 13.)  TPG allegedly anticipated based on LPL's inside information that once the market learned of LPL's poor fourth-quarter performance, LPL's stock price would fall.  (Id. ¶ 14.)  It thus approached Goldman Sachs in late November or early December 2015 to cash out more than 4 million shares of LPL stock through the accelerated share repurchase program at a time when LPL stock was trading at historic highs.  (Id.)

Before TPG's sale of LPL stock was publicly disclosed, on December 8, 2015, LPL participated in a conference sponsored by Goldman Sachs at which Casady and Matthew Audette, who had been hired in September 2015 to serve as LPL's CFO, "provided investors a near-end-of-fourth quarter financial update."  (Id. ¶ 15.)  The update was provided through a slide presentation, during which Casady, Audette, and "the company" made the allegedly materially false

3

statements on which this action is based.   The Complaint groups the statements into five categories:

1.  Statements reassuring the market that the financing of LPL's repurchase plan was viable so long as LPL's future earnings and cash flows could service the debt (e.g., that LPL's "earnings stream … is quite steady" and LPL was "still on track" to meet its 2015 expense guidance) (¶¶ 56-59);

2.  Statements regarding LPL's net new advisory assets (e.g., "we are averaging about $1.5 billion a month" in net new advisory assets) (¶¶ 60-66);

3.  Statements regarding the level of LPL's brokerage and advisory assets under management (AUM) (e.g., that LPL's "asset levels [had] recover[ed] nicely" and LPL had "good advisory asset growth overall") (¶¶ 67-72);

4.  Statements that LPL's gross profit would decline "slightly" in 4Q15 (¶¶ 73-81); and

5.  Statements reassuring investors that LPL would have financial "flexibility" to execute the share repurchase (¶¶ 82-85).

Defendants' statements allegedly misrepresented, or failed to disclose, weaknesses in LPL's financial performance as of the December 8th presentation. (Id. ¶ 16.)  That day, LPL's stock closed at $45.06/share, near its highest level in two years.  (Id.)

On December 10, 2015, and contrary to LPL's claim that the $250 million accelerated share buyback would take several months to complete, LPL announced it had already completed the accelerated buyback, allowing TPG to cash out 4.3 million shares at $43.27/share.  (Id. ¶ 17.)  More than three-quarters of the buyback spending went to TPG.  (Id.)

On February 11, 2016, LPL announced its 4Q15 and fiscal year 2015 ("FY2015") financial results that allegedly revealed the false nature of its December 8, 2015 statements.  (Id. ¶ 18.)  Contrary to the positive picture portrayed during

the Goldman Sachs conference, LPL's gross profits had fallen substantially during 4Q15; net new advisory assets were only $3.1 billion, $1.4 billion less than anticipated; and earnings were dragged down by unexpectedly weak advisory and brokerage asset performance. (Id.) Allegedly as a result of the news of LPL's weaker than expected performance, on February 12, 2016, LPL's stock dropped $8.76, nearly 35% in one day, on record volume, to close at $16.50/share. (Id. ¶ 19.) Had TPG's shares been repurchased by LPL at this point, LPL would have saved $115 million. (Id.) Although the market suffered a general downturn during the Class Period, LPL's performance was substantially weaker in comparison with its market and industry peers. (¶¶ 26-31.)

## II.  **LEGAL STANDARD**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered … any manipulative or deceptive device or contrivance…." 15 U.S.C. § 78j(b). Under Rule 10b–5, which implements section 10(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim for violation of Section 10(b) or Rule 10b–5, a plaintiff must allege "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Matrixx Initiatives, Inc. v. Siracusano ("Matrixx"), 563 U.S. 27, 37-38 (2011) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

At the pleading stage, a complaint asserting claims for violation Section 10(b) or Rule 10b–5 must satisfy the dual heightened pleading requirements of Federal

Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). <u>City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.</u>, 856 F.3d 605, 613 (9th Cir. 2017). Under Rule 9(b), the complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Securities fraud complaints are additionally subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint "plead with particularity both falsity and scienter." <u>Zucco Partners, LLC v. Digimarc Corp.</u>, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation marks and citation omitted). As to falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). As to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "controlling person[s]." 15 U.S.C. § 78t(a). To establish liability under Section 20(a), a plaintiff must first allege a violation of Section 10(b) or Rule 10b–5. <u>Lipton v. Pathogenesis Corp.</u>, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) (citation omitted).

## III.  <u>REQUEST FOR JUDICIAL NOTICE</u>

In support of their motion, Defendants filed a request for judicial notice ("RJN") of fourteen documents attached as Exhibits A through N. <u>See</u> Req. Jud. Not. (ECF No. 17-2), Decl. Gallagher (ECF No. 17-3) ¶¶ 1-14 & Exs. A-N (ECF Nos. 17-4 to 17-17). The documents include a transcript of Defendants' October 29, 2015 earnings call (Exhibit G), slides from the December 8, 2015 presentation (Exhibit I), a transcript of the December 8, 2015 presentation (Exhibit J), a transcript of Defendants' February 11, 2016 earnings call (Exhibit M), and various filings submitted by LPL to the United States Securities and Exchange Commission

("SEC") (Exhibits A-F, H, K, L, and N). Plaintiff does not oppose the RJN.

A court presented with a motion to dismiss a securities class action complaint must consider the complaint in its entirety, "as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, including documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). SEC filings are subject to judicial notice on a motion to dismiss. See Dreiling v. Am. Express Co., 458 F.3d 942, 946 n.2 (9th Cir. 2006). All of the documents submitted with the RJN are either judicially-noticeable SEC filings, or, as in the case of the transcripts and slide presentation, are incorporated by reference in the Complaint . See In re Amgen Inc. Sec. Litigation, 544 F. Supp. 2d 1009, 1024 (C.D. Cal. 2008) (taking judicial notice of a transcript of a meeting, details of which were set forth in complaint, pursuant to doctrine of incorporation by reference). Accordingly, the Court grants Defendants' RJN.

## IV. **DISCUSSION**

Defendants contend Plaintiff has failed to plead falsity with particularity and has failed to raise a strong inference of scienter. Mem. P. & Auth. in Supp. of Defs.' Mot. ("Defs.' Mot.") at 9-24. As discussed below, the Court finds that the Complaint's allegations do not create a strong inference of scienter and that certain of Defendants' allegedly false statements are inactionable.

A. Scienter

Plaintiff's Complaint alleges the following "indicia of scienter": (1) that the individual defendants were beholden to TPG (¶¶ 87-94); (2) their misrepresentations involved LPL's core operations and occurred near quarter-end (¶¶ 95-99); (3) the magnitude of LPL's financial disappointments in contrast with defendants' representations (¶ 100-102); (4) Defendants' "reasons for the miss are demonstrably false" (¶¶ 103-107); (5) TPG had access to inside information about LPL's anticipated 4Q15 financial results (¶¶ 108-109); and (6) the suspect timing

of the share repurchase (¶¶ 110-119). The gravamen of Plaintiff's scienter theory is that LPL was in a state of financial decline in early December 2015; that TPG knew this by virtue of its access to LPL's inside information, and wanted to take advantage of Goldman Sachs' $250 million loan to liquidate shares of LPL before the market reacted to LPL's anticipated poor fourth quarter performance; and Casady and Audette were motivated to help TPG by concealing the allegedly true state of LPL's affairs because Boyce and Schifter, both former TPG partners and current LPL Board members, had the ability to affect their compensation and employment with LPL.

Defendants raise a number of challenges to Plaintiff's theory of scienter, including that its core operations allegations are too vague, that certain admissions by Defendants fail to create a strong inference of scienter, and that the Complaint relies on what amounts to a flawed theory that Defendants had a motive to help TPG. The Court finds Defendants' challenge to Plaintiff's core operations theory persuasive, and concludes the theory's flaws are significant enough to warrant dismissal of the Complaint.

"Scienter is defined as a mental state embracing intent to deceive, manipulate, or defraud." Reese v. Malone, 747 F.3d 557, 568 (9th Cir. 2014) (citation and internal quotation marks omitted) (abrogated on other grounds by Align Tech., 856 F.3d at 620). A complaint stating claims under Section 10(b) or Rule 10b–5 must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, LLC, 552 F.3d at 991 (quoting In re Daou Systems, Inc., 411 F.3d 1006, 1014-15 (9th Cir. 2005)). "'[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" In re Oracle Corp. Sec. Litig., 627 F.3d 376, 390 (9th Cir. 2010) (quoting Howard v. Everex Sys., Inc., 228 F.3d 1057, 1064 (9th Cir. 2000).

The PSLRA requires a plaintiff to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. Under Tellabs, courts must review "all the allegations holistically" to determine whether they give rise to the required strong inference of scienter. Id. at 326; Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 (2011); In re Verifone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701-02 (9th Cir. 2012). The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323 (emphasis in original); Matrixx Initiatives, , 563 U.S. at 48; In re Verifone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701-02 (9th Cir. 2012).

The "core operations" inference refers to a theory of scienter whereby "facts critical to a business's 'core operations' or an important transaction" are inferred to be "known to a company's key officers...." S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783 (9th Cir. 2008). Such allegations may satisfy the scienter requirement in three circumstances:

> First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S.Ct. at 2510. [….] Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information, as in *Daou* and *Oracle*. Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

Id. at 785-86.

9

Plaintiff's core operations allegations do not satisfy any of the three alternatives. First, they are not sufficiently particular to create a strong inference of scienter on their own. To raise a strong inference of scienter, allegations that management had knowledge of negative internal reports should "include adequate corroborating details," such as the "sources of [plaintiff's] information with respect to the reports, how [plaintiff] learned of the reports, who drafted them, ... which officers received them," and "an adequate description of their contents." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002); disapproved on other grounds by South Ferry LP, 542 F.3d at 783-84. Here, Plaintiff alleges that "LPL's gross profits, net new advisory assets, alternative investment revenues and its level of brokerage and advisory assets were key financial metrics that were closely followed by the Company [and] its management" (Compl. ¶ 95), that these metrics were "tracked monthly… if not even more often on a weekly or daily basis" (¶ 96), and that to prepare for the December 8th conference, "Defendants consulted the recent LPL books and records" and thus "had substantial knowledge as to the Company's fourth quarter performance" (¶ 98). These allegations provide no factually detailed information such as the name, date, or content of any report allegedly reviewed by Defendants prior to the December 8th conference. See In re Vantive, 283 F.3d at 1088 (finding core operations allegations insufficient where Plaintiff failed to "cite to any specific report, to mention any dates or contents of reports, or to allege [its] sources of information about any reports"). Also, although it alleges that Defendants tracked LPL's "key financial metrics," the Complaint does not indicate what those financial metrics were as of early December 2015 or otherwise provide any description of LPL's financial state at the time of the December 8th conference. Without such information, the allegation that Defendants prepared for the conference by reading "recent LPL books and records" is an empty one, because the Complaint fails to convey what information those books and records would have contained. In sum, Plaintiff's core operations

allegations are not particular enough on their own to establish that Defendants had reasonable grounds to believe at the time of their December 8th presentation that LPL's state of affairs differed materially from their representations. See In re Oracle, 627 F.3d at 390 ("'[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'").

Nor is this a circumstance in which the Court can conclude "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." Id. Plaintiff argues LPL's core financial metrics were prominent facts that Defendants should be presumed to have known. However, this argument overlooks the fact that the Complaint does not allege facts characterizing the present state of the LPL's core financial metrics as of early December 2015. No matter how important LPL's gross profits, net new advisory assets, and other allegedly "key" metrics may have been to the company's operations, without information indicating where those metrics stood at or near the time Defendants were preparing to give their presentation, the Complaint falls short of establishing what material facts Defendants should be presumed to have known.

Plaintiff compares this case to Rihn v. Acadia Pharmaceuticals, Inc., No. 15cv00575 BTM(DHB), 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016), in which this Court found the complaint's allegations sufficient to show a strong likelihood the disputed information was known to defendants. However, Rihn is distinguishable. In Rihn, defendants admitted facts from which it was possible to determine the true state of the company's affairs at the time defendants made their alleged misstatements, including that the company had determined its manufacturing and quality control systems were substantially incomplete just before describing the same systems as "on track" for submission of a new drug

16-cv-0685-BTM-BGS

application.  Id. at *6, *9.  Here, by contrast, the Complaint provides no factual allegations quantifying LPL's current financial state at or shortly before the time of Defendants' alleged misstatements.  Plaintiff contends Casady's knowledge is demonstrated by his admission during a February 11, 2016 that "LPL had 'insight into the quarter … and knew we would have challenges….'"  (Compl. ¶ 22.)  However, unlike the admissions in Rihn, Casady's admission that he knew there would be "challenges" is too vague with regard to the timing and content of what was actually known to create a strong inference that Defendants materially misstated LPL's affairs on December 8th, or acted with deliberate recklessness in doing so.

Finally, even when reviewed holistically, the flaws in the Complaint's core operations allegations undermine the strength of its scienter theory as a whole.  Plaintiff's allegations are similar to scienter allegations the Ninth Circuit found insufficient in Lipton v. Pathogenesis Corp., 248 F.3d 1027, 1036 (9th Cir. 2002).  There, Plaintiff alleged that negative internal reports indicated flat demand for the company's product, but they failed to identify the reports "much less plead, in any detail, the contents of any such report or the purported data."  Id.  The Ninth Circuit held that without such information, it was unable to "ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of flat patient demand that would cause their optimistic representations to the contrary to be consciously misleading."  Id. (internal quotation and citation omitted).  Similarly, here, Plaintiff does not allege facts describing LPL's financial state on December 8, 2015, or the content of any reports reviewed by Defendants.  Instead, it starts with LPL's 4Q15 results and works backwards, alleging that because LPL's fourth quarter results were "disappointing," its results as of December 8th must also have been poor, because "[i]t defies belief that … LPL's finances could have changed so drastically … between Defendants statements on December 8, 2015" and December 31, 2015. (Id. ¶ 102).  At oral argument, Plaintiff presented charts

of two possible scenarios for LPL's net new advisory assets in 2015, one showing they "fell off a cliff" between December 8th and December 31st (a scenario Plaintiff contends is unlikely), and one showing the decline happened before the December 8th conference (the scenario Plaintiff regards as more likely). Oral Argument, Pl.'s Ex. 1 at pp. 11, 12. Yet while Plaintiff's theory of scienter relies on the probability that the latter scenario is the one that occurred, Plaintiff provides no supporting data or analysis explaining why the scenario it advances is the more likely one. Without allegations quantifying LPL's financial data as of December 8th, it is not possible to determine what Defendants actually or constructively knew regarding LPL's finances, or whether their "optimistic representations to the contrary" were "consciously misleading." Id.; see In re Oracle Corp. Sec. Litig., 627 F.3d at 389 ("the fact that Oracle's forecast turned out to be incorrect does not retroactively make it a misrepresentation").

The rest of Plaintiff's scienter allegations do not make up for this omission. Although the Court agrees with Plaintiff that the timing of LPL's buyback of shares from TPG is suspicious, particularly in light of its previous statement that the buyback would take months, the strength of the inference of wrongdoing created by the timing of the stock repurchase is undermined by the absence of allegations describing the state of LPL's finances in late November or early December 2015, when the buyback was being planned. TPG's alleged right to access LPL's inside information is of little significance in the absence of allegations describing the content of LPL's inside information. As currently stated, Plaintiff's allegations point more strongly to innocent inferences, such as that TPG's decision to exit LPL stock was based on anticipated headwinds applicable across the financial services industry, rather than part of a fraudulent scheme originating with LPL's inside information and carried out with the participation of Casady and Audette.

Therefore, as currently pled, Plaintiff's allegations do not create an inference of scienter that is "at least as compelling as any opposing inference of

16-cv-0685-BTM-BGS

nonfraudulent intent," Tellabs, 551 U.S. at 322, and Plaintiff's claims under Section 10(b) and Rule 10b–5 must be dismissed.  Dismissal will be with leave to amend.

B. Falsity

Defendants challenge some of their alleged misstatements as inactionable puffery, as predictions that proved true, and as misinterpretations of statements that, when viewed in context, fail to support Plaintiff's claims.  The Court agrees with Defendants' arguments in part.

1. Puffery

Defendants challenge two series of statements as inactionable puffery.

First, Plaintiff alleges the following statements from the December 8th presentation were false and misleading:

- Audette told investors that although the "markets went down a fair bit," he "did see market levels and asset levels recover nicely," and added, "we're up at the end of October [2015] to $483 billion [AUM] versus $462 billion at the end of the [third] quarter [of 2015] so nice rebound there." (Compl. ¶ 69.)

- Casady said LPL had "good advisory asset growth overall" and "fundamentally, this year [FY 2015] is like any other in terms of the gross amount [of advisors] and what's different is that we do have the smaller producers leaving." (Id.)

These statements were allegedly false because in reality, the growth rate of LPL's AUM was declining and performing substantially short of expectations in comparison with the performance of the S&P 500 index.  (Id. ¶¶ 70-72.)

Defendants contend Audette's and Casady's descriptions of LPL's asset levels and recovery as "nice" or "good" are too vague to be actionable.  Defs.' Mot. at 14 (citing In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010); In re Mellanox Tech., Ltd. Sec. Litig., 2014 WL 7204864, at *4 (N.D. Cal. 2014)).  Such language is sometimes called "puffery," a term that connotes "mildly optimistic, subjective assessment[s]" of a corporation by its own executives, which the Ninth Circuit has held "hardly amounts to a securities violation."  In re Cutera, 610 F.3d

14

at 1111. In <u>In re Cutera</u>, the Ninth Circuit held "investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." <u>Id.</u> In <u>In re Mellanox</u>, the district court concluded the statement "it's a very, very nice growth of our FDR products within that market" was inactionable puffery. 2014 WL 7204864, at *4. Here, Audette's statements that he "did see market levels and asset levels recover nicely" and there was a "nice rebound," and Casady's statement that LPL had "good advisory asset growth overall," are like the "feel good" statements deemed inactionable in <u>In re Cutera</u> and <u>In re Mellanox</u>. Defendants' motion is therefore granted with prejudice as to those statements.

Second, Defendants move to dismiss Audette's statement that "I would just add that our debt plan and debt structure and buyback plan was designed and built with having the flexibility to be dynamic as we execute it over time." (Compl. ¶ 82.) The statement allegedly led investors to believe LPL's earnings would be "strong enough to carry substantial debt loads" when in fact it knew its earnings were falling, jeopardizing its ability to comply with debt covenants. (<u>Id.</u> ¶¶ 83, 84.) Defendants maintain that phrases like "financial flexibility" have been held inactionable puffery. Mot. at 17:17-18 (citing <u>In re Airgate PCS, Inc. Sec. Litig.</u>, 389 F. Supp. 2d 1360, 1379 (N.D. Ga. 2005); <u>Newcal Indus. Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1053 (9th Cir. 2008)). In <u>In re Airgate</u>, the court evaluated statements describing an anticipated merger as a "strategic combination" that gave "additional operating efficiencies, financial flexibility, and growth potential" and found them to be "too general to be material." 389 F. Supp. 2d at 1379. In <u>Newcal</u>, the Ninth Circuit stated that "the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim" and held that a statement that a company would deliver "flexibility" in their contracts was a general assertion that "is classic puffery." 513 F.3d at 1052-53. The Court agrees that by this measure, Audette's statement about LPL's "flexibility" is too unquantifiable to be actionable, and therefore grants Defendants' motion with prejudice as to the

16-cv-0685-BTM-BGS

foregoing statement.

### 2. <u>Allegedly False Prediction that Proved True</u>

Defendants say the following statement by Audette proved to be true: "our 2015 core G&A guidance is 7.5% to 8.5% and, in dollars, roughly $700 million, that [*sic*] $697 million to $703 million. ***We're still on track.***" Mot. at 14:24-15:4 (emphasis in original).

Defendants rely on a subsequent press release from February 11, 2016, which indicates that LPL ended the fourth quarter of 2015 with G&A expense results of $695 million (a better result, because it meant lower expenses). The press release is part of LPL's SEC filings submitted with Defendants' RJN (Ex. L), and it supports Defendants' contention that Audette did not falsely portray that LPL was "on track." Plaintiff's opposition brief does not address this issue or attempt to explain how Audette's statement can be construed as misleading in light of the G&A expense results reported in the press release, nor does the Complaint contain specific allegations showing how Audette was misleading in characterizing LPL as "on track" to meet its expense guidance. Since Plaintiff does not oppose the accuracy of the press release, the Court grants Defendants' motion to dismiss as to the foregoing statement. <u>See, e.g.</u>, <u>In re Metricom Secs. Litig.</u>, No. C 01-4085 PJH, 2004 U.S. Dist. LEXIS 7834, at *47-55, *111-113 (N.D. Cal. Apr. 29, 2014) (dismissing securities claims where judicially noticeable documents demonstrated truth of the underlying statements).

Defendants also challenge Audette's prediction of a "likely" decline in gross profits as a forward-looking statement subject to the PSLRA's safe harbor protections. Defs.' Mot. at 16 n.6. "The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-looking statement, which is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." <u>Police Ret. Sys. v. Intuitive Surgical</u>,

Inc., 759 F.3d 1051, 1058 (9th Cir. 2014) (citation and internal quotation marks omitted). "The safe harbor applies if the forward-looking statement is '(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (ii) if it is not identified as a forward-looking statement and not accompanied by cautionary language, unless the statement was 'made with actual knowledge . . . that the statement was false or misleading.'" Id. (quoting 15 U.S.C. § 78u-5(c)(1)).

Here, the Court agrees Audette's prediction of a "likely" decline in gross profits is a forward-looking statement. The Complaint supports this conclusion, since it characterizes the statement as indicating an "expected sequential gross profit decline" (Compl. ¶ 74), a reference to future results. The Court has already found Plaintiff's allegations insufficient to show Audette acted with deliberate recklessness, a lesser standard than the "actual knowledge" of falsity required under the PSLRA's safe harbor. Accordingly, the Court grants Defendants' motion with leave to amend as to the foregoing statement by Audette.

### 3. Alleged Mischaracterization of Audette's Statements

Defendants claim Plaintiff has taken Audette's statements out of context, and that properly understood, they were true. The Court disagrees.

### a) Audette's Impressions of LPL

The Complaint quotes Audette as saying:

"Being here for these two months [October and November 2015] and spending a lot of time, … *I think it's a lot more powerful and compelling than I thought from the outside*. Third, and what Mark kind of hinted to on the capital plan side, being at a place where there's a lot less approvals necessary to go *execute on a capital plan in the best interest of shareholders*. So, the way we speak about it, a capital-lite model, *an earnings stream that is quite steady and produces cash flow over time*. Hopefully, the last two months have shown that that opportunity absolutely was there. *We're executing it all well*.

\* \* \*

*… **with respect to expenses and the capital plan, is largely just reiterating that what we said on the earnings call is we are still on track to do and that's still our guidance**. And just quickly, to highlight probably the most notable ones in the first two sub bullet points in the top half of the page on expenses; that our 2015 core G&A guidance is 7.5% to 8.5% and, in dollars, roughly $700 million, that $697 million to $703 million. **We're still on track**.*
*And then, specifically for next year, 2016, core G&A in that $715 million to $730 million range, which is that 2% to 4% growth. So that largely – not largely – that remains on track. So, no news here. **Just reiterating that what we said on the call is still the case***.

(Compl. ¶ 57 (emphasis in original).)   Plaintiff alleges that contrary to Audette's statements, LPL was "having a disastrous Q4" and was unlikely to produce the cash flow necessary to support the debt needed to fund the $500 million share buyback.  (Id. ¶¶ 58-59.)

Relying on Exhibit J, the transcript of the December 8th presentation, Defendants argue that when his statements are viewed in context, it becomes apparent Audette was actually talking about why he took the job at LPL rather than characterizing LPL's current financial performance.  See id.; RJN Ex. J at 333. However, the transcript does not support Defendants' contention.  Audette spoke right after Casady, who had just made introductory comments about LPL's outlook for 2016.  RJN Ex. J at 332.  When Casady finished, Audette was asked "[D]o you have anything to add to that [Casady's comments] in terms of what you're looking to do in 2016?  And then, as you've kind of been brought on board, what kind of surprised you positively about LPL and what do you think the company needs to do better at?"  Id. at 333.  At the start of his response, Audette said, "maybe a good framework for that would be just laying out the things that … really enticed me to come to the company … I think I can use those to give a little bit of color."  Id.  He went on to describe how LPL had looked to him from the outside—essentially, why he had joined LPL—while adding comments about the impressions he had

developed of LPL from the inside having "[been] here a little bit over two months…." Id. He was talking about two things at once: why he decided to join LPL, and how it seemed to him to be performing now that he was on the inside. The Complaint does not mischaracterize his response.

Defendants also contend Audette's comments about LPL's "steady" earnings stream and that LPL had been "executing it all well" over "the last two months" merely described LPL's capital structure and plan in general, and did not address its November or December 2015 financial performance. Defs.' Mot. at 11:9-24 (citing RJN Ex. J). However, Audette's response is not so clearly limited in scope as Defendants contend. While Audette said LPL had an "earnings stream that is quite steady and produces cash flow over time," RJN Ex. J at 333—a statement which, on its own, might be characterized as describing its capital model—he went on to say "[h]opefully, the last two months have shown that … we're executing it all well." The latter statement can reasonably be interpreted as a description of LPL's recent financial performance.

b) Audette's statements regarding LPL's net new advisory
assets

Plaintiff claims Audette made the following allegedly false statement during LPL's December 8, 2015 presentation: "[N]et new advisory assets continue to flow in well. And we are averaging about $1.5 billion a month. And you see that we had that in October [2015]. . . . [W]e are averaging about $1.5 billion [per month]." (Compl. ¶ 61.) He made the statement while referencing a slide titled "LPL Q4 2015 Mid-Quarter Operational Update." (Id. ¶ 62.) Plaintiff alleges that Audette's statement, when considered in connection with the slide, conveyed that LPL "had no reason to believe that net new advisory assets for December 2015 would deviate from the stated $1.5 billion per month average," when in fact LPL's fourth quarter performance garnered a total of only $3.1 billion, $1.4 billion short of expectations.

Defendants point out that the slide itself states "October net new advisory assets totaled $1.5B," RJN, Ex. I at 316, and contend this proves Audette oral commentary referred only to financial results for October, not November or December. Mot. at 12:17-13:8. However, Defendants' focus on the slide is too narrow. Plaintiff relies not only on the slide's text, but also on Audette's contemporaneous verbal comment that "we are averaging about $1.5 billion a month…. you see that we had that in October [2015]. . . . [W]e are averaging about $1.5 billion [per month]." ¶ 61; <u>see</u> Ex. J at 334. Audette spoke in the present tense – "we *are averaging*"—such that his statements can reasonably be interpreted as commenting on LPL's current performance, as compared to what LPL "*had* … in October." <u>Id.</u> (emphasis added). Plaintiff's allegation is that Audette's verbal comments, combined with the slide's title, "LPL Q4 2015 Mid-Quarter Operational Update," suggested he was addressing ongoing quarterly results (that is, November and mid-December performance) rather than just October results. Defendants' focus on the fact that the slide itself reported only October results thus misses the mark.

C. <u>Section 20(a)</u>

Since the Court finds Plaintiff has not alleged a violation of Section 10(b) or Rule 10b–5, its claim under Section 20(a) must also be dismissed. <u>See</u> <u>Lipton</u>, 284 F.3d at 1035 n.15.

## V. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, the Court ORDERS as follows:

1) Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND as to the Complaint in its entirety for failure to allege scienter;

2) Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND as to Audette's statements that he "did see market levels and asset levels recover nicely" and there was a "nice rebound"; Casady's statement that LPL had "good advisory asset growth overall"; and

16-cv-0685-BTM-BGS

Audette's statement that "I would just add that our debt plan and debt structure and buyback plan was designed and built with having the flexibility to be dynamic as we execute it over time";

3) Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND as to Audette's statement "our 2015 core G&A guidance is 7.5% to 8.5% and, in dollars, roughly $700 million, that $697 million to $703 million. ***We're still on track***", and Audette's statement regarding a "likely" decline in gross profits;

4) Defendants' motion to dismiss is otherwise DENIED.

Plaintiff shall have 45 days from the date this order is signed in which to file an amended complaint.

IT IS SO ORDERED:

Dated: August 18, 2017

Barry Ted Moskowitz, Chief Judge
United States District Court

16-cv-0685-BTM-BGS