1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   JONAH H. GOLDSTEIN (193777)
    SUSAN G. TAYLOR (190753)
3   BRIAN E. COCHRAN (286202)
    ANDREW W. HUTTON (172033)
4   655 West Broadway, Suite 1900
    San Diego, CA  92101-8498
5   Telephone:  619/231-1058
    619/231-7423 (fax)
6   jonahg@rgrdlaw.com
    susant@rgrdlaw.com
7   bcochran@rgrdlaw.com

8   Lead Counsel for Lead Plaintiff

9              UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11  CHARTER TOWNSHIP OF CLINTON ) POLICE AND FIRE RETIREMENT ) 12  SYSTEM, Individually and on Behalf of ) All Others Similarly Situated, ) 13                                    ) Plaintiff, ) 14                                    ) vs.                          ) 15                                    ) LPL FINANCIAL HOLDINGS INC., et ) 16  al.,                          ) ) 17                Defendants. ) _____ ) | Case No. 3:16-cv-00685-BTM-BGS  CLASS ACTION  CONSOLIDATED FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    DEMAND FOR JURY TRIAL |

18

19

20

21

22

23

24

25

26

27

28

1311790_1

Lead Plaintiff, Soft Drink and Brewery Workers Union Local 812 Retirement Fund ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by LPL Financial Holdings Inc. ("LPL" or the "Company"), as well as media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of LPL common stock between December 8, 2015 and February 11, 2016, inclusive (the "Class Period"), against LPL, Chief Executive Officer ("CEO") and Chairman Mark S. Casady and Chief Financial Officer ("CFO") Matthew J. Audette (collectively "LPL," the "Company" or the "Defendants") for violations of the Securities Exchange Act of 1934 ("1934 Act").  Defendant LPL is an independent broker-dealer, a custodian for registered investment advisors ("RIAs") and an independent consultant to retirement plans.  The Company provides a platform of brokerage and investment advisory services to independent financial advisors enabling them to provide their retail investors with financial and investment advice.  It generates revenues primarily from fees and commissions on clients' brokerage and advisory assets, and these metrics are highly material to LPL's investors, day-to-day operations, and market capitalization.

2.     LPL was founded in 1989 and in 2005 sold a majority stake to two private equity firms, TPG Capital ("TPG") and Hellman & Friedman LLC ("Hellman & Friedman"), in a deal valued at approximately $2.5 billion.  After it took private control, TPG elevated Defendant Casady to CEO and Chairman.  From 2006-2009, as

1   CEO and Chairman, Casady oversaw TPG's multi-hundred million dollar investment
2   in LPL, he was subject to TPG's oversight and he had regular communications with
3   TPG personnel.  During this time LPL was a private company, Casady made over $10
4   million while under TPG's control and influence.

5       3.      In November 2010, TPG and Hellman & Friedman took LPL public for
6   approximately $470 million (the "IPO").  Casady personally made $58 million in the
7   IPO.  Following the offering, TPG continued to own over 30% of LPL's common
8   stock and, after Hellman & Friedman exited LPL stock in 2013, TPG became LPL's
9   largest shareholder and maintained control and substantial influence over LPL's
10  affairs.  TPG appointed two directors to LPL's Board, Richard Schifter and Richard
11  Boyce.  TPG partner Schifter became LPL's "Lead Director" and also served on
12  LPL's Governance and Nominating Committee – a role that ensured TPG access to
13  LPL governance information, influence in the selection of Board of Director
14  candidates, and evaluation of the Board.  TPG partner Boyce also served on LPL's
15  Compensation Committee, which determined all aspects of Defendants Casady and
16  Audette's compensation, including salary, bonus, incentives, deferred compensation,
17  benefits, and severance.

18      4.      As stated in LPL's public filings, TPG retained "significant influence
19  over corporate transactions," the ability "to strongly influence or effectively control
20  LPL's decisions" and "will continue to be able to influence [LPL's] decisions
21  regardless of whether or not the stockholders believe that the transaction is in their
22  own best interests."

23      5.      In exercising such influence and control over LPL, TPG in its
24  shareholder agreement with LPL also explicitly received "the right to obtain *any*
25  reports, documents, information or other materials . . . which a member of the LPL
26  Board has received or has the right to receive."[1]

27
28  _____
    [1]   Here, as elsewhere, emphasis has been added.

6.     To compete in its industry, LPL uses online trading, exchanging and communicating customer account data instantaneously.  Through its advisor-facing information systems, corporate login-in procedures, online customer reporting processes,[2] and management systems interface(s), LPL's Board and senior management has real-time "24/7" access to customer account data that is aggregated into LPL's "key metrics," including "assets under management" (or "AUM"), "advisory assets," "brokerage assets," "alternative investments" (or "Alt. Inv."), "advisory revenues," and "commission revenues."  LPL's senior management accesses these key metrics in real-time for purposes of managing LPL's day-to-day operations, supervision duties, and reporting the most recent relevant data to investors and analysts.

7.     LPL's stakeholders and managers recognize LPL's real-time view into its operations and performance.  For example, during a December 8, 2015 conference call with the investment community, when speaking about "an earnings stream that is quite steady . . . the last two months have shown that . . . executing it all well," Defendant Audette – LPL's CFO – made repeated references to his real-time view of LPL over the "last two months" (October and November 2015), indicating access *and review* of LPL's financial performance immediately before the December 8, 2015 conference call.  Similarly, LPL analysts knew from their interactions with LPL senior executives that LPL executives have a "good line of sight" intra-quarter into LPL's financial performance, as confirmed by Defendant Casady's acknowledgment "certainly we had insight into the [fourth] quarter" in early December 2015.

8.     Likewise, TPG also had the right to receive real-time performance data, "key metrics" and other information regarding LPL's business directly from LPL and its executive officers.  Effectively, this meant that by virtue of the fact that TPG partners Boyce and Schifter served on LPL's Board of Directors, TPG as an entity had

---

[2]  For a demonstration of LPL's online investment account platform, *see* https://www.youtube.com/watch?v=DCarkq9c5d0.

1  the right **at any time** to access contemporaneous inside information regarding LPL's,

2  "key metrics," financial results and prospects – available to LPL insiders, but not

3  available to other LPL investors.  This special access allowed TPG to have real-time

4  visibility into LPL's financial performance and have inside information upon which it

5  could determine whether to trade or hold its LPL shares.  TPG maintained its ability to

6  control and influence LPL's decisions and its information rights throughout the 2015-

7  2016 time-period relevant to this action.

8       9.     When LPL went public in 2010, TPG also ensured that Casady remained

9  as LPL's CEO and Chairman while TPG remained in control, providing him with an

10  employment agreement that lasted until February 2014, in which LPL was required to

11  take steps to ensure Casady was elected to the board and remained its chairman.  TPG

12  ensured that LPL rewarded Defendant Casady handsomely, and Casady in turn was

13  beholden to TPG for his corporate position, prestige and wealth.  Between 2010 and

14  2015, while TPG was in firm control of LPL, Defendant Casady received stock

15  proceeds and compensation valued at over $119 million as LPL's Chairman and CEO

16  – positions he owed to TPG's oversight, influence and control over the Company:[3]

17

|  | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | Totals |
|---|---|---|---|---|---|---|---|
| Insider Sales Proceeds | $        0 | $        0 | $        0 | $23,452,413 | $ 600,000 | $64,467,480 | $ 88,519,893 |
| Salary | 900,000 | 885,479 | 800,000 | 800,000 | 800,000 | 800,000 | 4,985,479 |
| Option Awards | 3,519,400 | 3,079,998 | 2,799,991 | 2,800,000 | - | 2,677,905 | 14,877,294 |
| Non-Equity Incentive Comp. | 1,237,500 | 1,485,000 | 2,500,000 | 1,000,000 | 2,091,625 | 2,225,000 | 10,539,125 |
| Other Comp. | 52,475 | 71,440 | 48,842 | 57,553 | 47,673 | 39,820 | 317,803 |
|  | $ 5,709,375 | $ 5,521,917 | $ 6,148,833 | $28,109,966 | $ 3,539,298 | $70,210,205 | $119,239,594 |

---

[3]  TPG controlled Defendant Casady up through TPG's eventual reduction of beneficial ownership of LPL below 5% in 2016.  Casady's importance to TPG likewise diminished, as evidenced by Casady's "early retirement" from LPL announced at the end of 2016 and effective March 2017.  Throughout 2015 and early 2016, TPG controlled LPL's determination of whether Casady would depart LPL "for cause" – resulting in Casady losing unvested compensation – or "retirement" upon which Casady would receive valuable immediate vesting of compensation.

10.     Following the IPO, LPL became the subject of several regulatory and governmental investigations regarding the Company's fraudulent, deceptive and/or legally deficient business practices.  In February 2013, LPL paid $2.5 million to settle allegations by Massachusetts securities regulators that it had failed to adequately supervise its brokers who sold investments in non-traded real estate investment trusts ("REITs").  In May 2015, the Financial Industry Regulatory Authority ("FINRA"), the self-regulatory organization that regulates and oversees brokerage firms, sanctioned LPL $11.7 million for "widespread supervisory failures" related to complex product sales, trade surveillance and trade confirmations delivery.  In September 2015, LPL agreed to pay $1.8 million to settle charges by the Massachusetts Attorney General that it had improperly sold and marketed risky exchange-traded funds to retail investors.   LPL simultaneously agreed to pay $1.4 million in civil penalties to regulators in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands to settle charges that it failed to implement an adequate supervisory system regarding its sale of non-traded REITs and to enforce its own written procedures regarding the sale of non-traded REITs.

11.     The repeated regulatory actions caused LPL to be less attractive to LPL's more productive advisors, and by October 2015 some of LPL's large accounts (*i.e.*, measured by AUM) were leaving LPL for other firms at an accelerated pace, as the following data from *InvestmentNews.com* illustrates:

| Year | Advisor Firms Leaving LPL | Total AUM of Departing Advisors | Avg. AUM per Advisor |
|---|---|---|---|
| 2013 | 9 | $1.215 billion | $135 million |
| 2014 | 14 | 1.534 billion | 110 million |
| Jan – Nov 2015[4] | 20 | 3.262 billion | 163 million |

---

[4]   In the month of October 2015, the total AUM of advisors departing LPL for other firms had accelerated to $749 million for a single month, whereas the total AUM of departing advisors for the previous two months (August and September 2015) was only $209 million.

12.     Soon before the start of the Class Period, in early October 2015, as LPL faced nagging regulatory problems, Defendant Casady's future as Chairman and CEO was "attracting a lot of conjecture" in the investing community, and it was publicly reported that Defendant Casady's "glory days were before [LPL] went public during their growth phase."  Defendant Casady's continued employment depended on the approval of LPL's Board of Directors, which included now TPG Senior Adviser Schifter and now former TPG Partner Boyce.

13.     Shortly after the settlement of these significant regulatory enforcement actions, and LPL's payment of over $15 million in fines, on October 29, 2015, LPL publicly reassured its investors that it expected to move past its regulatory problems with "meaningfully lower" charges in the future, and that it would "maximize shareholder returns" by buying back $500 million worth of its own shares.  Defendant Casady told investors that the share buyback was a "bargain," because LPL shares were trading "at a significant discount to what we believe is their intrinsic value."  Defendants later stressed that the message sent to the market was that the buyback was the "key" as to how LPL would "turn the page" on its recent regulatory problems and propel its stock upward.  That same day the market analysts from Wells Fargo covering LPL stressed that, "the buyback program clearly signals management's confidence in the outlook."

14.     As intended, LPL's announcement that it would buy back half a billion dollars' worth of its own shares signaled the Company's confidence in its ability to fund the buyback by delivering solid financial results and earnings, propelling LPL's stock price over 10% in the days following the Company's announcement.

15.     On November 24, 2015, LPL announced that it had entered into an agreement with Goldman Sachs & Co. ("Goldman") whereby the bank would carry out half ($250 million) of the $500 million share repurchase on an accelerated schedule.  LPL stressed that the accelerated share repurchase plan was not anticipated to occur immediately, but instead "***will take several months to complete***."

16.     However, behind the scenes by at least the beginning of December 2015, with less than a month left in 4Q15, LPL's contemporaneous internal financial results and "key metrics" showed that the Company was in the midst of a disastrous fourth quarter.  The reforms the Company had implemented as a result of recent regulatory fines and penalties and a revamped Department of Labor ("DOL") fiduciary rule had caused a sharp downturn in some of the Company's most profitable financial products, including its alternative investment products which would end up down nearly *75%* year-over-year during the quarter.  Advisory firms with large accounts were leaving LPL (to join LPL's competitors) at an accelerated pace heading into 4Q15.

17.     Likewise, LPL's net new advisory assets, brokerage and advisory assets and gross profits were also in the midst of a substantial decline from expectations. LPL was near quarter-end with only three weeks left, and the financial metrics utilized by the Company and its senior management to measure these key areas of performance provided the Company visibility into the significant decline in its fourth quarter performance.  This real-time visibility in LPL's results has been acknowledged by at least three LPL stakeholders; (i) a Wells Fargo analyst acknowledged from dealings with LPL that its senior management has a "good line of sight" into LPL's intra-quarter performance; (ii) Defendant Audette acknowledged on December 8, 2015 his intra-quarter insight into the "last two months" (October and November) of LPL's performance and LPL was "executing it all well"; and (iii) Defendant Casady acknowledged in February 2016 that at the time of the buyback in early December 2015 "*certainly we had insight into the quarter . . . and knew we would have challenges*."[5]

---

[5]   The "challenges" Casady referred to was not the buyback, because the buyback was successfully completed months ahead of schedule.  The "challenges" faced by LPL at this time were its declining key metrics of advisory growth, assets, gross profits and revenue.

18.     As of early December 2015, when LPL was suffering a disastrous fourth quarter, the following factors were evident, known or knowable to Defendants, LPL senior management and TPG: (i) LPL maintained real-time information systems that reported via the field advisors' BranchNet platform and other online account systems, to LPL's corporate Oracle reporting systems, the then-current customer account values, including aggregated levels of "assets under management," levels of "advisory assets," levels of "brokerage assets," and "commission revenues"; (ii) LPL prepared online, instantaneous account statements for its advisors' customers that included the base data supporting LPL's key financial metrics; (iii) financial advisors that were departing LPL for competitors had notified LPL of their departures and the associated lost AUM was evident in LPL's real-time information systems; (iv) TPG maintained an explicit right at any time to access LPL's financial information, and "significant influence" and ability to effectively control LPL's financial decisions; (v) the LPL Board of Directors (on which former TPG partners Schifter and Boyce were directors) met formally 10 times in 2015, and thus would have likely met in close proximity to early December 2015 and discussed LPL's financial performance; (vi) TPG had utilized its prior influence in elevating Casady to Chairman and CEO; and (vii) Casady's future, which only one month prior was publicly reported to be uncertain and "attracting a lot of conjecture," depended on the continued approval of LPL's Board, of which Schifter and Boyce were members.

19.     As a result of these factors, and as of the December 8, 2015 conference call with the investment community, Defendants either knew, or were reckless in not knowing, that (i) LPL's rate of monthly growth of net new advisory assets had already declined by approximately $500 million or more per month in 4Q15 from a monthly average rate of $1.5 billion per month to a rate approximating $1.0 billion per month[6];

---

[6]     As explained in detail below at ¶¶70-83, Plaintiff's analyses of net new advisory assets for the two months ended November 2015 reveal an approximate $1 billion overstatement as of the December 8, 2015 conference call.  This figure represents Plaintiff's best estimate based on available information and extensive analyses.  The

(ii) Defendants were experiencing, in October and November 2015, extraordinarily poor correlation (below 50%) between growth of LPL's AUM relative to equity market movements, indicating that LPL's AUM levels were already negatively impacted by several billion dollars in 4Q15 due to factors other than market movements; (iii) LPL advisors with larger accounts and AUM were leaving LPL at an accelerated rate through October 2015 as compared to prior years; (iv) in addition to declining asset growth, LPL was experiencing a severe reduction in the sale of high-commission alternative investments (such as structured products), materially and negatively impacting LPL's commission revenues in 4Q15; and (v) each of these factors, when viewed holistically, indicated to LPL insiders that LPL's intra-quarter growth, gross profits and earnings streams were being materially and adversely impacted by undisclosed factors, causing LPL's financial results to likely fall far short of Wall Street's expectations.

20.    TPG knew that if the market learned that LPL's fourth quarter results fell far short of Wall Street expectations, it would cause a significant decline in LPL's stock price from the historically high levels at which its shares were trading in early December.  This would result in massive losses to the value of TPG's portfolio of LPL stock, unless TPG was able to unload its LPL stock before this negative financial information became public.  Thus, in late November/early December, and sometime prior to December 8, 2015, TPG approached Goldman – who was executing the buyback for LPL – to cash out more than 4 million shares from TPG's ownership of LPL through the accelerated share repurchase program while the stock was still trading at historically high levels.

21.    Prior to this sale being publicly disclosed, on December 8, 2015, LPL provided investors a near-end-of-fourth quarter financial update.  LPL falsely assured investors that the Company was performing as expected, including that LPL over the

precise facts, circumstances, and amount of the overstatement rely on non-public evidence uniquely and solely within Defendants' possession and control.

1   "last two months" had an "earnings stream that is quite steady," and that the Company

2   had been "executing it all well" – all while omitting the fact that up to that time LPL

3   was suffering a weak fourth quarter with severely disappointing financial results,

4   including a monthly average reduction of net new advisory assets by approximately

5   $500 million (or 33% each month), a less than 50% market correlation to LPL's levels

6   of AUM (dropping from 60% historical levels), and a sharp reduction in commission

7   revenues.  LPL's false and misleading message was material because growing asset

8   levels were necessary to support LPL's earnings stream and produce the necessary

9   cash flow in the future to allow LPL to successfully execute its $500 million

10   repurchase plan, pay down its associated debt and avoid any potential breach of its

11   debt covenants.  Defendants' December 8, 2015 statements followed less than six

12   weeks after LPL had, on October 29, 2015, reassured the public that substantially

13   increasing the Company's debt ratio to complete the $500 million repurchase "makes

14   the most sense today," and expressed management's confidence in LPL's financial

15   outlook for the fourth quarter of 2015.

16          22.     Such statements were still alive in the market, and LPL's December 8,

17   2015 statements reassured investors that: (i) nothing had materially changed since the

18   share buyback was announced on October 29, 2015; and (ii) that LPL's earnings

19   stream was more than sufficient to go forward with a $500 million repurchase plan

20   that made economic sense and would drive shareholder value.  LPL knew that if it

21   disclosed the truth regarding LPL's financial results, LPL's stock price would decline

22   significantly and cause TPG (who served as Casady's benefactor and overseer) to lose

23   out on tens of millions of dollars in insider trading proceeds.  TPG's "significant

24   influence over corporate transactions," ability to effectively control LPL's decisions,

25   regardless of whether it is in the best interest of LPL's shareholders, and TPG's

26   information rights to LPL's real-time financial results ensured that LPL did not

27   disclose to other investors LPL's disappointing 4Q 2015 performance.  On December

28   8, 2015, LPL's stock closed at $45.06 per share, near its highest levels in two years.

23.     Only two days later, on December 10, 2015, and contrary to LPL's statement only two weeks earlier that the share repurchase program "***will take several months to complete***," the Company announced that it had completed the ***entire*** $250 million (*i.e.*, first half) of the accelerated share repurchase program in only a matter of days, allowing TPG to cash out 4.3 million shares of its LPL common stock at $43.27 per share.  More than three quarters of LPL's $250 million buyback spending went to TPG, who at the time of the sale maintained the right to control and influence LPL's financial decisions and had direct access to LPL's undisclosed "24/7" intra-quarter financial information indicating that LPL was suffering a disastrous fourth quarter. The transaction allowed TPG to dispose of approximately one-third of its stake in LPL at historically high levels, generating approximately $187 million in insider sales proceeds.  Only on February 11, 2016 was it finally revealed that TPG had cashed in by selling millions of LPL shares at historically high share prices, while the Company was in the midst of a terrible fourth quarter that had not yet been disclosed to the public.

24.     On February 11, 2016, LPL announced its fourth quarter and full year 2015 financial results that revealed the false and misleading nature of Defendants' December 8, 2015 statements.  LPL disclosed that gross profits had fallen 35% in the quarter and 5% for the year and that it had generated only $0.37 per share in adjusted earnings per share ("EPS"), 27% below consensus analyst estimates of $0.51 per share.  The Company further revealed that reported net new advisory assets for the fourth quarter were only $3.1 billion, $1.4 billion less than Defendants had misled investors to believe on December 8, 2015.  The Company also disclosed that the negative performance in LPL's advisory and brokerage assets resulted in reported earnings being worse than expected – in contrast to their December 8, 2015 statements that advisory and brokerage assets had recovered along with improving market levels. Finally, LPL disclosed that in 4Q15, LPL's gross profit declined 5.1% from $339.8

1  million in 3Q15 to $322.4 million in 4Q15, the Company's worst sequential gross

2  profit decline in four years, primarily as a result of falling commission revenues.

3      25.    As a result of this news, on February 12, 2016 the price of LPL common

4  stock dropped $8.76, nearly 35% in one day, on record volume, to close at $16.50 per

5  share.  Had LPL not bowed to TPG's influence and control, and purchased TPG's

6  shares in the buyback only after disclosing its fourth quarter results, TPG's insider

7  trading proceeds would have been diminished by approximately $115 million.

8  Correspondingly, LPL would have been able to purchase the same number of LPL

9  shares back from TPG for $115 million less.

10      26.    Financial market analysts described LPL's financial results as "ugly" and

11  "very weak" and recognized the financial impact of this previously concealed

12  information.  William Blair analysts highlighted that: (i) "[g]ross profit of $322

13  million was $12 million below our estimate ($0.07 EPS impact) due to a combination

14  of items but particularly lower alternative investment revenues"; (ii) "[n]et new

15  advisory assets totaled $3.1 billion in the quarter and $16.7 billion for the year"; and

16  (iii) "[a]lternative investment commissions (largely non-traded REITs) were down

17  38% sequentially and likely will continue to decline."  Wells Fargo analysts stressed

18  that "all in all it was a very challenging quarter with revenue down over 7% year-

19  after-year including commissions that were down 12% year-after-year."  Credit Suisse

20  analysts emphasized that the "well below expectations" earnings miss was driven by

21  "weaker gross profits . . . characterized by a pull-back in brokerage sales, [and] weak

22  advisor growth trends."  UBS analysts noted that "[u]nderlying growth metrics were

23  unimpressive" because among other things, "net new asset growth slowed."

24      27.    JP Morgan analysts also noted "a lack of confidence in management" and

25  that "management looks bad here."  Moreover, during the February 11, 2016 LPL

26  investor call, the Wells Fargo analyst expressed overt cynicism that LPL did not

27  previously know of the disappointing financial results, given its real-time "24/7" view

28

of LPL performance, and noted the suspicious timing in which LPL bought back its

shares from TPG:

> The follow-up I had really had to do with the buyback, and *I know you guys tend to have a pretty good line of sight in your business*. And so I would imagine when you guys had some idea that the fourth quarter was going to be pretty challenging. So not sure why then you buy so much stock ahead of that print as opposed to waiting until after the fact and then you have all kinds of dry powder.

28.    In response, Defendant Casady admitted LPL had "insight into the

quarter . . . and knew we would have challenges," but blamed the Company's poor

results and deteriorating performance completely on an unforeseen market downturn.

Casady went so far as to cavalierly state that the scrutiny which he was facing from

the market for his purported unforeseen surprise regarding LPL's weak fourth quarter:

> Well, I think the surprise is the market downturn. No one predicted the Spanish Inquisition. So, as you look at it, you have the six weeks of relentless market drop including today, and that is the issue. So I think as you look at it, what we saw was an opportunity to get the first wave of buyback done at pace, and we have always been an aggressive buyer of our shares. So this is no different in terms of our behavior, and *certainly we had insight into the quarter. And you knew we would have challenges*, but didn't feel we would be that far off from the rest of the market, and I think the rest of the market's reporting shows that we're not that far off. And so on a relative basis, we will have said that the price is going to be somewhere around a number not too different than we used, and therefore, it makes sense to do it sooner rather than later in terms of reducing share count. It was no more complex than that.

29.    But, contrary to Defendant Casady's "market" excuse, analysts from JMP

Securities and Wells Fargo noted respectively that the fourth quarter results were due

not solely to a volatile market but were also the result of "company-specific

headwinds," and "other [LPL specific] issues affecting results including a low level of

net recruiting and ongoing declines in alternative investment sales."

30.    Moreover, Casady's excuse that it was somehow only a "surprise" market

downturn that caused LPL's disastrous fourth quarter is belied by the fact that LPL's

results and stock price decline were each drastically worse than the Company's market

and industry peers.

31.     The six publicly traded companies LPL listed in its February 25, 2016 10-K filing as its peers and that provided quarterly reports beat Wall Street analyst earnings expectations by 5.5% on average for the fourth quarter of 2015.  But, LPL missed *by over 27%* in comparison:



32.     Likewise, analyzing the stock price decline using the earning release date of ±1 trading day, LPL's peers on average suffered a 3.7% stock price decline following the release of their fourth quarter 2015 results.  But LPL stock price declined by nearly *22%* – almost seven times as much as its peers:



33.    The fallacy of Defendant Casady's excuse that LPL's disastrous fourth quarter 2015 results were due only to a "surprise" market downturn is further shown by the fact that LPL's earnings performance and corresponding stock price decline was substantially worse than the 16 comparable companies in the New York Stock Exchange ARCA securities broker dealer index.  These companies on average for the fourth quarter 2015 beat Wall Street analysts' earnings expectations by 3.8%, but LPL missed by over *27.3%* in comparison.

34.    Likewise, analyzing the earning release date of ±1 trading day, these 16 comparable companies on average suffered a -.5% stock price decline following the release of fourth quarter 2015 results.  But LPL stock price dropped by ***21.9%*** – over twenty times as much:



## Stock Price Decline – Industry Group

**Average stock price decline during earnings release window**
Timeframe: Earnings release date ±1 trading day

Source: Bloomberg.

35.     LPL's drastically worse fourth quarter performance and stock price decline in comparison to its market and industry peers, as demonstrated in ¶¶29-34 above, shows that it was hardly a purported unforeseen general market downturn that caused LPL's weak fourth quarter results.  That Casady could offer only a widespread unsupported excuse for LPL's fourth quarter results further demonstrates LPL's complicity in deceiving investors.

36.     The following chronology illustrates Defendants' fraud:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   37.   As a result of Defendants' false statements, LPL common stock traded at

17 artificially inflated prices during the Class Period. However, as the truth was revealed

18 into the market, the Company's common stock fell almost 63% from its Class Period

19 high, as the artificial inflation was removed from the stock. As a result of their

20 transactions in artificially inflated LPL common stock during the Class Period,

21 Plaintiff and other class members suffered significant damages. By contrast, TPG

22 generated $187 million in proceeds by selling its LPL stock back to the Company at

23 peak prices. If TPG had sold after LPL's disastrous fourth quarter results and

24 diminished prospects were disclosed to the market, it would have generated $115

25 million less in insider trading proceeds.

26
27
28

**JURISDICTION AND VENUE**

38.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

39.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

40.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  LPL also maintains primary offices and an operational center in this District.  Defendant Audette maintains a residence in this District and is based out of this District, and Defendant Casady has maintained a residence in this District for several years.

41.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

**PARTIES**

42.     Lead Plaintiff Soft Drink and Brewery Workers Union Local 812 Retirement Fund purchased LPL common stock at artificially inflated prices during the Class Period and has been damaged as a result of Defendants' alleged misconduct, as detailed in the Certification previously filed, (Dkt. No. 10-3) and incorporated herein.

43.     Defendant LPL is an independent broker-dealer, a custodian for RIAs and an independent consultant to retirement plans.  The Company maintains primary offices at 4707 Executive Drive, San Diego, California 92121.

44.     Defendant Casady was the Company's Chairman of the Board and CEO until his "early retirement" in March 2017, positions he had held since December 2005 and March 2006, respectively.

45.     Defendant Audette is the Company's CFO, a position he has held since September 2015.

46.     The Defendants referenced above in ¶¶44-45 referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements which caused the price of LPL common stock to be artificially inflated during the Class Period.

47.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LPL's data derived from LPL's BranchNet reporting platform, online account systems, and similar "24/7" reporting systems, daily reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market.  They made or were provided with the public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  They also participated in conference calls with securities analysts and investors in which they made materially misleading statements and omissions and held themselves out to be knowledgeable on the topics which they discussed.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

**DEFENDANTS' FRAUD**

48.     Defendants are liable for: (i) making materially false public statements; or (ii) failing to disclose adverse material facts known to them which rendered their

1   public statements about LPL false or misleading.  Defendants' fraud: (i) deceived the

2   investing public regarding LPL's contemporaneous financial results, "key metrics,"

3   prospects and business; (ii) artificially inflated the price of LPL common stock; and

4   (iii) caused Plaintiff and other members of the Class (as defined below) to purchase

5   LPL common stock at artificially inflated prices, and suffer damages when the

6   previously non-disclosed truth was finally revealed.

7                               **BACKGROUND**

8           49.    LPL, together with its subsidiaries, provides an integrated platform of

9   brokerage and investment advisory services to independent financial advisors and

10  financial advisors at financial institutions in the United States.  Its brokerage offerings

11  include variable and fixed annuities, mutual funds, equities, retirement and 529

12  education savings plans, fixed income products, insurance and alternative investments.

13  LPL's insurance offerings comprise personalized advance case design, point-of-sale

14  service, and product support for a range of life, disability, and long-term care

15  products.  The Company also offers fee-based advisory platforms and support, which

16  provide access to no-load/load-waived mutual funds, ETFs, stocks, bonds,

17  conservative option strategies, unit investment trusts, institutional money managers,

18  and no-load multi-manager variable annuities.  In addition, LPL offers cash sweep

19  programs and retirement solutions, a fee-based service that allows qualified advisors

20  to provide consultation and advice.  Further, LPL provides other services comprising

21  tools and services enabling advisors to maintain and grow their practices and custodial

22  services to trusts for estates and families.  The Company offers its services to

23  approximately 14,000 independent financial advisors, including financial advisors at

24  approximately 700 financial institutions.

25  **LPL's Key Performance Metrics**

26          50.    The majority of LPL's revenue streams fall into two categories:

27  commission revenues and advisory revenues.  For fiscal 2015, commission revenues

28  and advisory revenues generated 46% and 32%, respectively, of LPL's total net

1   revenues.  Commission revenues derive from upfront advisor fees and commissions

2   for investment products and, for certain products, a trailing commission.  Advisory

3   revenues derive from fee-based advisory platforms and the provision of ongoing

4   investment advisory services.  As explained by LPL in its 2014 Form 10-K, "[N]et

5   new advisory assets are a primary driver of future advisory fee revenue and have

6   resulted from the continued shift by our existing advisors from brokerage towards

7   more advisory business."  The Company has also highlighted net new advisory assets

8   as a key business metric in every 10-K and 10-Q from 4Q14 through 4Q15 in the

9   Company's MD&A under a subsection entitled "How We Evaluate Our Business."[7]

10  For fiscal 2015, 72% of LPL's revenue was recurring in nature, providing the

11  Company substantial visibility into its future revenue streams.  In addition, for

12  transaction-based commissions, the Company generates revenues "at the point of

13  sale," providing the Company with further visibility into its commission-based

14  revenues at a given point in time.

15  **LPL's Real-Time View of Performance Data**

16       51.    LPL also  had, before and throughout the Class period, significant and

17  real-time "24/7" visibility into its performance data and key metrics measuring asset

18  balances and related revenues.  For example, LPL management had real-time "24/7"

19  access to "key metrics" including then-current levels of advisory and brokerage assets

20  via LPL's management systems' interface to "BranchNet," LPL's proprietary advisor

21  platform that LPL claims is "one of our competitive strengths."  LPL also maintains

22  instantaneous account information online.[8]

---

23  [7]   LPL's SEC filings explain, "[a]dvisory and brokerage assets are comprised of
24  assets that are custodied, networked, and non-networked, and reflect market
    movement in addition to new assets, inclusive of new business development and net of
25  attrition.  Insured cash account and money market account balances are also included
    in advisory and brokerage assets."  Net new advisory assets consist "of funds from
26  new accounts and additional funds deposited into existing advisory accounts that are
    custodied in our fee-based advisory platforms."

27  [8]   For a demonstration of LPL's online investment account platform, see
28  https://www.youtube.com/watch?v=DCarkq9c5d0.

52.     LPL describes BranchNet's capabilities for providing real-time information about account levels, types of trades, and compliance documentation, telling investment advisors that BranchNet is "[a]ccessible 24/7 . . . provid[ing] straight-through processing of trade requests, execution of mutual fund, equity, fixed income, option, annuity and direct business transactions. You will receive documentation, tax reporting and trade confirmations through BranchNet, as well." LPL also represents that BranchNet generates "Portfolio Reports" that allow LPL financial advisors "to analyze your clients' holdings and help you potentially grow your assets under management. It allows you to quickly find all accounts and all positions held by a client or household through one convenient location; and offers multiple views of your aggregate data."

53.     LPL's BranchNet platform and other online account systems, with "24/7" real-time data, interfaces directly with LPL's Oracle-based and other management reporting systems, allowing LPL senior management to view LPL's key metrics on a real-time basis, an industry standard. For example, LPL's information systems – essentially unchanged throughout the Class period and into 2016 – could report to LPL shareholders within 18 days (on February 18, 2016), the monthly results of net new advisory assets for January 2016. The BranchNet platform interface with LPL corporate-based systems can similarly aggregate a real-time "24/7" detailed and itemized breakdown of assets, including advisory, brokerage, alternative investments, mutual funds, cash, and associated revenues for each component of the total assets under management as the following screenshot illustrates:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20  **TPG's Control of LPL and Casady**

21      54.    Prior to 2010, LPL was majority owned by TPG and Hellman &

22  Friedman, two private equity firms that owned a combined 72% stake in LPL.  In

23  November 2010, these private equity firms took LPL public in an IPO in which 15.7

24  million LPL shares were sold to the public at $30 per share.

25      55.    Even after the IPO, TPG retained a substantial ownership stake in LPL

26  and influence over its affairs.  Two TPG partners, Boyce and Schifter, served as

27  directors of LPL.  TPG partner Schifter became LPL's "Lead Director" in 2013 to

28

2014 and also served on the LPL Board of Governance and Nominating Committee – a role that ensured TPG access to LPL governance information, influence in the selection of Board of Director candidates, and evaluation of the Board.  TPG partner Boyce also served on LPL's Compensation Committee, which determined all aspects of Defendants Casady and Audette's compensation, including salary, bonus, incentives, deferred compensation, benefits, and severance.

56.    As stated in LPL's public filings, TPG retained "significant influence over corporate transactions" and the ability "to strongly influence or effectively control LPL's decisions" and "will continue to be able to influence [LPL's] decisions regardless of whether or not the stockholders believe that the transaction is in their own best interests."

57.    In exercising such influence and control over LPL, TPG in its shareholder agreement with LPL also explicitly received "the right to obtain any reports, documents, information or other materials . . . which a member of the LPL Board has received or has the right to receive."  TPG also had the right to receive additional information regarding LPL's business directly from the Company's executive officers.  Effectively, this meant that by virtue of the fact that TPG partners Boyce and Schifter served on LPL's Board of Directors and TPG's other rights to inside information, TPG as an entity had the right *at any time* to access inside financial information regarding LPL's financial results and prospects not available to other investors.  This special access allowed TPG to always have real-time visibility into LPL's financial performance and to have inside information on which to either trade or hold its LPL shares.  TPG maintained its ability to control and influence LPL's decisions and its rights to inside information during the 2015-2016 time-period relevant to this action.

58.    LPL has also identified TPG as a "related party" in SEC filings, and stated that it has continued to enter into various related-party transactions with TPG

and certain of TPG's portfolio companies since the IPO.  As of December 31, 2014, TPG owned approximately 13% of the outstanding shares of LPL common stock.

**LPL's Regulatory Problems**

59.   Following the IPO, LPL became the subject of several regulatory and governmental investigations into allegedly fraudulent, deceptive and/or legally deficient business practices at the Company and among its network of financial advisors:

- In February 2013 it was announced LPL had settled allegations by Massachusetts securities regulators that it had failed to adequately supervise its brokers who sold investments in non-traded REITs for $2.5 million.

- In May 2015 FINRA announced that it had sanctioned LPL $11.7 million for "[w]idespread [s]upervisory [f]ailures [r]elated to [c]omplex [p]roduct [s]ales, [t]rade [s]urveillance and [t]rade [c]onfirmations [d]elivery."

- In September 2015 it was announced that LPL had agreed to pay $1.8 million to settle charges by the Massachusetts Attorney General that it had improperly sold and marketed risky ETFs to retail investors.

- Also in September 2015, it was announced that LPL had agreed to remediate investor losses and pay $1.425 million in civil penalties to regulators in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands for its alleged failure to implement an adequate supervisory system regarding its sale of non-traded REITs and its failure to enforce its written procedures regarding the sale of non-traded REITs.

**LPL's Departing Advisors**

60.   During LPL's regulatory problems, the pace at which LPL advisors and their associated AUM were departing LPL accelerated in 2015, and in particular, in October 2015, as the following data from *InvestmentNews.com* illustrates:

| 2015 Date | Advisor(s) | AUM ($M) | Firm joining | State |
|---|---|---|---|---|
| Jan. 9 | Metz, Sanchez, Sbrocco | $150.00 | Raymond James | NJ |
| Jan. 15 | Sedberry, Jones | 93.00 | Raymond James | CA |
| Jan. 20 | Morris | 65.00 | Indep. Financial Group | CA |

| 2015 Date | Advisor(s) | AUM ($M) | Firm joining | State |
|---|---|---|---|---|
| Jan. 26 | Shen | 50.00 | Indep. Financial Group | CA |
| Feb. 2 | Bethea, Angst | 100.00 | Securities America | AL |
| Mar. 13 | Freibart | 61.36 | Ameriprise Financial | LA |
| May 5 | Doneth | 146.91 | Ameriprise Financial | OR |
| May 15 | King, Kelly | 108.00 | Commonwealth Fnl. | NJ |
| May 29 | Daigle, Comeaux, Bond | 350.00 | Commonwealth Fnl. | LA |
| May 29 | Eggers | 150.00 | Raymond James | TX |
| June 1 | Ronn, Phillips, Phillips | 158.00 | Kestra Financial | MN |
| July 7 | Bordelon, Lock, Hollis | 800.00 | Securities America | LA |
| Aug. 3 | Kennedy | 79.00 | Wells Fargo Advisors | FL |
| Aug. 7 | Levengood | 50.00 | Voya Financial Advisors | PA |
| Sept. 16 | Jones | 80.00 | Securities America | OK |
| Oct. 19 | Pickler, Baile | 250.00 | Commonwealth Fnl. | TN |
| Oct. 21 | Lancaster (3) | 166.00 | Raymond James | TX |
| Oct. 22 | Laughter, Jones | 114.00 | Commonwealth Fnl. | GA |
| Oct. 30 | Varma | 219.00 | FSC Securities | CA |
| Nov. 6 | Minton | 72.00 | Ameriprise Financial | WI |

61.     The rate of advisors and AUM departing LPL was greatly accelerated in 2015 as compared to prior years, as reported by *InvestmentNews.com*:

| Year | Advisor Firms Leaving LPL | Related AUM Leaving LPL | Avg. AUM per Advisor |
|---|---|---|---|
| 2013 | 9 | $1.215 billion | $135 million |
| 2014 | 14 | 1.534 billion | 110 million |
| Jan – Nov 2015[9] | 20 | 3.262 billion | 163 million |

**LPL's First Half of Planned $500 Million Share Repurchase**

62.     On October 29, 2015, LPL financial announced its third quarter fiscal 2015 financial results.  LPL reported adjusted EPS for the quarter of $0.55 per share, above consensus analyst estimates, and stated that it expected to move on from its regulatory problems with "meaningfully lower" regulatory-related charges going forward.  It also announced that it would be implementing a new "capital management plan to create greater shareholder value."  Key to this plan was a $500 million share

---

[9]   In the month of October 2015, the AUM of advisors departing LPL for competitors totaled a whopping $749 million for one month, whereas the previous two months (August and September 2015) totaled $209 million.

repurchase program authorized by the Board.  The Company stated that in order to pay for this share repurchase it planned to significantly increase its target leverage ratio from a range of two to three times net debt-to-earnings before interest, taxes, depreciation and amortization ("EBITDA") to a ratio of four times net debt-to-EBITDA.  On a conference call to discuss the quarterly results, Defendant Casady stated that the share buyback was a "bargain," as he believed LPL shares were trading "at a significant discount to what we believe is their intrinsic value."  Defendant Audette meanwhile stated that increasing the Company's leverage to a four times net debt-to-EBITDA ratio is "what makes the most sense today," and that LPL would only go above the four times debt-to-EBITDA ratio if there were "very good returns to justify doing so."

63.    As intended, LPL's announcement that it would buy back up to $500 million of its own shares signaled the Company's confidence in its ability to deliver expected financial results, increased its EPS and immediately propelled its stock price over 10% in the days following the Company's announcement.  As summarized by Wells Fargo's market analyst, "[W]e believe the buyback program clearly signals management's confidence in the outlook."

64.    On November 24, 2015, LPL issued a press release announcing that it had entered into a credit agreement for $700 million of new term loans due November 20, 2022 and had extended $631 million of existing term loans to March 29, 2021 in order to fund the share repurchase plan.  As a result of the debt transaction, the Company stated its net target leverage had increased to a 3.7 times net debt-to-EBITDA ratio, and that it would breach its revised credit covenants if its leverage exceeded a five times net debt-to-EBITDA ratio.  In connection with the transaction, the Company incurred $21 million of debt issuance costs and its total weighted average interest rate for debt outstanding increased from 3.1% to 3.9%.  The Company also announced that it had entered into an agreement with Goldman whereby it would pay Goldman $250 million to carry out an accelerated share repurchase on LPL's

1    behalf.  The press release stated that LPL estimated the accelerated share repurchase

2    "***will take several months to complete***."

3    **The December 8, 2015 Goldman Sachs Investor Conference**

4         65.    On December 2, 2015, LPL announced that it would present intra-quarter

5    at a financial services conference sponsored by Goldman Sachs on December 8, 2015.

6    On or about December 4, 2015, LPL insiders were preparing the presentation for the

7    Goldman investor conference, consulting the Company's most recent "24/7" financial

8    records regarding its key metrics.  *See* ¶¶50-53; 60-61, above.  At the same time, TPG

9    was consulting the same information and/or records as LPL senior management

10   (including Defendants Casady and Audette), observed the poor intra-quarter results,

11   and approached Goldman to discuss ***immediately*** cashing out a significant portion of

12   its LPL stock through the accelerated share repurchase program that was supposed to

13   take ***months*** to complete.

14                    **FALSE AND MISLEADING STATEMENTS**
                      **ISSUED DURING THE CLASS PERIOD**
15

16        66.    At the December 8, 2015 conference and in the related slide presentation,

17   Defendants made false and misleading statements regarding LPL's business, prospects

18   and financial results.  These false and misleading statements reassured the market that

19   the financing of LPL's share repurchase plan was viable, sensible and could be

20   achieved so long as LPL's future earnings and cash flows could service the debt that

21   would fund the repurchase.  For example, in response to an analyst question about

22   how LPL would "turn the page" on its recent regulatory problems, Defendant Casady

23   stated that "execut[ing]" the share repurchase would be "key" to driving top line

24   growth.

25        67.    At the December 8, 2015 conference, in discussing the Company's 2016

26   outlook, Defendant and CFO Audette highlighted the share repurchase capital plan,

27   claiming that it was "in the best interest of shareholders," and reassured investors that

28   (having just left the CFO position of E*Trade, an LPL peer company) Audette had

witnessed a Company that was a "lot more powerful and compelling than I thought from the outside," with "an earnings stream that is quite steady and produces cash flow over time," and that LPL had been "executing it all well" since he had come on board in late September 2015:

> Being here for these two months [October and November 2015] and spending a lot of time, I wouldn't say it was a surprise because it was expected, but **I think it's a lot more powerful and compelling than I thought from the outside**.

> Third, and what Mark kind of hinted to on the capital plan side, being at a place where there's a lot less approvals necessary to go **execute on a capital plan in the best interest of shareholders**. So, the way we speak about it, a capital-lite model, **an earnings stream that is quite steady and produces cash flow over time**. Hopefully, the last two months have shown that that opportunity absolutely was there. **We're executing it all well**.

68.    The above statements were material to LPL investors because they conveyed the message that LPL's earnings stream and financial prospects were steady and would produce the necessary cash flow in the future to allow LPL to successfully execute its repurchase plan, pay down its debt and avoid any potential breach of its debt covenants. These statements also reaffirmed LPL's statements on October 29, 2015, that substantially increasing the Company's debt ratio to complete the $500 million repurchase "makes the most sense today," and reassured investors that: (i) nothing had changed; and (ii) that LPL's earning stream was more than sufficient to go forward with a repurchase plan that made economic sense and would drive shareholder value.

69.    The statements referenced in ¶¶67, 71, 75, 85, 86, 88-90, 92, 93, 97, 110 were materially false or misleading when made because they failed to disclose the following facts:

(a)    By at least the beginning of December 2015, LPL's internal financial results showed that LPL was in the midst of a disastrous fourth quarter. LPL's growth of net new advisory assets had declined by a monthly rate of approximately $500 million, from a misrepresented rate of $1.5 billion per month to a

1   rate approximating $1.0 billion per month.[10]  Defendants were also experiencing, in

2   October and November 2015, extraordinarily poor correlation (below 50%) between

3   growth of LPL's AUM relative to equity market movements, indicating that billions

4   of dollars of LPL's AUM levels were being negatively impacted by factors other than

5   market movements.   Compounding these negative metrics, Defendants were

6   experiencing a severe reduction in the sale of high-commission alternative

7   investments (such as structured products), materially and negatively impacting LPL's

8   commission revenues in 4Q15.

9               (b)      The reforms LPL had implemented as a result of recent regulatory

10  fines and penalties and a revamped DOL fiduciary rule had caused a sharp downturn

11  in some of LPL's most profitable financial products, including its alternative

12  investment products which would end up down nearly 75% year-over-year during the

13  quarter.  Further, advisory firms with larger accounts (*i.e.*, larger AUM) were leaving

14  LPL (many to join LPL's competitors) at an accelerated pace heading into 4Q15.  LPL

15  was already near quarter-end with only three weeks left to close of 4Q15, and the

16  financial metrics utilized by the Company to measure these areas of poor performance

17  were clearly visible to Defendants, given Defendant Audette's repeated statements

18  that his insider view of LPL concerned the "last two months" – October and

19  November 2015.   Similarly, LPL financial analysts knew that LPL had, as of

20  December 2015, a "good line of sight" into its results and Defendant Casady also

21  acknowledged a real-time view into 4Q15 results, saying in February 2016 that

22  "certainly we had insight into the quarter . . . and knew we would have challenges."

23

24

25  [10]   Based on the analyses below at ¶¶70-83, net new advisory assets in December
    were approximately $1 billion, which means that net new advisory assets for the two
26  months ended October and November 2015 were approximately $2 billion (4Q15 total
    was $3.1 billion).  Thus, as of the December 8, 2015 conference call, Defendants'
27  representation that LPL was averaging $1.5 billion per month materially overstated
    net new advisory assets for the two months ended November 2015 by approximately
28  $1 billion.

1          (c)     The purchase was not in the best interests of LPL's shareholders

2  because Defendants did not expect future earnings to support the debt needed to fund

3  a buyback up to $500 million.  Instead, LPL bowed to TPG's influence and control

4  and purchased TPG's holdings in LPL at inflated prices.  Had LPL disclosed its true

5  financial condition and prospects, the stock price would have been significantly less

6  and the repurchase, would have been less costly for LPL.  Indeed, when LPL's true

7  financial condition was revealed, the stock dropped 35% to $16.50 per share in a

8  single trading day, representing a potential $115 million cost savings for the share

9  repurchase.

10         (d)     Defendant Audette had recently joined the Company in late

11  September 2015, after about four years as CFO of E*Trade Financial (an LPL peer

12  company).  Defendant Audette was therefore uniquely qualified and credible in

13  making the misleading statement that LPL, with his insider view on the "last two

14  months," was even "more powerful and compelling" on the inside than was visible to

15  investors "from outside," which gave the false and misleading impression that

16  Defendants, if anything, were being conservative in their representations to the market

17  when in reality they were materially overstating the strength of LPL's business,

18  prospects and financial results.

**DEFENDANTS' STATEMENTS MATERIALLY OVERSTATED LPL'S
LEVELS OF NET NEW ADVISORY ASSETS AND WERE FALSE AND
MISLEADING WHEN MADE**

21        70.     LPL's "net new advisory assets" are a primary driver of future "advisory

22  fee revenue," both key financial metrics closely followed by LPL senior management,

23  analysts and investors.  Associated advisory revenues are a component of LPL

24  revenue that is growing in importance to LPL as its revenue mix changes and the

25  percentage of commissions' revenues (relative to total revenues) declines.  As

26  explained by LPL in its 2014 Form 10-K, "[N]et new advisory assets are a primary

27  driver of future advisory fee revenue and have resulted from the continued shift by our

28  existing advisors from brokerage towards more advisory business."  LPL has also

1  highlighted net new advisory assets as a key business metric in every 10-K and 10-Q

2  from 4Q14 through 4Q15 in the Company's MD&A under a subsection entitled "How

3  We Evaluate Our Business."[11]   Numerous analysts also highlighted net new advisory

4  assets as an important financial metric demonstrating that LPL's performance and

5  revenues relating to net new advisory assets are material to LPL's investors.

6      71.    During Defendants' December 8, 2015 investor presentation, Defendants

7  made false or misleading statements regarding LPL's continued earnings growth in

8  the context of discussing net new advisory assets.  Specifically, Defendant Audette

9  gave the false or misleading impression that the rate of LPL's net new advisory assets

10  was at pace to achieve $4.5 billion in net new advisory assets in 4Q15:

11      [N]et new advisory assets continue to flow in well.  And we are
       averaging about $1.5 billion a month.  And you see that we had that in
12      October [2015]. . . .  [W]e are averaging about $1.5 billion [per month].

13      72.    Defendants' false or misleading statements were made to investors when

14  referencing a power point slide within the December 8 presentation titled, "LPL Q4

15  2015 Mid-Quarter Operational Update."

16      73.    In preparation of this presentation, on or about December 4, 2015,

17  Defendants utilized the "24/7" real-time data resident in LPL's BranchNet platform,

18  online accounts platform, and Oracle-based and other interface systems that

19  aggregated this data into LPL's "key metrics" and other performance measures.  At

20  this time, Defendants were also knowledgeable regarding the status of advisors and

21  associated AUM both joining and departing LPL through November and had

22  reasonable expectations for December's activity based on communications LPL

23  maintains with its advisors.  Defendants' contemporaneous statements implied to the

24

25  ───────────────
   [11]   LPL's SEC filings explain, "[a]dvisory and brokerage assets are comprised of
26  assets that are custodied, networked, and non-networked, and reflect market
   movement in addition to new assets, inclusive of new business development and net of
27  attrition.  Insured cash account and money market account balances are also included
   in advisory and brokerage assets."  Net new advisory assets consist "of funds from
28  new accounts and additional funds deposited into existing advisory accounts that are
   custodied in our fee-based advisory platforms."

market that reporting was real-time: (i) because net new advisory assets "continue to flow in well," results for November 2015 were on pace with the "averag[e] [of] $1.5 billion" per month (same as October 2015 results of approximately $1.5 billion per month) and (ii) with only the three weeks of December 2015 left to complete the fourth quarter, the Company had no reason to believe that net new advisory assets for December 2015 would deviate from the stated $1.5 billion per month average.  In sum, LPL was on pace to garner an additional $1.5 billion for December, equaling a total of $4.5 billion for the fourth quarter of 2015.

74.     Defendants were aided in this deception by the fact that LPL had consistently achieved a monthly average of $1.5 billion net new advisory assets ($4.5 billion on a quarterly basis) for the preceding seven quarters (January 2014 through September 30, 2015) – a 21-month period:



75.     Based on Defendants' power point slide and Defendant Audette's contemporaneous statements that "we are averaging about $1.5 billion a month [in net new advisory assets]" that "we had that in October [2015]," Audette falsely conveyed to investors that he was commenting on LPL's current performance, as compared to what LPL "had . . . in October."   Defendant Audette's statement misleadingly

1  indicated that he was addressing ongoing quarterly results up to the date of the
2  December 8 presentation, rather than just October 2015 results.

3       76.   Thus, investors and analysts were left with the unmistakable – but false
4  and misleading – impression that for the first two months of 4Q15, LPL had already
5  earned about $3 billion net new advisory assets and that "net new advisory assets
6  continue to flow in well," as they had in the past.

7       77.   On February 11, 2016, LPL announced that for the three months ended
8  4Q15 it had generated only $3.1 billion in net new advisory assets, falling $1.4 billion
9  short of a $1.5 billion monthly average for the quarter.  Thus, Defendants' December
10 8, 2015 statements that "net new advisory assets continue to flow in well," and that
11 "we are averaging about $1.5 billion [per month]" were false and misleading when
12 made, because LPL had only generated as few as $2 billion of net new advisory assets
13 for the two month period ending November 2015, resulting in a gross overstatement
14 for that two-month period of approximately $1 billion.[12]

15      78.   Given the consistent inflow of over $1.5 billion per month throughout
16 almost the entirety of 2015, Defendants had at least constructive knowledge that LPL
17 was realizing less than $1.5 billion per month for October and November.  To be true,
18 December would have been zero, but December was not.

19      79.   Net new advisory assets could not have been zero for the remaining
20 month of December 2015, for various reasons.

21         (a)   First, as explained above, net new advisory assets are included in
22 new assets under management gained from advisors that join LPL from other firms.
23 For December 2015, LPL recruited 18 new advisory firms (a total of 20 advisors) that
24 brought to LPL new accounts with assets under management of nearly $2 billion.[13]

25

26 _____
   [12]  *See* footnote 6, *supra*.

27 [13]  LPL recruited advisors' AUM in December 2015 was $1.981 billion.  Even
28 assuming some timing differences or lags between months, nearly $2 billion
   represents a reasonable measure over any rolling one-month period based on a

Based on analysis of the particular advisors who joined LPL in December 2015, the incoming $2 billion AUM in December 2015 from new advisors consists of both advisory and brokerage assets. LPL reported that the advisory/brokerage asset ratio was 39.6% advisory assets in 4Q15. Applying this ratio to the $2 billion of transferred AUM in December 2015, net new advisory assets would have increased by about $780 million ($1.981 billion X 39.6% = $784 million) as a result of LPL adding new advisors in December 2015.

(b)     Second, LPL reported no loss of advisors for December 2015, so there was no corresponding negative AUM attributable to advisors leaving LPL that would offset December's nearly $2 billion in new advisors' AUM. Likewise, there is no negative advisory assets for departing advisors in December 2015 to offset the estimated $780 million new advisory assets during that month for advisors joining LPL. Similarly, there is no indication from LPL's reports that it suffered a significant outflow of customer advisory assets during December 2015.

(c)     Third, LPL would also increase net new advisory assets in December 2015 as a result of having converted $800 million of existing brokerage assets to advisory assets in 4Q15.[14]   Based on an analysis of LPL's historically consistent conversion of brokerage assets into advisory assets, it is likely that brokerage assets of $200 million or more were converted into advisory assets in December 2015, as the following table depicts:

---

monthly average of $1.56B new AUM from incoming new advisors for the nine-month period July 2015 through March 2016.

[14]   *See* "Q2 2017 Earnings Key Metrics" LPL slide presentation dated July 27, 2017 at 6.

| Quarter | Brokerage to Advisory Conversions (Net) | Average Net Conversions per Month |
|---------|------------------------------------------|-----------------------------------|
| 2Q15 | $1.2 billion | $400 million |
| 3Q15 | 1.0 | 333 |
| 4Q15 | 0.8 | 267 |
| 1Q16 | 1.0 | 333 |
| 2Q16 | 1.4 | 467 |
| 3Q16 | 1.3 | 433 |

(d)     Finally, equity market movements are of no consequence because *e.g.*, these market level movements are not included in the LPL's definition of net new advisory assets, or equity market levels were relatively stable in December 2015 in any event, indicating that there would be no significant outflows of net new advisory assets attributable to declining markets.

80.     Based on the foregoing analyses, approximately $1 billion of net new advisory assets inflowed to LPL in December 2015, without indication of any significant offsetting factor(s).  Thus, Defendants' reporting of $1.5 billion a month average rate through the two months ended November 2015 is overstated by approximately $1 billion at the time of the December 8, 2015 conference call.[15]

81.     Had net new advisory assets been $4.5 billion for 4Q15, that would have represented expected growth, up from $4.2 billion the quarter before.  Consequently, investors were stunned to learn on February 11, 2016 that by the close of 4Q15 on December 31, 2015, net new advisory assets had in fact plunged 26% sequentially from $4.2 billion in 3Q15 to $3.1 billion in 4Q15 and 23% year-over-year from $4.0 billion in 4Q14 to $3.1 billion in 4Q15.  As noted by UBS financial analysts, "[u]nderlying growth metrics were unimpressive" because, among other things, "net new asset growth slowed."  William Blair additionally highlighted that "[n]et new

---

[15]  *See* footnote 6, *supra*.  A $1 billion overstatement is consistent with Plaintiff's allegations that Defendants overstated the level of assets under management. *See* ¶92, *infra*.

1   advisory assets totaled $3.1 billion in the quarter and $16.7 billion for the year"
2   recognizing the impact of this previously concealed information.

3       82.     Additionally, the billion dollar plunge in net new advisory assets in 4Q15
4   concealed by Defendants on December 8, 2015 substantially raised the risk that future
5   net new advisory levels would trend below expectations as well.  In fact, the drop in
6   net new advisory assets that began before the December 8, 2015 conference call with
7   investors continued into 1Q16.  In 1Q16, LPL's net new advisory assets would total
8   only $2.0 billion (an average of $0.67 billion per month), plunging 35% sequentially
9   from $3.1 billion in 4Q15 and nearly 62% year-over-year from $5.2 billion in 1Q15.
10  Defendants not only failed to warn investors that net new advisory assets had already
11  fallen substantially below an average of $1.5 billion per month at the time of their
12  December 8, 2015 conference call, but also failed to warn investors that the
13  significantly adverse trend that existed as of December 8, 2015 could be expected to
14  continue into 2016.

15      83.     Beginning 2016, LPL commenced monthly reporting of net new advisory
16  assets.  Analyses of these monthly statements and the related trends indicates further
17  support for Plaintiff's allegations that October 2015 and November 2015 amounts of
18  net new advisory assets were overstated by approximately $1 billion.  During the 20-
19  month period from January 1, 2016 through August 31, 2017, LPL reported 5 months
20  in which net new advisory assets declined from the previous month: 33.3% in April
21  2016; 35.3% in September 2016; 10.5% in January 2017; 39.1% in April 2017; and
22  20.0% in June 2017.  Further, during this period, LPL never reported a monthly
23  amount less than $200 million.  Thus, during this 20-month period of time near the
24  Class period, when LPL reported net new advisory assets on a monthly basis, LPL has
25  never reported a monthly decline of more than 40% or $200 million.  For Defendants'
26  December 8 statements about net new advisory assets to be true, net new advisory
27  assets would have needed to decline 93.3% in December 2015 and essentially net $0
28  (during a month when there is evidence of up to $1 billion of inflows and no

1    significant offsetting outflows) – more than twice LPL's largest monthly decline

2    during the following 20-months period.

**DEFENDANTS' STATEMENTS MATERIALLY OVERSTATED THE**
3    **LEVEL OF LPL'S BROKERAGE AND ADVISORY ASSETS AND WERE**
     **FALSE OR MISLEADING WHEN MADE**
4

5           84.    LPL's brokerage, advisory and other AUM is a financial metric material

6    to investors because AUM is an important indicator of performance and financial

7    health and growth, and represented a source of revenue for LPL.  During the

8    December 8, 2015 conference call, LPL stressed the "growth of assets and gross

9    profits as more representative of its business growth than revenue growth," and

10   Defendant Audette specifically stated in February 2016 that "assets, both brokerage

11   and advisory, are the key driver of our gross profit."  For example, advisory and

12   brokerage assets drove approximately 79% of LPL's total net revenue and gross profit

13   for the nine months ended September 30, 2015.

14          85.    In LPL's investor presentation on December 8, 2015, the Company stated

15   that "[b]rokerage and advisory assets [AUM] rebounded with equity markets" and

16   "LPL's steady asset growth has driven topline performance."  The Company provided

17   bar charts showing that brokerage and advisory assets combined and the Company's

18   gross profit have each been growing at an "8% CAGR [compounded annual growth

19   rate]" from 2010 through 3Q15.

20          86.    Defendant Audette also told investors that although the "markets went

21   down a fair bit," he added, "we're up at the end of October [2015] to $483 billion

22   [AUM] versus $462 billion at the end of the [third] quarter [of 2015] . . . ."  But this

23   statement regarding LPL's levels of AUM was materially misleading and/or

24   overstated when made because LPL's AUM was actually about $3 billion less (about

25   14% of the represented increase) based on LPL's realized correlation between AUM

26   and the market, and therefore AUM was already negatively impacted by undisclosed

27   factors unrelated to the markets.

28

87.    Since 2013, LPL had consistently disclosed to investors that asset growth had a 60% correlation to market fluctuations.[16]  LPL's statements above concerning continued correlation to and "rebound" to the market at the end of October 2015, relative to the reported $483 billion AUM, were misleading when made because LPL's management failed to disclose that by the December 8, 2015 presentation, LPL's AUM were performing substantially below expectations relative to market levels (*i.e.*, the S&P 500 Index).  For example, while the S&P Index rose 8.3% in the month of October 2015, LPL's AUM actually rose only 4.6% from $461.8 billion to $483 billion, a 55% correlation to the S&P 500 Index, even though the Company contemporaneously claimed good asset growth, including the statement "net new advisory assets continue to flow in well."

88.    In November and December, LPL AUM growth performed far worse than the 55% correlation for October relative to the S&P 500 Index.  That is, for the entire 4Q15, while the S&P 500 Index rose 6.45% in 4Q15, LPL's advisory and brokerage assets rose only 3.0%, a weak 47% correlation with the S&P 500 Index.  LPL's omission regarding the declining growth rate of AUM relative to the market through December 8, 2015 was particularly misleading in light of LPL's statement that "brokerage and advisory assets [AUM] rebounded with equity markets," and, further, that "LPL views growth of assets and gross profits as more representative of its business growth than revenue growth."  Telling of the divergence from historical performance, LPL ceased disclosing after 3Q15 the claimed 60% correlation between AUM performance and market fluctuations.

89.    Based upon the following analyses, it is apparent that AUM was overstated at the end of November by several billion dollars:

---

[16]   LPL Forms 10-Q and Form 10-K issued for reporting periods beginning January 1, 2013 through September 30, 2015 reported 60% correlation to market fluctuations.

| | AUM ($billions) | S&P 500 Closing Levels | AUM/S&P Correlation | 4Q15 Correlation ($billions) |
|---|---|---|---|---|
| End. Sept-15 | $462.0 | 1920.03 | | |
| Oct Increase | $21.0/4.54% | 159.33/8.30% | 54.7% | |
| End. Oct-15 | $483.0 | 2079.36 | | $480.0 |
| Nov Increase[17] | $0.1/0.03% | 1.05/0.05% | 54.7% | |
| End. Nov-15 | $483.1 | 2080.41 | | $480.0 |
| Dec Decrease | ($7.1)/(1.47%) | (36.47)/(1.75%) | 84.0% | |
| End. Dec-15 | $476.0 | 2043.94 | | $476.0 |
| | | | | |
| End. 3Q15 | $462.0 | 1920.03 | | |
| Increase | $14.0/3.03% | 123.91/6.45% | 47.0% | |
| End. 4Q15 | $476.0 | 2043.94 | | |

90.     When Defendant Audette spoke in early December 2015, he represented that LPL had $483 billion AUM at the end of October and connected the $21 billion increase that month to good market correlation.  Based on Audette's December statements, there were no indications of material changes in November, and since the S&P 500 Index levels were essentially unchanged, with good market correlation, investors would have reason to believe that the AUM balances also remained in the $483 billion range at the end of November 2015.

91.     However, those representations could only be true if there was suddenly a *negative* 84% correlation in December 2015 between LPL AUM balances and the S&P 500 Index levels.  This spike in negative correlation between LPL's AUM and the S&P 500 Index could not have occurred in December 2015 under several analyses.  Before 4Q15, LPL had consistently represented since 2013 that the correlation to market fluctuations was 60%.  Further, a 55% market correlation during market

---

[17]   Implied in Defendant Audette's statements on the December 8, 2015 conference call, November 2015 was the same correlation as October, and within the range of correlation previously disclosed by LPL.

1   increases, but 84% market correlation during market decreases, for the same group of

2   assets in customer accounts, is inexplicable.  Additionally, as explained above, no

3   advisors (and therefore no associated AUM) departed LPL in December 2015, thus

4   the explanation for the dramatic decline in December AUM cannot be attributed to a

5   mass exodus of advisors in December.

6       92.    Using the 47% market correlation observed for 4Q15 for each of the

7   months in 4Q15, the above analysis reveals that LPL's AUM was overstated by

8   several billion dollars at the end of October and/or November, and Defendant Audette

9   had failed to disclose the material fact that LPL's AUM declined at the end of

10  November by several billion dollars for reasons unrelated to market movements.  This

11  material overstatement of AUM is likewise consistent with the allegations above that

12  net new advisory assets were overstated for the two months ended November 2015 by

13  approximately $1 billion.  That is, in 4Q15, advisory assets were about 39% of total

14  brokerage and advisory assets.  Thus, 39% of a $3 billion overstatement of AUM in

15  October – November 2015 would equate to approximately a $1.2 billion

16  overstatement of advisory assets in the same period, consistent with the allegations in

17  ¶¶70-83, above.

18      93.    Similarly, Defendant Casady falsely stated that with respect to assets,

19  "fundamentally, this year [FY 2015] is like any other in terms of the gross amount [of

20  advisors] and what's different is that we do have the smaller producers leaving."

21  Defendant Casady's statements were knowingly false and misleading when made

22  because Defendants knew from notices LPL had received from departing advisors,

23  and the negotiations between LPL and the departing advisors that preceded those

24  notices, that the gross amount of both advisors and their AUM was accelerating and

25  that larger producers were leaving as compared to the previous two years.  That is,

26  Defendant Casady's statement that it was only "smaller producers leaving" is

27  demonstrably false because, in fact, bigger producers were leaving with the average

28

AUM sizes of departing advisors having grown as compared to the prior two years (as reported by *InvestmentNews.com*):

| Year | Advisor Firms Leaving LPL | Related AUM Leaving LPL | Avg. AUM per Advisor |
|---|---|---|---|
| 2013 | 9 | $1.215 billion | $135 million |
| 2014 | 14 | 1.534 billion | 110 million |
| Jan – Nov 2015[18] | 20 | 3.262 billion | 163 million |

94.     Given the changing mix of revenue components (brokerage vs. advisory), the Company's increasing need to show demonstratively ***growing*** advisory assets and related revenues to counterbalance declining brokerage revenues, and the rate at which LPL was losing advisors and related large AUM accounts, investors were surprised to learn during 4Q15 that the level of AUM had fallen substantially short of expectations, with exceptionally slow growth relative to the S&P 500 Index. Financial analysts were disappointed with LPL's $475.6 billion reported AUM as of 4Q15 and UBS and S&P Capital IQ specifically cited this key business metric as a reason for the substantial drop in LPL's stock price following the Company's announcement of 4Q15 results: (i) "[C]lient assets missed expectations"; and (ii) "We cut our 12-month target [stock] price [for LPL common stock] by $30 to $21 [per share], [or] 11.1X our '16 [2016] EPS estimate of $1.89 [per share], cut from $2.71 [per share], a discount to its two-year average P/E [price earnings multiple] of 17X . . . ***due to lower AUM [assets under management, or advisory and brokerage assets], which [the] company expects will pressure gross profits in '16***." Similarly, Credit Suisse emphasized that the "well below expectations" earnings miss was driven by "weaker gross profits . . . characterized by a pull-back in brokerages sales, [and] weak advisor growth trends."

---

[18]   In the month of October 2015, the AUM of advisors departing LPL for competitors totaled a whopping $749 million for one month, whereas the previous two months (August and September 2015) totaled $209 million.

**DEFENDANTS' STATEMENTS CONCERNING LPL'S "STEADY"
EARNINGS AND THAT LPL WAS "EXECUTING IT ALL WELL"
WERE FALSE AND MISLEADING WHEN MADE**

95.     Defendants' failure to disclose LPL's weak fourth quarter AUM performance was particularly important because LPL's "assets under management" or "AUM" was viewed as a primary driver of the Company's gross profits.   As Defendant Audette would state in February 2016, "Assets, both brokerage and advisory, are the key driver of our gross profit."  And LPL's gross profit is primarily driven by net revenue.[19]  Together, advisory and brokerage assets drove approximately 79% of LPL's total net revenue and gross profit for the nine months ended September 30, 2015.[20]

96.     Total commission revenue was LPL's most important source of revenue and gross profit in 2015.[21] Defendants knew by their December 8, 2015 conference call, that LPL's gross profit was declining substantially in 4Q15, primarily as a result of falling commission revenue, and in particular decreases in sales-based activity for alternative investments, equities, mutual funds, fixed income, and variable annuities, which are subsets of total commission revenues.[22]  As a result, in 4Q15, LPL's gross

---

[19]   As set forth in LPL's SEC filings, LPL's brokerage asset levels are one of the primary drivers of LPL's commission revenue, LPL's most important source of revenue, representing 47% of LPL's total net revenue for the nine months ended September 30, 2015.  LPL's advisory asset levels are the primary driver of LPL's advisory revenue, LPL's second most important source of revenue, representing 32% of LPL's total net revenue for the nine months ended September 30, 2015.  For the nine months ended September 30, 2015, gross profit was 31.8% of net revenue.

[20]   LPL's SEC filings explain, "Gross profit is calculated as net revenues less production expenses. Production expenses consist of the following expense categories from our consolidated statements of income: (i) commission and advisory and (ii) brokerage, clearing, and exchange."

[21]   *See* 3Q15 Form 10-Q for period ended September 30, 2015, filed October 29, 2015 at 22.

[22]   *See* LPL 2015 Form 10-K, filed February 25, 2016 at 44.

1  profit declined 5.1% from $339.8 million in 3Q15 to $322.4 million in 4Q15, the

2  Company's worst sequential gross profit decline in four years.[23]

3       97.    Defendant Audette also falsely reassured investors on the December 8,

4  2015 conference call that commission revenue would be "more of the same [$480.3

5  million] that we saw in the third quarter [3Q15]," when Defendants knew or were

6  reckless in not knowing that commission revenue was already falling below those

7  stated figures.  Commission revenues for 4Q15 would be reported at $463.5 million,

8  3.5% below the "more of the same" $480 million reported in 3Q15.

9       98.    At the time that Defendants made these statements, however, they knew,

10  or were reckless in not knowing, that LPL's commission revenue had already

11  plummeted via real-time visibility into the Company's commission revenue through

12  December 8, 2015.  Defendants had actual or constructive knowledge of the extent of

13  deterioration of 4Q15 commission revenues as of the December 8, 2015 conference

14  call because they received regular reports and had access to "24/7" real-time data

15  about LPL's commission revenues and brokerage assets to date.  *See* ¶¶150-153,

16  *supra*.

17       99.    Defendants received regular reports and had access to virtual real-time

18  data about LPL's commission revenues and brokerage assets by the time of their

19  December 8, 2015 conference call as evidenced by LPL's detailed online and monthly

20  statements issued to all of its individual LPL account holders that includes the very

21  same data, but on an individual account basis.  For example, Defendants could see via

22  their "24/7" the amounts of deteriorating "Alt. Inv." levels and associated revenues.

23  *See* ¶53, *supra*.  If LPL could issue both online and monthly brokerage statements and

24  make them available online within only two calendar days of the close of any given

25  month, then Defendants surely had access to – and knew – the very same

26

27  [23]  Also in 4Q15, LPL's gross profit declined 3.9% year-over-year, from $335.4
   million in 4Q14 to $322.4 million in 4Q15, the Company's worst year-over-year gross
28  profit decline in four years.

1  contemporaneous information on a consolidated basis, reflecting total brokerage assets

2  under management as well as total fees charged to LPL account holders; that is, the

3  current earned commission revenue.

4      100.  As noted in the excerpt below from LPL's "Guide to Your Monthly

5  Statement," LPL also provided timely information about each LPL client's account in

6  monthly statements prepared by LPL, including the client's monthly fees and

7  expenses, which includes commission revenue for the months shown.  (Fees and

8  expenses were $415.25 and $575.58 for the months ended July 31, 2010 and August

9  31, 2010, respectively, in LPL's example below).  Those monthly statements also

10  included the client's current amount of brokerage assets and their change from the

11  prior month.



101.   For the first three quarters of 2015, LPL's reports reflected that commission revenues were consistently 0.17% of brokerage assets in each of the three quarters.  Audette' s statement intra-quarter on December 8, 2015 that 4Q15 was "more of the same" was untrue on that date because, by that date, commission revenues as a percentage of brokerage assets had fallen to less than 0.17%.

102.   The 4Q15 decline in commission revenues was known or knowable on December 8, 2015 because the decline in commission revenues did not suddenly materialize after the December 8, 2015 conference call.  Based on Audette's statement that commission revenues would be "more of the same" as previously reported, and that previously-reported commission revenues were 0.17% of brokerage assets in October and November 2015, then mathematically commission revenues would have needed to be 0.14% on December 2015 – well below previous reporting periods – to reach $463 million reported commission revenues in 4Q15.[24]

103.   Through LPL's information systems that provided revenue breakdowns by the types of investments, Defendants knew by December 8, 2015 that the substantial decline in commission revenue in 4Q15 had already occurred and was primarily attributable to decreases in sales-based activity for alternative investments, equities, mutual funds, fixed income, and variable annuities.  In particular, revenues from alternative investments and equities declined sequentially by 37.6% and 12.3%, respectively, from 3Q15 to 4Q15.  In fact, alternative investment revenue (including investment categories in which LPL had paid substantial regulatory fines, settlements and penalties) would drop a staggering $47.1 million or 74% year-over-year in 4Q15, from $63.4 million in 4Q14 to $16.3 million in 4Q15.

104.   This decrease was particularly significant because alternative investment products were particularly lucrative for LPL and had recently been the focus of regulators and Company reforms.   The dramatic downturn thus signaled a

---

[24]   Commission revenues as a percentage of brokerage assets were 0.18% in each quarter of 2014; 0.17% in each of the first three quarters of 2015; and 0.16% in 4Q15.

1   fundamental change in certain of the Company's major revenue streams, a fact

2   confirmed by an acceleration in the decline of LPL's alternative investment revenues

3   in the first quarter of 2016, which dropped nearly 87% to $7.8 million in 1Q16, a

4   greater than 50% sequential decline from 4Q15's already abysmal results.

5       105.   Financial analysts from William Blair cited in a February 12, 2016 report,

6   declines in alternative investments as a major cause of the 4Q15 gross profit decline:

7       •   Alternative investment commissions (largely non-traded REITs
8           [Real Estate Investment Trusts]) were down 38% sequentially and
            likely will continue to decline from here due to where we are in
9           the real estate cycle, new FINRA [Financial Industry Regulatory
            Authority] disclosure rules, and the upcoming DOL [Department
10          of Labor] fiduciary standard rule.

11                          *       *       *

12
    LPL reported fourth-quarter adjusted EPS of $0.37, $0.14 below
13  consensus as well as our estimate. Gross profit of $322 million was $12
    million below our estimate ($0.07 EPS impact) due to a combination of
14  items but particularly alternative lower investment revenues.

15      106.   Wells Fargo also noted the declining commissions, finding "all in all it

16  was a very challenging quarter with revenue down over 7% year-after-year including

17  commissions that were down 12% year-after-year."

18      107.   Defendants later acknowledged, for example, that "[a]lternative

19  investment sales commissions were challenged throughout the year, in particular non-

20  traded real estate investment trusts (REITs), due to a maturing real estate cycle and

21  uncertainties regarding upcoming regulatory changes." Further, the category was a

22  particular focus of LPL management given the regulatory settlements, fines and

23  penalties and efforts to reform Company practices in alternative investment products

24  in 2015.

25      108.   LPL's $464 million reported 4Q15 commission revenue represented a

26  $26 million or 5.3% shortfall from LPL's expected level of $490 million commission

27  revenue for 4Q15, based on 2Q15 and 3Q15 rates of return on brokerage assets. This

28  $26 million shortfall was the same amount as LPL's miss of the Wall Street consensus

1    estimate for 4Q15 total net revenue.  LPL's reported total net revenue for 4Q15 was

2    $1.02 billion, or $26 million less than the Wall Street consensus estimate of $1.046

3    billion for 4Q15 total net revenue.  Consequently, essentially all of LPL's $26 million

4    total net revenue shortfall in 4Q15 was attributable to LPL's commission revenue

5    shortfall.

**DEFENDANTS' STATEMENTS REASSURING INVESTORS THAT LPL**
6    **WAS POSITIONED TO GENERATE STRONG EARNINGS WERE FALSE**
7    **AND MISLEADING WHEN MADE**

8        109.   As Defendant Audette noted during the December 8, 2015 conference

9    call, "EBITDA is a general proxy [for] the amount of cash we generate [and it's] the

10    primary driver of the amount of debt we're allowed to have."

11        110.   By representing that LPL had the ability to generate cash to service debt

12    that would fund the buy-back plan, Defendants misled investors into believing that the

13    Company's earnings would be strong enough to carry substantial debt loads going

14    forward.  Defendant Casady told investors that LPL "can easily fit [new acquisitions]

15    into this structure even if the full buyback were completed . . . [s]o, if something

16    bigger [*i.e.*, a new investment opportunity] came along on the M&A [merger and

17    acquisition] front, again, we should be able to do that without a problem."  Defendant

18    Casady also reiterated that the share repurchase would be "the best use" of Company

19    capital because of LPL's then-current share "price," stressing that "we can buy our

20    own stock at 8-to-9 times EBITDA" which was purportedly better than what was

21    "available to us in the M&A market [which] appears to be more like 10-, 12-, 14-

22    times EBITDA."  "***So it's just price***. . . . And, quite simply, I think it's a question of

23    allocation of capital, ***the best use***."

24        111.   When investors ultimately learned LPL's actual disappointing FY 2015

25    EBITDA, they recognized that LPL's earnings stream was not supported and that

26    LPL's financial condition was worse than Defendants conveyed in their December 8,

27    2015 conference call.  As earnings fell, leverage ratios rose, jeopardizing LPL's

28    compliance with its debt covenants.  As UBS analysts noted:

> [B]uybacks were outsized in the 4Q[15] and so far in the 1Q[16], they will likely slow from here as the company is closing in on its debt covenants and management acknowledges the dire outlook.

Additionally, Wells Fargo analysts later noted:

> Leverage will likely limit buybacks – . . . The company maintains nearly $250MM on its existing buyback authorization but, given elevated leverage levels, we don't expect much in the way of repurchases going forward. We calculate [LPL] could begin to run up against its debt covenant of 5*x* net debt to EBITDA with another 15% decline in EBITDA from the 4Q[15] level. Accordingly, further material declines in EBITDA could result in excess cash flow going to debt reduction, in our view.

112. Moreover, Defendants knew that, with only 23 days remaining before the close of FY 2015, the $43.27 per-share price for the LPL stock buyback (with an implied market capitalization of $4.11 billion) announced December 10, 2015 was vastly inflated. Defendants knew that LPL's reported 4Q15 and FY 2015 EBITDA, EPS, gross profit, and total net revenue were going to be substantially below expectations, and that FY 2016 results were likely to be weaker as well. Defendants also knew as of their December 8, 2015 conference call (while they were in the process of executing the stock buyback at an inflated price), that when 4Q15 and FY 2015 results were announced on February 11, 2016, LPL's stock price would likely fall substantially.

## ADDITIONAL INDICIA OF SCIENTER

113. In addition to the facts alleged herein and throughout, the following facts provide additional indicia of scienter: (i) the Individual Defendants were beholden to TPG; (ii) the misrepresentations involved LPL's near quarter-end core operations for which Defendants had real-time "24/7" data access and related reporting; (iii) the magnitude of the financial disappointment contrasted with Defendants' misstatements; (iv) Defendants' purported reasons for the miss are demonstrably false; (v) TPG had access to adverse inside information about LPL's fourth quarter financial results, business and prospects; and (vi) the suspect timing of the share repurchase.

**The Individual Defendants Are Beholden to TPG**

114.   Private equity firm TPG has long had control over LPL's business and affairs and substantial influence over the Company's management.  TPG, along with private equity partner Hellman & Friedman, took LPL private in 2005 in a deal that valued the Company at $2.5 billion.  After it took private control of the Company, TPG elevated Defendant Casady to his current position as CEO and Chairman.  For five years, Defendant Casady oversaw TPG's multi-hundred million dollar investment in LPL as the Company's CEO and Chairman, and in this capacity worked closely with TPG personnel.  From 2006-2009, Defendant Casady earned over $10 million in compensation in his positions at LPL under TPG control and influence.

115.   TPG took LPL public in 2010, vaulting Defendant Casady into the ranks of the ultra-wealthy.  Defendant Casady sold more than $58 million worth of his personal LPL shares in the IPO.  TPG also ensured that Defendant Casady remained as LPL's CEO and Chairman, providing him with an employment agreement that lasted through February 2014.  As part of this agreement, LPL was required to take steps to ensure Defendant Casady was elected to the board and remained its chairman. The agreement also provided a generous severance provision that would require LPL to provide Defendant Casady with nearly $90 million in severance and stock options if he was terminated without cause.  Between 2010 and 2015, Defendant Casady made over $119 million as LPL's Chairman and CEO – positions he owed to TPG's oversight, influence and control over the Company:

| | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | Totals |
|---|---|---|---|---|---|---|---|
| Insider Sales Proceeds | $         0 | $         0 | $         0 | $23,452,413 | $ 600,000 | $64,467,480 | $ 88,519,893 |
| Salary | 900,000 | 885,479 | 800,000 | 800,000 | 800,000 | 800,000 | 4,985,479 |
| Option Awards | 3,519,400 | 3,079,998 | 2,799,991 | 2,800,000 | - | 2,677,905 | 14,877,294 |
| Non-Equity Incentive Comp. | 1,237,500 | 1,485,000 | 2,500,000 | 1,000,000 | 2,091,625 | 2,225,000 | 10,539,125 |
| Other Comp. | 52,475 | 71,440 | 48,842 | 57,553 | 47,673 | 39,820 | 317,803 |
| | $ 5,709,375 | $ 5,521,917 | $ 6,148,833 | $28,109,966 | $ 3,539,298 | $70,210,205 | $119,239,594 |

116.   TPG took an activist, hands-on approach through its control of LPL, particularly through TPG's control of LPL CEO and Chairman, Defendant Casady. As TPG partner and LPL director Schifter put it in a press release dated October 27, 2005, "We look forward to working closely with Mark Casady and the rest of his team in the coming years to strengthen and build upon the leading position that LPL and its advisors hold in the industry."  Likewise, in an interview with TPG partner and LPL director Boyce, published September 26, 2012, Boyce said that with LPL  he played a "governance role, a strategy role," as well as providing "support and operational issues."  As further evidence of the direct correlation between TPG's control of LPL Casady's senior executive role in connection with that control, soon after TPG's LPL beneficial ownership level fell below 5% in 2016, LPL announced Defendant Casady's "retirement" effective March 2017.

117.   Following the 2010 IPO, TPG continued to control LPL's business and affairs and maintained substantial influence over its management.  TPG continued to own more than 30% of LPL's common stock, the most of any investor after Hellman & Friedman exited its position in 2013.  TPG also appointed two directors to LPL's board, Richard Boyce and Richard Schifter – both TPG partners when appointed – and maintained additional governance rights over LPL's board and board committees. Boyce served on LPL's compensation committee, and Schifter served on LPL's nominating and governance committee.  In addition, TPG received "information rights" allowing it access to the same information as board members, the right to inspect the books and records of the Company, and access to LPL officers for real-time information regarding the Company's business and prospects, among other information rights.  TPG also continued to receive millions of dollars in fees from LPL in exchange for various consulting services.

118.   As part of the influence and control over LPL, TPG ensured its position would not change by demanding significant amendments to the Stockholder Agreement in September 2014 to provide it with enhance governance and control

1  rights even if TPG's share ownership of the Company substantially diminished.

2  These changes were necessary to ensure TPG's control after it reduced its stake in

3  LPL during the 2012-2014 time period.  As stated in LPL's SEC filings, TPG retained

4  "*significant influence* over corporate transactions" and the ability "to *effectively*

5  *control LPL's decisions*," and that TPG had interests that may differ from other

6  shareholders and may even take actions in service of those interests against the

7  interests of other shareholders.

8      119.  Similarly, Defendant Audette was hired as LPL's CFO in September

9  2015, while TPG maintained substantial influence over the Company and its

10  management and Board.  In connection with LPL's recruitment of, and negotiations

11  with Defendant Audette, he was awarded 2015 equity awards and cash bonus awards.

12  Under LPL governance policies and practices, the LPL Compensation Committee

13  (that included Compensation Committee member and TPG former partner Boyce),

14  had responsibility for the issuance of these awards to Defendant Audette.  Pursuant to

15  the terms of his employment offer letter, in connection with his commencement of

16  employment, Defendant Audette was granted 17,605 RSUs and 17,605 stock options

17  with an exercise price of $42.60, the closing price of LPL shares on October 30, 2015.

18  Defendant Audette's base salary for 2015 was $600,000 and he was awarded a bonus

19  of at least $250,000.

20      120.  Further, in early 2016 the Compensation Committee established long-

21  term incentive awards for both Defendant Casady ($3.15 million) and Defendant

22  Audette ($1.05 million).  These awards are not based on LPL performance, but are

23  designed to reward the executive based on the executives' individual performance in

24  2015 and other retention considerations.  Based on these factors, the Compensation

25  Committee (of which TPG former partner Boyce was then a member) awarded both

26  Defendants Casady and Audette 100% of the targeted awards.

27      121.  Just before the beginning of the Class Period, in early October 2015,

28  Defendant Casady's tenure as Chairman and CEO of LPL was "attracting a lot of

1  conjecture" and it was publicly reported that his "glory days" were behind him.  Given

2  the long history of TPG's control over LPL, Defendant Casady was well aware that

3  his livelihood lay primarily in TPG's hands.  Similarly, Defendant Audette knew that

4  TPG would have influence over Audette's continued employment and the amount of

5  his compensation.

6      122.   Thus, it is no coincidence that in late 2015, as news was circulating that

7  Defendant Casady may be in jeopardy of losing his job, and with yearly evaluations of

8  the Individual Defendants in the hands of the Board, that TPG was able to push

9  through an early termination of the accelerated share repurchase program in order to

10  cash out its own LPL shareholdings at a time when LPL's stock price was historically

11  high.   The Individual Defendants were beholden to TPG and had a compelling

12  incentive not to provide a full picture of LPL's disastrous fourth quarter results during

13  the December 8, 2015 conference call, as Defendants knew or should have known the

14  truth would almost certainly diminish TPG's insider selling proceeds by tens of

15  millions of dollars.

16  **The Misrepresentations Involved LPL's Core Operations,**
   **Based on Contemporaneous Data Available to and Reviewed**
17  **by Senior Management, and Occurred Near Quarter End**

18      123.   LPL's gross profits, net new advisory assets, alternative investment

19  revenues and its level of brokerage and advisory assets were key financial metrics that

20  were closely followed by the Company, its management and the market.  Analysts

21  reported on and followed these metrics, and investors viewed them as primary

22  indicators of the Company's future expected earnings.

23      124.   Additionally, Defendants Casady and Audette had clear visibility into the

24  Company's financial performance at the time they spoke to the investment community

25  on December 8, 2015.  For example, Defendant Audette mentioned several times on

26  the December 8 teleconference that had insight into the "last two months" (*i.e.*,

27  October and November 2015), and Defendant Casady later admitted that "certainly we

28  had insight" (during the share repurchase and concurrent teleconference) into 4Q15.

1    Thus, Defendant Audette spoke in the present tense such that his statements were
2    commenting on LPL's current performance as of the date of the call.  An LPL analyst
3    also stated that LPL senior management had a "good line of sight" into intra-quarter
4    results.  Metrics such as net new advisory assets were tracked continually, and no later
5    than monthly, as were earnings and revenues, if not even more often on a weekly or
6    daily basis.  By the December 8, 2015 investor call, materially adverse trends in
7    LPL's key metrics were known to LPL insiders:  (i) LPL's growth of net new advisory
8    assets had materially slowed from a monthly average of $1.5 billion per month to a
9    rate approximating $1.0 billion per month and for the two months ended November
10   2015, was overstated by approximately $1 billion; (ii) Defendants were experiencing,
11   in October and November 2015, extraordinarily poor correlation (below 50%)
12   between growth of LPL's AUM relative to equity market movements, indicating that
13   LPL's AUM levels were being negatively impacted by billions of dollars for factors
14   other than market movements; (iii) Defendants were experiencing a severe reduction
15   in the sale of high-commission alternative investments (such as structured products).
16        125.   Further, the majority of LPL's revenue streams were recurring and fall
17   into two categories: commission revenues and advisory revenues.  For fiscal 2015,
18   commission revenues and advisory revenues generated 46% and 32%, respectively, of
19   LPL's total net revenues.  Commission revenues derive from upfront advisor fees and
20   commissions for investment products and, for certain products, a trailing commission.
21   Advisory revenues derive from fee-based advisory platforms and the provision of
22   ongoing investment advisory services.  For fiscal 2015, 72% of LPL's revenue was
23   recurring in nature, providing the Company substantial visibility into its future
24   revenue streams.   In addition, for transaction-based commissions, the Company
25   generates revenues "at the point of sale," providing the Company with further
26   visibility into its commission-based revenues at a given point in time.  Further, the
27   Company's alternative investment revenues were a particular focus at the time in light
28

1311790_1

of LPL's recent spate of regulatory problems and reforms regarding this revenue source.

126.   By the time of the December 8, 2015 conference call, approximately 10 out of 13 weeks for LPL's fiscal fourth quarter had already occurred.  To prepare for the investor conference, Defendants consulted LPL's real time "24/7" account data system that aggregated LPL's most key performance measures.  Those reports showed that LPL's key metrics were underperforming as alleged herein.  As a result, Defendants had substantial knowledge as to the Company's fourth quarter performance and visibility into the remainder of the quarter.  For example, Defendant Audette made clear that his visibility into LPL's performance was for "the last two months" (October and November 2015).  Later, in response to an analyst statement that LPL had a "pretty good line of sight" into its fourth quarter results, Defendant Casady would admit that he and the rest of management "certainly, we had insight into the quarter" and "knew we'd have challenges."

127.   Thus, with only three weeks left in the quarter, Defendants knew their statements regarding LPL's key financial metrics were false and misleading when made, especially given the centrality of the metrics at issue to LPL's core operations and importance to the market.

**The Magnitude of LPL's Financial Disappointment in Contrast to Defendants' Misrepresentations**

128.   The magnitude of Defendants' misrepresentations provides further indicia of scienter.  For example, Defendants' December 8 statements that LPL was averaging $1.5 billion in net new advisory assets per month during the fourth quarter implied a quarterly figure more than 45% greater than the $3.1 billion in net new advisory assets LPL actually achieved during the quarter.  Similarly, Defendants' representation that commission revenue in 4Q15 would be "more of the same" as LPL's 3Q15 results was far from the truth.  In fact, the Company's fourth quarter alternative investment revenue declined 74% year-over-year, contributing to an

approximately $26 million commission revenue shortfall. The magnitude of this miss was particularly significant because it occurred in formerly lucrative alternative investment products that had been the focus of regulatory scrutiny and Company reform in preceding quarters. Consequently, the dramatic downturn in LPL's alternative investment revenues signaled a fundamental shift in LPL's primary revenue sources that would adversely impact the Company's ability to generate profits and cash flows going forward. Indeed, 4Q15 represented the Company's worst sequential profit decline in four years.

129. Defendants did not make minor errors, but substantial misrepresentations of their core financial metrics. As Defendants were aware, analysts and investors paid close attention to these metrics and used them to assess the Company's expected future cash flows and evaluate the price of LPL stock. Thus, on December 8, when Defendants reaffirmed the purported benefits of the share repurchase plan and stated that the Company's capital plan was in shareholders' "best interest" and indicative of "an earnings stream that is quite steady and produces cash flow over time" these statements were diametrically opposed to reality. At the time, Defendants knew that TPG would use the accelerated share repurchase plan to cash out at well above $40 per share – close to a two-year share price high and more than double the share price after the truth was revealed in February 2016 – and thus that the buyback would result in a wasteful and inefficient use of Company capital in order to benefit a favored and controlling insider.

130. Only eight weeks after Defendants' misrepresentations, it was disclosed that the quarter had actually ended with drastically different negative results. It defies belief that so many different aspects of LPL's finances could have changed so drastically in the short amount of time between Defendants' statements on December 8, 2015 and the disclosure of the actual financial results, and that a controlling insider with access to internal Company information was able to coincidentally excise a substantial portion of its LPL shareholdings at exactly the right time.

**Defendants' Purported Reasons for the Miss Are Demonstrably False**

131.   Defendant Casady's unsupported excuse that it was simply a general unforeseen market decline that caused LPL's poor 4Q15 results further shows his complicity in the scheme to mislead and defraud investors in order for TPG, to whom the Individual Defendants were beholden, to cash out at peak prices.

132.   Of six peer companies identified by LPL in its February 25, 2016 10-K filing, those peers beat Wall Street analyst earnings expectations by 5.5% on average for the fourth quarter of 2015.   But, LPL missed *by over 27%* in comparison. Likewise, LPL's peers on average suffered a 3.7% stock price decline following the release of their fourth quarter 2015 results using a ±1 trading day window.  But LPL stock price declined by nearly 22% – almost seven times as much as its peers.

133.   The falsity of Casady's excuse that LPL's disastrous fourth quarter 2015 results were due only to an unforeseen market downturn is further demonstrated by the fact that LPL's earnings performance and corresponding stock price decline was substantially worse than the 16 comparable companies in the New York Stock Exchange ARCA securities broker dealer index.  These companies on average for the fourth quarter 2015 beat Wall Street analysts' earnings expectations by 3.8%, but LPL missed by over *27.3%* in comparison.  Likewise, these 16 comparable companies on average suffered a -.5% stock price decline following the release of fourth quarter 2015 results using a ±1 trading day window.  But LPL stock price dropped by 21.9% – over twenty times as much.

134.   Likewise, analysts from JMP Securities and Wells Fargo highlighted respectively that the 4Q15 results were also the result of "company-specific headwinds," and "other [LPL specific] issues affecting results including a low level of net recruiting and ongoing declines in alternative investment sales."

135.   LPL's drastically worse fourth quarter performance and stock price decline in comparison to its market and industry peers shows that it was hardly a purported unforeseen general market downturn that caused LPL's weak fourth quarter

1   results.  That Defendant Casady could offer only a widespread unsupported excuse for

2   LPL's fourth quarter results further demonstrates Defendants' complicity in deceiving

3   investors.

4   **TPG Had Access to Insider Information**

5   136.   TPG in its shareholder agreement with LPL also explicitly received "the

6   right to obtain *any* reports, documents, information or other materials . . . which a

7   member of the LPL Board has received or has the right to receive."  TPG also had the

8   right to receive additional information regarding LPL's business directly from the

9   Company's executive officers.  Effectively, this meant that by virtue of the fact that

10  TPG partners Boyce and Schifter served on LPL's Board of Directors, TPG as an

11  entity had the right *at any time* to access inside financial information regarding LPL's

12  financial results and prospects not available to other investors.  This special access

13  allowed TPG to have real-time visibility into LPL's financial performance and have

14  inside information upon which it could determine whether to trade or hold its LPL

15  shares.

16  137.   The Board, on which TPG former partners Boyce and Schifter sat, met 10

17  times in 2015.  In addition, a special meeting of the Board was held to approve the

18  early termination of the accelerated share repurchase program in order to allow TPG

19  to sell its LPL shares back to the Company around the time of the December 8, 2015

20  conference call.  Because TPG retained the right to access any information shared

21  with the Board, it would have had access to inside information regarding LPL's

22  unfavorable 4Q15 results at the time and a strong incentive to unload its shareholdings

23  before the truth was disclosed to the market.

24  **The Highly Suspect Sequence of Events**

25  138.   The highly suspect sequence of events makes clear that the timing of

26  TPG's sale of LPL stock at peak prices and the false and misleading nature of

27  Defendants' statements on the December 8, 2015 conference call were not

28  coincidental.

139.   LPL announced on October 29, 2015 that it would "maximize shareholder returns" by buying back $500 million worth of its own shares.  This announcement had the desired effect of signaling the Company's confidence in its business and forthcoming financial results which propelled the stock price over 10% in subsequent days.

140.   On November 24, 2015 LPL announced it had entered into an agreement with Goldman to carry out a $250 million accelerated share repurchase as part of the $500 million buyback.  The Company, however, cautioned even the accelerated buyback would take "several months" to complete.

141.   However, behind the scenes by at least the beginning of December 2015, LPL's financial results demonstrated that the Company would be facing a disastrous fourth quarter.  With only a few weeks left until quarter end, the financial metrics used by the Company to measure its financial performance indicated abysmal results far below market expectations.  At this time, TPG had the ability to influence and control LPL's decisions even to the detriment of other shareholders and had access to internal financial information that would have shown a significant decline in LPL's business. Indeed, LPL's Board met ten times in 2015 and as discussed above, any information shared with Directors of the Board would automatically be made available to TPG as well.

142.   While LPL's stock was then trading well above $40 per share (near a two-year high), TPG understood that once the market was made aware that LPL's fourth quarter financial results would fall far short of Wall Street expectations, the stock price would decline substantially leading to massive losses in the value of TPG's LPL stock portfolio.

143.   Thus, in late November or early December, and prior to December 8, 2015, TPG approached Goldman to carry out the repurchase of more than 4 million shares while the stock was still trading at historically high levels.

144.   Prior to the sale being publicly disclosed, on December 8, 2015, LPL provided investors with a near end-of-quarter financial update during which Casady and Audette falsely assured investors that the Company was performing as expected – hiding the Company's true financial results and prospects.  Following the statements made at the conference, LPL's stock traded as high as $45.89 per share.

145.   Two days later, and contrary to LPL's previous statement that the share repurchase program "*will take several months to complete*," the Company announced that TPG had cashed out 4.3 million shares of its LPL common stock at $43.27 per share, comprising more than three quarters of the accelerated buyback, and that the entire $250 million accelerated share repurchase program had been completed in a *matter of days*.  TPG was thus able to cash out at peak prices, and at the precise time that LPL's internal results experienced adverse trends but before these results were disclosed to the market.

146.   The following chronology illustrates the fraud:



147.   Thus, TPG's access to LPL's financial information, and its ability to control and influence LPL's financial decisions, allowed it to dispose of approximately one-third of its stake in LPL at a historically high stock price, generating approximately $187 million in insider sales proceeds.  If TPG had been forced to sell its shares after the fourth quarter results were disclosed, its insider trading proceeds would have been diminished by approximately $115 million.

148.   When TPG's beneficial interest in LPL fell below 5% in 2016, LPL announced Defendant Casady's "early retirement" permitting immediate vesting of Casady's million-in-deferred compensation.

## LOSS CAUSATION/ECONOMIC LOSS

149.   During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions of material facts necessary to render those

1  statements not false and misleading, which artificially inflated the price of LPL
2  common stock.

3       150.   As set forth in detail in ¶¶66-112, LPL's false and misleading statements
4  and omissions focused on LPL's key business metrics such as net new advisory assets,
5  brokerage and advisory assets, revenues and gross profits.

6       151.   Plaintiff and investors purchased LPL stock at inflated prices and
7  suffered damages when the price of LPL stock declined upon the revelations of the
8  truth in contrast to Defendants' earlier misstatements.  The timing and magnitude of
9  LPL's significant price decline negates any inference that the loss suffered by Plaintiff
10  and other Class members was caused by changed market conditions, macroeconomic
11  or industry factors or Company-specific facts unrelated to Defendants' fraudulent
12  conduct.

13      152.   On February 11, 2016, LPL announced its fourth quarter and full year
14  2015 financial results and revealed the falsity of its December 8, 2015
15  misrepresentations.  LPL disclosed that gross profits had fallen 35% in the quarter and
16  5% for the year and that it had generated only $0.37 per share in adjusted EPS, 27%
17  below consensus analyst estimates of $0.51 per share.  The Company further revealed
18  that reported net new advisory assets for the fourth quarter were only $3.1 billion,
19  $1.4 billion less than Defendants misled investors to believe on December 8, 2015.
20  The Company also disclosed that the negative performance in LPL's advisory and
21  brokerage assets resulted in reported earnings being worse than expected – in contrast
22  to their December 8, 2015 statements that advisory and brokerage assets had
23  recovered and would trend upwards.  Finally, LPL disclosed that in 4Q15, LPL's
24  gross profit declined 5.1% from $339.8 million in 3Q15 to $322.4 million in 4Q15,
25  the Company's worst sequential gross profit decline in four years, primarily as a result
26  of falling commission revenues.

27      153.   Numerous analysts recognized the financial impact of this previously
28  concealed information.  William Blair highlighted that: (i) "[g]ross profit of $322

million was $12 million below our estimate ($0.07 EPS impact) due to a combination of items but particularly lower alternative investment revenues"; (ii) "[n]et new advisory assets totaled $3.1 billion in the quarter and $16.7 billion for the year"; and (iii) "[a]lternative investment commissions (largely non-traded REITs) were down 38% sequentially and likely will continue to decline."  Wells Fargo stressed that "all in all it was a very challenging quarter with revenue down over 7% year-after-year including commissions that were down 12% year-after-year."  Credit Suisse emphasized that the "well below expectations" earnings miss was driven by "weaker gross profits . . . characterized by a pull-back in brokerage sales, [and] weak advisor growth trends."

154.   As a result of this news, the price of LPL common stock dropped nearly 35% to close at $16.50 per share on unusually high trading volume of over 11.4 million shares.  Analysts from UBS described the results as "[u]gly" and JP Morgan noted a "lack of confidence in management," and that "management looks bad here."  Indeed, Wells Fargo's analysts expressed skepticism that LPL had no previous knowledge of the disappointing financial results, and noted the suspicious timing of the share repurchase from TPG:

> The follow-up I had really had to do with the buyback, and I know you guys tend to have a pretty good line of sight in your business.  And so I would imagine when you guys had some idea that the fourth quarter was going to be pretty challenging.

155.   Defendant Casady rebuffed any suggestion of knowledge and attempted to blame LPL's poor results on an unforeseen market downturn.  However, analysts from JMP Securities and Wells Fargo highlighted respectively that the 4Q15 results were also the result of "company-specific headwinds," and "other [LPL specific] issues affecting results including a low level of net recruiting and ongoing declines in alternative investment sales."

156.   Casady's attempt to blame LPL's disastrous financial results on the general market downturn is belied by the fact that LPL's results and stock price decline were drastically worse than its market and industry peers.

157.   Six quarterly reporting public companies LPL listed in its February 25, 2016 10-K filing as its peers beat Wall Street analyst earnings expectations by 5.5% on average for the fourth quarter of 2015.   But, LPL missed *by over 27%* in comparison:



158.   Likewise, analyzing the earning release date of ±1 trading day, LPL's peers on average suffered a 3.7% stock price decline following the release of their fourth quarter 2015 results.   But LPL stock price declined by nearly *22%* – almost seven times as much as its peers:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**Stock Price Decline – Peer Group**

**Average stock price decline during earnings release window**
Timeframe: Earnings release date ±1 trading day

Peer
Average:
-3.7%

-1.8%   -2.8%   -3.3%   -3.8%   -5.0%   -5.7%

-21.9%

Wells Fargo   TD Ameritrade   Morgan Stanley   Raymond   Bank of   Charles   LPL
Advisors       Holding                          James Financial   America   Schwab

Sources: LPLA February 25, 2016 10-K filing; Bloomberg.

16   159.   The fallacy of Casady's excuse that LPL's disastrous fourth quarter 2015
17   results were due only to an unforeseen market downturn is further proven by the fact
18   that LPL's earnings performance and corresponding stock price decline was
19   substantially worse than the 16 comparable companies in the New York Stock
20   Exchange ARCA securities broker dealer index. These companies on average for the
21   fourth quarter 2015 beat Wall Street analysts' earnings expectations by 3.8%, but LPL
22   missed by over ***27%*** in comparison.

23   160.   Likewise, analyzing the earning release date of ±1 trading day, these 16
24   comparable companies on average suffered a -.5% stock price decline following the
25   release of fourth quarter 2015 results.  But LPL stock price dropped by ***21.9%*** – over
26   twenty times as much:

27
28



## Stock Price Decline – Industry Group

**Average stock price decline during earnings release window**
Timeframe: Earnings release date ±1 trading day

Source: Bloomberg.

161.   As a result of Defendants' false statements, LPL common stock traded at artificially inflated prices during the Class Period.  However, when the previously concealed truth was finally disclosed to the market, the Company's stock suffered massive sales, sending the price down 63% from its Class Period high and causing economic harm and damages to Plaintiff and Class Members.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET**

162.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased LPL common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

163.   At all relevant times, the market for LPL common stock was efficient for the following reasons, among others:

(a)     LPL stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, LPL filed periodic public reports with the SEC; and

(c)     LPL regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

164.   Defendants' false and misleading statements during the Class Period described above at ¶¶66-112 were made in the present tense and discussing LPL's then-current and historical performance and thus were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

165.   LPL did not issue verbal "Safe Harbor" warnings to accompany its oral FLS issued during the Class Period and, in any event, any warnings were ineffective to shield those statements from liability.

166.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or

1   misleading and the FLS was authorized and/or approved by an executive officer of

2   LPL who knew that the FLS was false.  Further, none of the historic or present tense

3   statements made by Defendants were assumptions underlying or relating to any plan,

4   projection or statement of future economic performance, as they were not stated to be

5   such assumptions underlying or relating to any projection or statement of future

6   economic performance when made.

7                        **CLASS ACTION ALLEGATIONS**

8           167.   Plaintiff brings this action as a class action pursuant to Rule 23 of the

9   Federal Rules of Civil Procedure on behalf of all persons who purchased LPL

10   common stock during the Class Period (the "Class").  Excluded from the Class are

11   Defendants and their families, the officers and directors of the Company, at all

12   relevant times, members of their immediate families and their legal representatives,

13   heirs, successors or assigns, and any entity in which Defendants have or had a

14   controlling interest.

15           168.   The members of the Class are so numerous that joinder of all members is

16   impracticable.  LPL stock is actively traded on the NASDAQ and there are nearly 89

17   million shares of LPL common stock outstanding.  While the exact number of Class

18   members is unknown to Plaintiff at this time and can only be ascertained through

19   appropriate discovery, Plaintiff believes that there are hundreds of members in the

20   proposed Class.  Record owners and other members of the Class may be identified

21   from records maintained by LPL or its transfer agent and may be notified of the

22   pendency of this action by mail, using the form of notice similar to that customarily

23   used in securities class actions.

24           169.   Common questions of law and fact predominate and include: (i) whether

25   Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or

26   misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded

27   that their statements were false; and (iv) whether Defendants' statements and/or

28

1    omissions artificially inflated the price of LPL common stock and the extent and

2    appropriate measure of damages.

3        170.   Plaintiff's claims are typical of the claims of the members of the Class as

4    all members of the Class are similarly affected by Defendants' wrongful conduct in

5    violation of federal law that is complained of herein.

6        171.   Plaintiff will fairly and adequately protect the interests of the members of

7    the Class and has retained counsel competent and experienced in class and securities

8    litigation.

9        172.   A class action is superior to all other available methods for the fair and

10   efficient adjudication of this controversy since joinder of all members is

11   impracticable.  Furthermore, as the damages suffered by individual Class members

12   may be relatively small, the expense and burden of individual litigation make it

13   impossible for members of the Class to individually redress the wrongs done to them.

14   There will be no difficulty in the management of this action as a class action.

15                                    **COUNT I**

16         **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
17                           **Against All Defendants**

18       173.   Plaintiff incorporates all allegations in ¶¶1-172 above by reference.

19       174.   During the Class Period, Defendants disseminated or approved the false

20   statements specified above, which they knew or recklessly disregarded were

21   misleading in that they contained misrepresentations and failed to disclose material

22   facts necessary in order to make the statements made, in light of the circumstances

23   under which they were made, not misleading.

24       175.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

25           (a)    Employed devices, schemes and artifices to defraud;

26           (b)    Made untrue statements of material facts or omitted to state

27   material facts necessary in order to make the statements made, in light of the

28   circumstances under which they were made, not misleading; or

1311790_1

                                    - 69 -                    3:16-cv-00685-BTM-BGS

1            (c)     Engaged in acts, practices, and a course of business that operated

2 as a fraud or deceit upon Plaintiff and others similarly situated in connection with their

3 purchases of LPL common stock during the Class Period.

4          176.   Plaintiff and the Class have suffered damages in that, in reliance on the

5 integrity of the market, they paid artificially inflated prices for LPL common stock.

6 Plaintiff and the Class would not have purchased LPL common stock at the prices

7 they paid, or at all, if they had been aware that the market price had been artificially

8 and falsely inflated by Defendants' misleading statements.

9          177.   As a direct and proximate result of Defendants' wrongful conduct,

10 Plaintiff and the other members of the Class suffered damages in connection with their

11 purchases of LPL common stock during the Class Period.

12 **COUNT II**

13 **For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

14

15          178.   Plaintiff incorporates all allegations in ¶¶1-177 above by reference.

16          179.   The Individual Defendants acted as controlling persons of LPL within the

17 meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company,

18 and ownership of LPL common stock, the Individual Defendants had the power and

19 authority to cause LPL to engage in the wrongful conduct complained of herein.

20          180.   LPL controlled the Individual Defendants and all of its employees.

21          181.   By reason of such conduct, Defendants are liable pursuant to §20(a) of

22 the 1934 Act.

23 **PRAYER FOR RELIEF**

24 WHEREFORE, Plaintiff prays for judgment as follows:

25     A.     Determining that this action is a proper class action, and certifying

26 Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

27 Procedure and Plaintiff's counsel as Class Counsel;

28     B.     Awarding damages and interest;

1       C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

2       D.    Awarding such equitable/injunctive or other relief as the Court may deem

3   just and proper.

## JURY DEMAND

4

5       Plaintiff demands a trial by jury.

6   DATED:  October 2, 2017        ROBBINS GELLER RUDMAN
                                   & DOWD LLP

7                                   JONAH H. GOLDSTEIN
                                SUSAN G. TAYLOR

8                                   BRIAN E. COCHRAN
                                ANDREW W. HUTTON

9

10                                             s/ Jonah H. Goldstein

11                                 JONAH H. GOLDSTEIN

12                                 655 West Broadway, Suite 1900
                              San Diego, CA  92101-8498

13                                 Telephone:  619/231-1058
                              619/231-7423 (fax)

14

15                                 Lead Counsel for Lead Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 2, 2017.

                                         s/ Jonah H. Goldstein
                                        JONAH H. GOLDSTEIN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:       jonahg@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-00685-BTM-BGS Charter Township of Clinton Police and Fire Retirement System v. LPL Financial Holdings Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard Lawrence Gallagher**
  richard.gallagher@ropesgray.com,Matthew.Tolve@ropesgray.com,courtalert@ropesgray.com,rogelio.jose@ropesgray.com

- **Jonah H. Goldstein**
  JonahG@rgrdlaw.com,e_File_SD@rgrdlaw.com

- **Andrew W. Hutton**
  drew@law-hutton.com,drew@awhlaw.com

- **Tricia L McCormick**
  TriciaM@rgrdlaw.com,DHouck@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michael Joseph Shiposh**
  michael.shiposh@ropesgray.com

- **Susan Goss Taylor**
  STaylor@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David C Walton**
  davew@rgrdlaw.com,hectorm@rgrdlaw.com,hstmartin@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`