UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LPL FINANCIAL HOLDINGS INC.; et al.,

Defendants.

Case No.: 16-cv-685-BTM-BGS

**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**

**[ECF No. 36]**

## I. <u>INTRODUCTION</u>

This is a putative securities class action filed on behalf of all purchasers of common stock of LPL Financial Holdings Inc. ("LPL") between December 8, 2015 and February, 2016, inclusive (the "Class Period"). Plaintiff alleges that on December 8, 2015, Defendants made false and misleading statements regarding LPL's business and prospects, artificially inflating common stock prices during the Class Period.

The Court previously granted Defendants' Motion to Dismiss the

Consolidated Complaint ("CC"), concluding that Plaintiff's "core operations theory" of scienter was flawed because the CC failed to allege particularized facts (1) identifying the name, date, or content of any report Defendants allegedly reviewed before the conference and (2) establishing LPL's financial state at the time of the December 8th statements. (ECF 28 at 10-12).

Now the Court considers Defendants' Motion to Dismiss the First Amended Complaint (FAC). The question before the Court is whether Plaintiff has cured the pleading deficiencies the Court identified in its previous Order. For the reasons set forth below, the Court concludes Plaintiff still has not pled scienter or falsity with the specificity required under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Court GRANTS the Motion to Dismiss the FAC with leave to amend.

## II. BACKGROUND

### A. Facts

The Court incorporates by reference the background facts set forth in its Order granting in part and denying in part the Motion to Dismiss the Complaint. (ECF No. 28).

### B. Proceedings

Plaintiff filed a Complaint on March 22, 2016, and Defendants filed a Motion to Dismiss for failure to state a claim. (ECF Nos. 1, 17). The Court granted Defendant's Motion in part and denied it in part. (ECF No. 28). The Court found that the Complaint "did not create a strong inference of scienter," and that "certain of Defendants' allegedly false statements were inactionable." (ECF No. 28 at 7). The Court dismissed the Complaint with leave to amend. (ECF No. 28 at 7).

On October 2, 2017, Plaintiff filed a First Amended Complaint ("FAC"). Defendants moved to dismiss the FAC for failure to state a claim (ECF Nos. 34, 36) and later requested oral argument for the purpose of discussing: (1) whether

Plaintiff abandoned certain alleged misstatements by failing to address them in its Response; (2) whether Plaintiff's "approach to pleading fraud by guesstimation" is permissible; (3) whether Plaintiff has cured the scienter failings the Court's previous order identified by adding amendments alleging the existence of 24/7 real-time reporting systems; and (4) whether dismissal with prejudice is warranted. (ECF No. 39). The parties appeared before the Court for oral argument on December 4, 2018. (ECF No. 41).

## III. REQUEST FOR JUDICIAL NOTICE

Defendants requested judicial notice of documents attached to the Motion to Dismiss and its accompanying declaration as Exhibits A through Q. (*See* ECF No. 36-2.) Plaintiff opposes the inclusion of Exhibits O, P, and Q.[1]

Exhibit O is a redlined comparison of the consolidated Complaint against the FAC. Plaintiff objects that the redlined comparison of the two complaints is not proper for judicial notice.

Exhibit P is a chart of stock price performance for peer groups from December 2015 through February 2016. Plaintiff argues that historical stock price is not relevant and not properly subject to judicial notice, citing *In re Amylin Pharm., Inc., Sec. Litig.,* No. 01-CV-1455-BTM (NLS), 2002 WL 31520051, at *2 (S.D. Cal. Oct. 10, 2002) ("The court finds Amylin's historical stock price, introduced to show that the price rose after the close of the class period, is irrelevant to the motion to dismiss."). (ECF No. 37-1 at 4-5). Defendants argue that Plaintiff raises peer performance in the FAC (*See* FAC ¶31) and unlike *In re Amylin*, the proffered stock prices here fall within the class period.

Exhibit Q shows correlations between LPL's changes to AUM and changes in S&P index prices. Plaintiff argues that the exhibit covers years that fall outside

[1] Plaintiff initially opposed Exhibit A, LPL's Form 10K, and Exhibit C, LPL's Schedule 14A Proxy Statement, but withdrew its opposition. (ECF No. 38-2 "Gallagher Decl." ¶¶ 3, 4).

the scope of the FAC. Defendants contend because the FAC raises the impossibility of a negative 84% correlation, the chart is appropriate should the Court determine deductive guesswork is not a violation of the PSLRA.

A court presented with a motion to dismiss a securities class action complaint must consider the complaint in its entirety, "as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, including documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). SEC filings are subject to judicial notice on a motion to dismiss. *See Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

Because the Court has not relied upon Exhibits P or Q in reaching a decision on the Motion to Dismiss, Plaintiff's objection to their admission is moot. *See In re Silicon Storage Tech., Inc., Sec. Litig.*, No. 05-cv—0295-PJH, 2007 WL 760535, at *29 (N.D. Cal. Mar. 9, 2007). As for Exhibit O, Civil Local Rule 15.1(c) provides that "any amended pleading filed after the granting of a motion to dismiss . . . with leave to amend must be accompanied by a version of that pleading that shows—through redlining, underlining, strikeouts, or other similarly effective typographic methods—how that pleading differs from the previously dismissed pleading." Because Plaintiff failed to do so, the Court will accept Defendant's submission of a redlined copy comparing the pleadings.

All of the remaining documents submitted are either judicially-noticeable SEC filings, or are incorporated by reference in the FAC. Accordingly, the Court grants Defendants' Request for Judicial Notice except as to Exhibits P and Q.

## IV. DISCUSSION

The FAC states claims for (1) violation of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10-b; and (2) violation of section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b). Under Rule 10b–5, which implements section 10(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim for violation of Section 10(b) or Rule 10b–5, a plaintiff must allege " '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Matrixx Initiatives, Inc. v. Siracusano* ("*Matrixx*"), 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

At the pleading stage, a complaint asserting claims for violations of Section 10(b) or Rule 10b–5 must satisfy the dual heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017). Under Rule 9(b), the complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Securities fraud complaints are additionally subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation marks and citation omitted). As to falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). As to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "controlling person[s]." 15 U.S.C. § 78t(a). To establish liability under Section 20(a), a plaintiff must first allege a violation of Section 10(b) or Rule 10b–5. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) (citation omitted).

The Court first addresses scienter, and then turns to the alleged falsity of Defendants' statements.

**A. Scienter**

Under the PSLRA, plaintiffs must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "The inference must be that the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (internal citation and quotation omitted). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he

//

//

//

//

//

could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The Supreme Court explains that courts "must review all the allegations holistically" when determining whether scienter has been adequately pled. *Tellabs*, 551 U.S. at 326. The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

Allegations regarding management's role in a company may help satisfy the PSLRA scienter requirement in three circumstances:

> First, the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the *Tellabs* standard. *Id.* at 785–86. Second, the allegations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," as in *Daou*, 411 F.3d at 1023, and *Oracle*, 380 F.3d at 1234. *S. Ferry*, 542 F.3d at 786. Third, in rare circumstances, such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter. *Id.* (citing *Berson*, 527 F.3d at 988).

*Reese*, 747 F.3d at 575-76.

In the previous order dismissing the Complaint, the Court found that Plaintiff's "core operations theory" of scienter was flawed because the Complaint failed to allege particularized facts (1) identifying the name, date, or content of any report Defendants allegedly reviewed before the conference and (2) establishing LPL's financial state at the time of the December 8th conference. (ECF No. 28 at 10-12). Although the Court agreed that the timing of the TPG buyback was suspicious, the above omissions led the Court to conclude the factual pleadings did not create a sufficiently compelling inference of scienter. (Id.

at 13).

The FAC attempts to cure this deficiency by (1) "showing that in early December 2015, Defendants had real-time knowledge of the Company's performance in its key metrics"; and (2) "quantifying the amount of deterioration known to Defendants at the time they made their present tense misrepresentations." (ECF No. 37 at 1).

With respect to Defendants' real-time knowledge that LPL was suffering "a disastrous fourth quarter," the FAC newly alleges that individual field advisors used a platform, BranchNet, that provides 24/7 information and is linked to LPL's corporate Oracle reporting system. (¶ 18, 51-53). According to the FAC, "LPL's information systems . . . could report to LPL shareholders within 18 days . . . the monthly results of net new advisory assets." (¶53). The information was allegedly aggregated, "allowing LPL senior management to view LPL's key metrics in real time" and use that information to prepare for their December 8 presentation. (¶¶ 53, 73, 99). The FAC cites senior managements' statements that they had clear insights into the "last two quarters" and "a good line of sight" into intra-quarter results as evidence of their review of these systems. (¶ 124). The FAC also alleges that financial advisors were departing LPL at high rates, and the resulting lost AUM was reflected in this real-time information system. (¶ 18, ¶ 60). The FAC includes charts from *InvestmentNews.com* that identify the departing advisors and quantifies the AUM they took with them. (¶ 60-61).

As for quantifying where those financial metrics stood on December 8th, the FAC, like its predecessor, works backwards using the results of the 4Q15 and publicly reported statistics. However, the FAC shows far more analysis, alleging that Defendants' statements could only be true if revenue for December were effectively zero, net new advisory assets declined by 93.3%, and "there was suddenly a negative 84% correlation" between LPL AUM and S&P Index levels. (¶ 78-80, 83, 90-93). The FAC adds that Defendants knew LPL's growth had

slowed from 1.5 billion a month to "a rate approximating $1.0 billion per month," that they had overstated their average rate at the time of the conference call, that they were experiencing a less than 50% correlation between LPL's AUM growth and equity movements, and that, according to *InvestmentNews.com*, their advisors and AUM were leaving at high rates. (¶ 19).

Defendants argue that the FAC's reference to BranchNet and corporate Oracle reporting systems fail the PSLRA's pleading standards because BranchNet "is a proprietary, customer-facing product used by individual advisors" and the FAC "does not allege that BranchNet is the system of record for LPL's financial statements" or that "BranchNet enabled LPL to consolidate its internal financial information from thousands of advisors serving millions of investors at the push of a button." (ECF No. 36 at 20). Defendants add that Plaintiff has yet to provide the name, date, or content of any specific report generated by these systems, or allege exactly when Defendants reviewed them. (Id.). Moreover, Defendants state if "the bare assertion that LPL maintained a financial reporting system allowing supposed 24/7 access could survive dismissal," it would undermine the PSLRA's heightened pleading standard. (Id.). Defendants urge the Court to reject Plaintiff's deductive work, as the FAC "relies on conclusory allegations to repackage publicly available information as evidence of intent," and to find Plaintiff failed to make the necessary showings to satisfy the core operations theory. (Id. at 23). Defendants' arguments are persuasive.

To avoid a rule that would allow plaintiffs to allege the existence of internal documents and "bring securities fraud suits with little more basis than the fact that the stock price had fallen," the Ninth Circuit has held that "a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230-31 (9th Cir. 2004) (quoting *In re Silicon Graphics*, 183 F.3d at 984).

Generally, management's "receipt of unspecified weekly or monthly reports" is an insufficient basis for inferring scienter. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (citing *In re Vantive,* 283 F.3d at 1087). To prevail, plaintiffs must go beyond general assertions about the mere existence of internal reports and "what they think the data shows" and identify specific documents the defendants relied upon as well as the contents of those documents. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002).

"Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware." *S. Ferry Lp., No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). The complaint must allege management's "actual exposure to information" — "general awareness of the day-to-day workings of the company's business does not establish scienter" without an allegation of "specific information conveyed to management and related to the fraud." *Id.* at 784-85. However, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." *In re Daou Sys., Inc., 411 F.3d* at 1022 (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d at 1234).

*In re Daou*, the court inferred scienter where, on top of specific allegations of "suspicious corporate acquisitions and insider stock sales," the complaint alleged that several confidential witnesses confirmed management's knowledge and practice of manipulating and misrepresenting revenue amounts. 411 F.3d at 1023. Similarly, in *Nursing Home*, the court distinguished between the complaint in *Lipton v. Pathogenesis Corporation*, which was dismissed because it merely

referred to the existence of reports and postulated what the data *might* have shown, from the complaint at hand, which included "hard numbers" and "specific statements from former employees and managers . . . testifying to a major slowdown in sales." 380 F.3d at 1226 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002)). Finally, *In re Quality Systems, Inc.*, the Ninth Circuit found scienter where the complaint included "multiple statements from confidential witnesses with personal knowledge of [the company's] declining sales during that period," and personal knowledge that reports were "automatically delivered to management" and that management had a practice of "continually monitoring" those reports. 865 F.3d 1130, 1145 (9th Cir. 2017).

Generally, courts have not found scienter where the complaint alleges the existence of a powerful database but does not contain specific admissions from management or statements from confidential witnesses regarding whether and how management accessed the disputed information through the database.

For example, in *Browning v. Amyris*, the district court dismissed a complaint because the confidential witnesses failed to state the basis for their "beliefs" that management disregarded scientists' warnings and plaintiffs made "no allegations about what data or information is in the [scientific] database" that management allegedly reviewed. No. 13-cv-02209-WHO, 2014 WL 1285175, at * 16 (N.D. Cal. Mar. 24, 2014). The court held that allegations regarding management's unfettered access to the database and responsibility to report scientific findings to the board were too general to create a strong inference of scienter. *Id.* (citing *In re Daou Sys.*, 411 F.3d at 1022 (stating "general allegations of a defendant's interaction with other officers and employees" insufficient to create strong inference of scienter) (internal alterations omitted)). The court also noted that while it was reasonable to expect management to have knowledge about "discrete events" of "critical importance to the business at issue," such as regulatory approval of a company's most important drug, it was unreasonable to

charge management with knowing whether a company would successfully meet its projections based on all potential dispositive factors. *Id.* Finally, the court stated that the expert consultants' representations that management "could not have reasonably projected the publicly stated projections for production" lacked facts sufficient to show the requisite culpability for fraud as opposed to mere misjudgment. *Id.* at *19.

Similarly, in *In re Silicon Storage Technology, Inc., Securities Litigation*, the district court dismissed a complaint that provided a comprehensive list of databases to which management had access, but did not use "information in the data bases" to show the falsity of company statements. 05-cv-0295, 2007 WL 760535 at *9 (N.D. Cal. Mar. 9, 2007). The complaint included statements from confidential witnesses making specific allegations as to certain managers' use and manipulation of the databases, but these statements were deemed insufficient. *Id.* at *25-27. The court also rejected plaintiffs' "reliance on generic data"—public filings and expert-provided market data—as their primary source of "facts" regarding the alleged falsity. *Id.* at *30.

Here, Plaintiff's core-operations theory allegations do not satisfy any of the three circumstances under which scienter may be inferred. First, the allegations are not particular enough to suggest management had "actual access" to the disputed information, and thus do not independently satisfy the PSLRA. Plaintiff has provided information about a system—BranchNet—that generates reports to individual advisors in real-time. However, Plaintiff does not provide the name, date, or content of a contemporaneous report that Defendants accessed in preparation for their December 8th presentation. The FAC acknowledges that it takes 18 days for monthly results to roll in, but does not speicfy which numbers Defendants actually had in hand on December 8th. (See FAC ¶ 53). Unlike cases in which scienter was found, the FAC does not supply hard numbers, admissions from management that they reviewed BranchNet or Oracle-based systems

to generate their presentation, or corroborating statements by witnesses with personal knowledge of the company's financial state and management's fraud. *See, e.g.*, *Nursing Homes*, 380 F.3d at 1226 ("Plaintiffs here have hard numbers and make specific allegations regarding large portions of Oracle's sales data. The Complaint contains specific statements from former employees and managers" stating what defendants "would have known"); *In re Quality Systems, Inc.*, 865 F.3d at 1145. Defendants' statements that they had a clear line of insight into the quarter are not the same as an admission that they used BranchNet and Oracle to generate the information that formed the basis for the December 8th statements. *Cf. In re Quality Sys.*, 865 F.3d at 1146 (weighing as a factor that executive told analysts that the company "used information maintained in Salesforce databases to report its sales pipeline and make revenue forecasts for its SEC filings"). Like the dismissed Complaint in *Lipton v. Pathogensis Corp*, the FAC here says the reports must have existed and postulates what the data might have shown. *See* 284 F.3d at 1035-36. The FAC relies almost entirely on approximations and after-the-fact public data regarding LPL and peer performance to arrive at those numbers. The Ninth Circuit and district courts have consistently rejected such an approach as insufficient. *See, e.g.*, *Lipton*, 284 F.3d at 1035-36; *Browning*, 2014 WL 1285175, at *16; *In re Silicon Storage Tech., Inc.*, 2007 WL 760535 at *9. If Plaintiff were to satisfy the "actual access" prong with this showing, any company with a sophisticated internal reporting system that experienced a dramatic drop in revenue could be liable for securities fraud, an outcome that the PSLRA was enacted to prevent. *See In re Daou*, 411 F.3d at 1021; *Nursing Home,* 380 F.3d at 1230-31. The Court concludes Plaintiff has not pled with particularity that defendants had actual access to the disputed information.

Without proving Defendants' actual access or establishing the reports' contents, the same doubts the Court articulated in its previous Order remain as

to the other two means of satisfying the PSLRA. With respect to the "absurdity" prong, the Court cannot conclude that "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *See In re Oracle*, 627 F.3d at 390. Plaintiff does not identify a singular discrete event impacting the business of which Defendants must have been aware; rather, Plaintiff charges Defendants with failing to accurately analyze the movements and assets of 14,000 independent investment advisors and predict the downturn for 4Q15. *See, e.g., Browning v. Amyris, Inc.*, No. 13-CV-02209-WHO, 2014 WL 1285175, at *16 (N.D. Cal. Mar. 24, 2014) (distinguishing between "discrete events" like "stop-orders for a small number of contracts that affect a huge portion of a company's revenue and regulatory approval of a company's most important drug" and "knowing whether [a company] would successfully meet its projections or not" based on a "significant number of factors"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1190 (S.D. Cal. 2009) (finding significant in scienter analysis the allegation that defendants knew that a company accounting for 38% of defendants' revenue had cancelled orders). When it takes weeks to roll up financial results in a highly decentralized business with inflows and outflows of billions in assets, among a multitude of other market factors at play, it is not "absurd" that management did not possess the knowledge necessary to anticipate the sharp fall in stock price.

Although Defendants had every reason to examine LPL's key metrics prior to meeting with investors on December 8, plaintiffs cannot invoke a core-operations inference by "mere[ly assert[ing] that all CEOs should want their companies to succeed and therefore ought to know everything about their business." *Browning*, 2014 WL 1285175 at *15. "[A]dopting this standard would eviscerate the core-operations test and turn it into an automatic presumption of comprehensive knowledge on the part of management." *Id.* Moreover, without specifically alleging the material facts in Defendants' possession on December 8,

it is specious to claim it is "absurd" that they did not know those facts. Thus, Plaintiff has not pled "absurdity."

Having concluded that no single fact independently supports an inference of scienter, the Court now turns to consider all the indicia of scienter together. The FAC alleges the following "additional indicia of scienter":

> (i) the Individual Defendants were beholden to TPG; (ii) the misrepresentations involved LPL's near quarter-end core operations for which Defendants had real-time "24/7" data access and related reporting; (iii) the magnitude of the financial disappointment contrasted with Defendants' misstatements; (iv) Defendants' purported reasons for the miss are demonstrably false; (v) TPG had access to adverse inside information about LPL's fourth quarter financial results, business and prospects; and (vi) the suspect timing of the share repurchase.

(FAC ¶ 113).

Even when reviewing the allegations holistically, the FAC does not allege a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 322. Without specifically alleging the contents of the reports LPL's management relied upon, Plaintiff's allegations regarding TPG's alleged right to access LPL's nonpublic, internal information have little weight in the scienter analysis. The timing and acceleration of TPG's $187 million sale of LPL stock remains suspect, but the inference Plaintiff urges is less compelling than other innocent inferences: TPG could have done so because LPL's shares were at "historically high levels" (FAC ¶ 20) or because TPG anticipated the marketdownturn even if LPL's key metrics did not. The FAC's highly speculative allegations about Defendants' motives—to benefit a minority shareholder at the expense of LPL and 87% of shareholders—are not compelling, particularly absent any statements from confidential witnesses. Indeed, Plaintiff's hypothetical scenario presents a case of insider trading almost too blatant to be plausible, especially given the absence

of any allegations regarding a criminal investigation.

Plaintiff's effort to show scienter by hypothesizing where LPL's financial metrics stood in December 2015 is similarly undermined by Plaintiff's failure to plead Defendants' actual access to information indicating a disastrous fourth quarter. Casady's statement that LPL "had insight into the quarter" and "knew we would have challenges" is too vague about those challenges to qualify as an admission supporting an inference of scienter. Moreover, a full reading of Casady's explanation for LPL's miss shows he did not entirely blame an "unforeseen market downturn," but rather stated that the surprise of the market downturn combined with foreseeable challenges within the business, previously thought surmountable, led to the poor results. The statement does not signal culpability.

Plaintiff's allegations that Defendants had contemporaneous data available are contradicted by the FAC's admission that it takes weeks to get a full picture of the business. (FAC ¶ 53). And even if the Court were to ascertain the reliability of Plaintiff's methodology showing where LPL's financial metrics likely stood in December 2015, the addition of this ingredient to the "scienter stew" would not complete the dish. Although courts accept the representations of expert consultants in complaints alleging securities fraud, a showing that management's projections were unreasonable does not supply a sufficiently compelling inference of scienter. *Browning*, 2014 WL 128175 at *16. Defendants had to possess that information at the time of the alleged fraud. Moreover, the PSLRA was enacted to prevent pleading "fraud by hindsight", and these allegations contain no contemporaneous information. *In re Daou Sys., Inc*, 411 F.3d at 1021. Although Defendants missed their projections by a significant margin, and TPG was lucky to get out when it did, the weight of evidence does not override the innocent inference that Defendants believed the representations they made on December 8 and did not knowingly or recklessly disregard data to

the contrary.

Given the foregoing, Plaintiff has failed to plead a core-operations theory of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 322. It comes down to the fact that the FAC still does not allege with particularity what Defendants actually or constructively knew about LPL's finances on December 8th. (*See* ECF No. 28 at 13). The FAC does not provide statements by anyone with internal knowledge of where LPL knew the metrics stood on December 8; a specific admission from management that they used the databases and consulted with them on a certain date before December 8th; or any content or information from the reports or databases upon which Defendants allegedly relied. This is fatal to the FAC's scienter allegations. Many cases subject to dismissal provided far more factual bases for their claims, and Plaintiff does not provide a case supporting the result it seeks here.

Plaintiff's claims under Section 10(b) and Rule 10b-5 must be dismissed. Dismissal will be with leave to amend.

**B. Falsity**

The deficiencies identified above similarly plague Plaintiff's falsity allegations. Although the Court dismisses the FAC on the basis that it fails to allege scienter, the Court will nevertheless address the parties' arguments as to whether Defendants made false and misleading statements.

To satisfy the PSLRA, Plaintiff's FAC must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

The FAC largely alleges the same false or misleading statements as its predecessor. (*See* FAC ¶¶ 69, 67, 71, 75 85, 86, 88-90, 92, 93, 97, 110).

Defendants move to dismiss the statements set forth below.

(1) Audette's Statements About LPL's Business

Defendants contend that the following statement about LPL's business is inactionable:

> "Being here for these two months [October and November 2015] and spending a lot of time, ... *I think it's a lot more powerful and compelling than I thought from the outside*. Third, and what Mark kind of hinted to on the capital plan side, being at a place where there's a lot less approvals necessary to go *execute on a capital plan in the best interest of shareholders*. So, the way we speak about it, a capital-lite model, *an earnings stream that is quite steady and produces cash flow over time*. Hopefully, the last two months have shown that opportunity absolutely was there. *We're executing it all well*."

(FAC ¶ 67) (emphasis in original).

The FAC asserts the above statements were materially misleading because "they conveyed the message that LPL's earnings stream and financial prospects were steady and would produce the necessary cash flow in the future to allow LPL to successfully execute its repurchase plan, pay down its debt, and avoid any potential breach of its debt covenants," when really, LPL's "internal financial results showed LPL was in the midst of a disastrous fourth quarter." (FAC ¶ 67-69).

Defendants contend that this statement is inactionable because (1) the statements constitute opinions that the FAC fails to show Audette disbelieved; (2) the statements are "feel good monikers" and "vague statements of optimism" upon which "no shareholder reasonably relies." (ECF No. 36-1 at 10-11). The Court agrees with Defendants.

As examined above, Defendants have not shown what management knew at the time of the December 8th conference, or that Audette disbelieved the statements he made at the time. Moreover, "[m]ildly optimistic, subjective assessment[s] hardly amount[] to a securities violation," and most investors "

'know how to devalue the optimism of corporate executives.' " *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (quoting *VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1481 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir.1993)). Statements like " 'we're doing well and I think we have a great future,' 'business will be good this year ... we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first ...,' 'everything is clicking [for the 1990s] ... new products are coming in a wave, not in a trickle ... old products are doing very well' and 'I am optimistic about [the company's] performance during this decade' " have been held nonactionable, even if in hindsight the statements proved to be false. *See id.* (citing *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1095 (N.D.Cal. 1994), *aff'd,* 95 F.3d 922 (9th Cir.1996)). Another court held that the statement "it's a very, very nice growth of our FDR products within that market" was non-actionable. *In re Mellanox Tech., Ltd. Sec. Litig.*, 2014 WL 7204864 at *4 (N.D. Cal. 2014).

The Court previously ruled that this statement could "reasonably be interpreted as a description of LPL's recent financial performance." (ECF No. 28 at 17). However, these statements are similar to statements held nonactionable in *In Re Cutera*, *In Re Syntex Corp*, and *In re Mellanox*. And to the extent Plaintiff relies on S&P 500 and InvestmentNews.com to show that Audette knowingly overstated LPL's growth trends, investors had access to the same public information and thus "already knew" of the realities notwithstanding these statements of corporate optimism. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).

(2) <u>Audette's Statements About LPL's Net New Advisory Assets (NNAA)</u>

Defendants contend that Audette's following statement is also non-actionable:

"[N]et new advisory assets continue to flow in well. And we are averaging

> about $1.5 billion a month. And you see that we had that in October [2015] . . . . [W]e are averaging about $1.5 billion [per month]." (FAC ¶ 71)

The FAC alleges that this statement gave the false and misleading impression that "for the first two months of 4Q15, LPL had already earned about $3 billion net new advisory assets" (FAC ¶ 76) and that "LPL was on pace to garner . . . a total of $4.5 billion for the fourth quarter of 2015." (FAC ¶ 73). Defendants argue that an "implied" statement cannot be actionable, and even it could, (1) the falsity of this statement is not pled with particularity because the FAC not allege what the net new advisory assets actually were and guesstimation is insufficient, and (2) that Audette's prediction for 4Q15 is protected by PSLRA's safe harbor provision as a forward-looking statement accompanied by cautionary risk disclosures. (Mot. at 14).

"[C]lassic growth and revenue projections . . . are forward-looking on their face." *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058–59 (9th Cir. 2014). Statements accompanied by adequate cautionary language are subject to the PSLRA safe harbor provisions. Adequate cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). In the event of mixed statements, the non-forward-looking portions are not protected under safe harbor provisions of the PSLRA. *In re Quality Sys., Inc., Sec. Litig.*, 865 F.3d 1130, 1150 (9th Cir. 2017). Statements like, "[t]here is nothing drying up and there is nothing slowing down," or "there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years," and "I went back through the data . . . and objectively looked it [and it counteracts concerns about future sales lengthening]" are considered non-forward-looking. *Id.* at 1143. Even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have 'actual knowledge' that the

statement was false or misleading." *Id.* at 1149 (citing *Cutera*, 610 F.3d at 1112-13).

As an initial matter, Audette does not actually state that LPL had 3 billion and was on track to reach 4.5 billion by 4Q15. (FAC ¶ 71). Defendants' point, that Plaintiffs' method of arriving at a number involves imprecise guesswork and neglects to take into account that 1.5 billion is an average rather than exact rate, is well taken.

That being said, the above statement is mixed; it describes LPL's current financial state, remarks on past months, and projects future growth, and so is not entirely "forward-looking." There is some protective language: Audette couches his optimistic projection using the word "averaging" and stating vaguely that the advisory assets "continue to flow in well." Audette's statements are not quite as explicit as those the Ninth Circuit held were non-forward-looking *In Re Quality Systems*, 865 F.3d at 1149, but they don't quite "identify important factors that could cause actual results to differ materially." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). However, even if the court were to find that the statements lacked adequate cautionary language, because Plaintiff has not shown that Audette had actual knowledge that the statement was false or misleading, the Court holds that the statement is non-actionable. *See In Re Quality Systems*, 865 F.3d at 1149.

(3) <u>Audette's Statements about AUM</u>

Defendants claim the following statement about AUM is non-actionable:

> The "markets went down a fair bit," but "we're up at the end of October [2015] to $483 billion [AUM] versus $462 billion at the end of the [third] quarter [of 2015] . . . . " (FAC ¶ 86)

The FAC alleges this statement was materially misleading because "LPL's AUM was actually about $3 billion less (about 14% of the represented increase) based on LPL's realized correlation between AUM and the market, and therefore AUM was already negatively impacted by undisclosed factors unrelated to the

markets." (FAC ¶ 86). The FAC contends that AUM was "overstated at the end of November by several billion dollars." (¶ 89-91).

Defendants assert that nowhere in the statement does Audette represent what the AUM actually was in November, and that Plaintiff's use of guesswork is not a basis for proving falsity. (ECF No. 36-1 at 15). Defendant contests Plaintiff's assumptions that: the correlations for October and November 2015 were identical; that a negative 84% correlation is inconceivable following a month with a 55% market correlation (FAC ¶ 91); and that a 47% market correlation observed during the 4Q15 should apply to each month (FAC ¶ 92). (ECF No. 36-1 at 16).

The Court finds that this statement is not misleading. Although Audette omitted making a statement about November, he did not affirmatively state what November's tally was and he acknowledged that "the markets went down a fair bit." This weighs against finding the statement false and misleading. Moreover, Plaintiff's have not actually provided the financial metrics for LPL at that time.

(4) Casady's Statement About Producer Departures

Defendants claim the following statement about producer departures is non-actionable:

> "[F]undamentally, this year [FY 2015] is like any other in terms of the gross amount [of advisors] and what's different is that we do have the smaller producers leaving." (FAC ¶ 93).

Defendants contend that Plaintiff's argument that this was "untrue" is conclusory, (*See* ECF No. 37 at 16), and argue the statement is non-actionable because Plaintiff "fails to cite any particularized facts explaining which producers left LPL, the timing of such departures, and how the size of those producers who left compares to those who stayed." (ECF No. 38 at 5).

Although the FAC features a table of advisor firms leaving LPL per year and associated AUMs, Defendant is correct that the FAC makes no actual

comparison between those producers who left and those who stayed. (See FAC ¶¶ 11, 93). The statement also acknowledges that producers are leaving, which was true. It is however a bit of a stretch to claim "FY 2015 is like any other" when the AUM of the departing advisors totaled $749 million in October compared to $209 million for the previous two months. (FAC ¶ 93, 94 n.18). However, without a comparison to previous years, Plaintiff has not sufficiently alleged falsity.

(5) <u>Statements about Commission Revenues</u>

Defendant challenges as non-actionable the FAC's allegation that Audette made false reassurances in the conference call that commission revenue would be "more of the same [480.3 million] that we saw in the third quarter [3Q15]," (FAC ¶ 97). The FAC alleges this statement is false and misleading because "Defendants knew or were reckless in not knowing" that commission revenue was falling below those figures, "3.5% below the 'more of the same' $480 million reported in 3Q15." (FAC ¶ 97). Plaintiff has pled falsity as to this statement, as LPL's commission revenues for 4Q15 was reported at $463.5 million. (FAC ¶ 97).

(6) <u>Statements About Financial Flexibility</u>

Finally, Defendants take issue with the following allegation in the FAC:

> "By representing that LPL had the ability to generate cash to service debt that would fund the buy-back plan, Defendants mislead investors into believing the Company's earnings would be strong enough to carry substantial debt loads going forward." (FAC ¶ 110)

Defendants assert this is a repackaging of an argument the Court already denied with prejudice, i.e. that "defendants misled investors about LPL's financial flexibility to carry out the share repurchase." (ECF No. 36-1 at 18). Defendants contend the FAC remains deficient because it fails "to allege either that LPL breached any of its debt covenants on accord of the 4Q15 downturn or that LPL has experienced any difficulties in servicing its debt since then." (*Id.*)

Defendant is correct that the Court already dismissed Audette's statement that "I would just add that our debt plan and debt structure and buyback plan was

designed and built with having the flexibility to be dynamic over time" with prejudice. (ECF No. 28 at 15-16).

The Court holds Plaintiffs have failed to adequately plead the falsity of the above statements with the exception of Audette's statements about commission revenues.

**C. Section 20(a)**

Because the Court finds Plaintiff has not alleged a violation of Section 10(b) or Rule 10b-5, its claim under Section 20(a) must also be dismissed. *See Lipton*, 284 F.3d at 1035 n.15.

## V. <u>CONCLUSION</u>

Defendants' Motion to Dismiss is GRANTED with leave to amend. The court will sua sponte consider whether the Second Amended Complaint satisfies the deficiencies noted above. Defendants may submit a brief in argument that a final judgment of dismissal should be entered within 15 days of the filing of the Second Amended Complaint. Plaintiff may file an opposition brief 15 days after Defendants' brief is filed. Briefs may not exceed 12 pages each. The Court will thereafter rule whether a final judgment of dismissal should be entered or whether an answer should be filed. If Plaintiff has nothing further to add or wishes to appeal now, Plaintiff may file a notice of no intent to further amend. The Court will then enter a final and appealable judgment.

IT IS SO ORDERED.

Dated: March 29, 2019

Barry Ted Moskowitz

Honorable Barry Ted Moskowitz
United States District Judge